| 351 Conn. 511 | APRIL, 2025 | 511 |
|---|---|---|

In re Jewelyette M.

IN RE JEWELYETTE M.*
JOHN N. ET AL. *v.* COMMISSIONER OF
CHILDREN AND FAMILIES
(SC 21055)

IN RE JEWELYETTE M.
(SC 21068)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Elgo, Js.

*Syllabus*

The foster parents of the minor child, J, appealed from the decision of the trial court to remove them as intervenors in the dispositional phase of neglect proceedings concerning J. Although the foster parents were initially granted intervenor status, the trial court later granted the motion of the petitioner, the Commissioner of Children and Families, to remove them as intervenors during the pendency of the neglect proceedings in light of the Appellate Court's then recent decision in *In re Ryan C.* (220 Conn. App. 507), in which the court concluded that nonrelative foster parents are precluded by statute (§ 46b-129 (p)) from intervening in neglect proceedings. After the foster parents were removed as intervenors, and while their appeal from that removal was pending, the trial court held a hearing on the petitioner's motion to revoke the commitment of J to the petitioner's custody and ultimately granted the motion and transferred guardianship of J to J's biological father. Subsequently, the foster parents filed a writ of error challenging the court's decision on the motion to revoke. On appeal from the trial court's removal of them as intervenors, the foster parents claimed that *In re Ryan C.* was wrongly decided and that the trial court improperly had removed them as intervenors under that authority. In their writ of error, the foster parents claimed, inter alia, that the trial court had deprived them of their right to be heard and to comment under § 46b-129 (p) by barring them from attending the entire revocation hearing and from giving a sworn statement after hearing the evidence. *Held*:

The trial court improperly removed the foster parents as intervenors on the basis of *In re Ryan C.*, this court having concluded that *In re Ryan C.* was wrongly decided and must be overruled, and, accordingly, this court reversed the trial court's order removing the foster parents as intervenors and granted

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

In re Jewelyette M.

the foster parents' writ of error insofar as they sought reversal or vacatur of the trial court's revocation order, and the case was remanded for a new revocation hearing.

This court concluded that § 46b-129 (p) does not bar a trial court from granting a foster parent's request for permissive intervention in the dispositional phase of a neglect proceeding under the relevant rule of practice (§ 35a-4 (c)) and overruled *In re Ryan C.* to the extent that it held otherwise.

There was no question that nonrelatives are permitted to intervene in the dispositional phase of neglect proceedings under Practice Book § 35a-4 (c), so long as the court finds that it is in the child's best interest to do so, and, contrary to the Appellate Court's conclusion in *In re Ryan C.*, it was not evident that the legislature nullified the trial court's authority to grant foster parents permissive intervention under that rule of practice when it enacted an amendment (P.A. 01-142, § 8) to § 46b-129 (p) that replaced automatic standing for foster parents in such proceedings with an automatic right to be heard and to comment.

Nothing in the text of § 46b-129 (p), which expressly expands rather than restricts the rights of foster parents within its scope by affording them an automatic right to be heard and to comment, could be understood to prohibit permissive intervention; rather, this court concluded that § 46b-129 (p) clearly and unambiguously guarantees foster parents a right to be heard on the best interests of their foster children in any proceeding under § 46b-129, if they so wish, without the need to request permissive intervention.

The trial court deprived the foster parents of their right to be heard and to comment on J's best interest at the revocation hearing by only allowing the foster parents to make a statement at the start of the hearing and then excusing them from the remainder of that hearing.

Regardless of whether a foster parent has been granted intervenor status, under § 46b-129 (p), an eligible foster parent's "right to be heard and [to] comment on the best interests" of his or her foster child in any proceeding under § 46b-129 ordinarily will include the right to be present throughout the proceeding in question and to argue at the appropriate time as to the child's best interest in light of the evidence presented, but the right to be heard and to comment under § 46b-129 (p) does not encompass the right to call or cross-examine witnesses, or to appeal an adverse ruling, which are rights reserved exclusively for the parties to the proceeding.

Nonetheless, under § 46b-129 (p), in implementing the statutory requirements in any particular case, the trial court retains discretion, for good cause shown and within reasonable limits, to broaden or restrict a foster parent's right to be heard if the court concludes that such a modification is necessary to ensure that the proceeding is conducted in a manner that best serves the rights at stake and objectives to be achieved.

351 Conn. 511 APRIL, 2025 513

In re Jewelyette M.

(*One justice concurring in part and dissenting in part, with whom another justice joins in part; two justices dissenting in two opinions*)

Argued December 19, 2024—officially released March 21, 2025**

*Procedural History*

Petition, in the first case, by the Commissioner of Children and Families to adjudicate the respondents' minor child neglected, brought to the Superior Court in the judicial district of New Britain, Juvenile Matters, and tried to the court, *Abery-Wetstone, J.*; judgment adjudicating the minor child neglected and committing the minor child to the custody of the commissioner; petition, in the second case, by the foster parents of the minor child for a writ of habeas corpus, brought to the Superior Court in the judicial district of New Britain, Juvenile Matters; thereafter, the court, *C. Taylor, J.*, granted the foster parents' motion to intervene in the first case and their motion to consolidate the cases; subsequently, the court, *C. Taylor, J.*, granted the commissioner's motions for an order that the foster parents be removed as intervenors in the first case and to bifurcate the cases, and the foster parents appealed; thereafter, the foster parents filed a writ of error from, among other orders, an order of the court, *Daniels, J.*, granting the commissioner's motion to revoke the commitment of the minor child. *Reversed*; *writ of error granted in part*; *further proceedings*.

*Brandon B. Fontaine*, with whom was *Meaghan E. Collins*, for the appellants and plaintiffs in error (foster parents).

*Evan O'Roark*, assistant solicitor general, with whom, on the brief, was *William Tong*, attorney general, for the appellee and defendant in error (commissioner).

** March 21, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

In re Jewelyette M.

*James P. Sexton*, assigned counsel, for the minor child.

*Opinion*

ECKER, J. These appeals concern the legal rights of foster parents to participate, as intervenors or otherwise, in neglect proceedings with respect to the best interest of any child who either is currently living with the foster parents or has been in the foster parents' care within the year prior to the initiation of any such proceeding. The primary issue before us is whether General Statutes § 46b-129 (p)[1] prohibits foster parents from intervening in the proceedings by conferring on them a limited "right to be heard and comment" in the proceedings. We conclude that the statute does not prohibit a trial court from permitting foster parents to intervene in such proceedings.

Jewelyette M., who is now nearly ten years old, was committed to the care and custody of the petitioner, the Commissioner of Children and Families (commissioner), shortly after her birth in June, 2015. When she was two years old, the parental rights of her mother were terminated, and the commissioner placed her with preadoptive foster parents, John N. and Diana N. (foster parents). For the first half of Jewelyette's life, the commissioner's permanency plan called for terminating the parental rights of her father, John M.,[2] and for her adop-

_____

[1] General Statutes § 46b-129 (p) provides in relevant part: "A foster parent, prospective adoptive parent or relative caregiver who has cared for a child or youth shall have the right to be heard and comment on the best interests of such child or youth in any proceeding under this section which is brought not more than one year after the last day the foster parent, prospective adoptive parent or relative caregiver provided such care. . . ."

Although § 46b-129 (p) has been amended by the legislature since the events underlying this case; see, e.g., Public Acts 2024, No. 24-126, § 6; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] The father, John M., although a respondent in the underlying proceedings, is not a party to this appeal and for convenience is referred to in this opinion as John.

In re Jewelyette M.

tion. In 2020, the commissioner changed course and decided that Jewelyette should be reunited with John. John thereafter filed a motion to revoke Jewelyette's commitment to the custody of the commissioner. The trial court granted the foster parents' motion to intervene for the purpose of opposing revocation. Following a six day trial on diverse dates in 2022 and 2023, the court, *C. Taylor, J.*, denied the motion to revoke, finding that it was in Jewelyette's best interest to remain with her foster parents.

Soon after the trial court issued its decision in May, 2023, the Appellate Court released its opinion in an unrelated case, *In re Ryan C.*, 220 Conn. App. 507, 299 A.3d 308, cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023), in which the court held that § 46b-129 (p) prohibits foster parents from intervening in neglect proceedings. See id., 518–19, 525–26. The day following the release of the decision in *In re Ryan C.*, the commissioner filed a motion to remove the foster parents as intervenors in the present case. The motion was granted by the trial court. In SC 21055, the foster parents appeal[3] from that decision, claiming that the trial court improperly had removed them under the authority of *In re Ryan C.*, a case they contend misconstrued § 46b-129 (p). We agree that *In re Ryan C.* was incorrectly decided, and must be overruled, because the legislature did not intend § 46b-129 (p) to prohibit a trial court from granting permissive intervention to a foster parent when appropriate. Accordingly, we reverse the judgment of the trial court in SC 21055.

Following the foster parents' removal as intervenors, the commissioner filed a new motion to revoke Jewelyette's commitment, which the trial court, *Daniels, J.*,

---

[3] The foster parents appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

In re Jewelyette M.

granted after a brief hearing on November 4, 2024, the details of which will be described later in this opinion. In SC 21068, the foster parents claim that the trial court deprived them of their right to be heard in that proceeding under § 46b-129 (p) by not allowing them to be present during the entire hearing or to give sworn testimony, and by requiring them to give any statement at the start of the hearing without hearing the evidence. Because there is a chance the issue could arise on remand, and to prevent further delay in the proceedings, we address this aspect of the foster parents' claim in part III of this opinion. We conclude that a nonintervening foster parent's right to be heard normally will include the right to be present throughout the proceeding and to comment at the appropriate time on the evidence presented to the court.

I

When Jewelyette was born, both she and her mother tested positive for opiates and methadone. Jewelyette's withdrawal symptoms were so severe that she was kept in a neonatal intensive care unit for more than one month. Prior to her release from the hospital, the commissioner sought and obtained an order of temporary custody. Jewelyette was subsequently adjudicated neglected and committed to the commissioner's care and custody. At the time of her commitment, the trial court, *Abery-Wetstone, J.*, found that her father, John, who was then forty-nine years old, had "an extensive criminal history" and "a long-standing, substantial substance abuse history . . . ." (Internal quotation marks omitted.) John also had been "diagnosed with [attention deficit hyperactivity disorder], bipolar disorder, anxiety disorder, cocaine dependency, alcohol dependency and generalized anxiety," as well as "intermittent explosive disorder." (Internal quotation marks omitted.) John was incarcerated for much of Jewelyette's infancy, until she was approximately three years old.

In re Jewelyette M.

In 2016, the commissioner filed termination of parental rights (TPR) petitions as to both Jewelyette's mother and John, alleging a failure to rehabilitate. On May 18, 2017, the petition was granted as to the mother. Shortly thereafter, Jewelyette was placed in the care of her foster parents, where she remained until July, 2024. When she was four years old, the commissioner's permanency plan recommended the termination of John's parental rights and Jewelyette's adoption. Over John's objection, the trial court, *C. Taylor, J.*, approved that plan, and, on December 9, 2019, the commissioner filed a new TPR petition as to John, alleging a "failure to rehabilitate and acts of commission/omission . . . ."[4]

A trial on that petition was scheduled to begin in March, 2020, but was postponed due to the onset of the COVID-19 pandemic. In August, 2020, the commissioner filed an updated permanency plan, which continued to call for the termination of John's parental rights and for Jewelyette's adoption. John filed an objection to the plan, and, a short time later, the commissioner filed a new permanency plan, this time recommending reunification. Jewelyette's attorney objected to the new plan, and the trial court sustained her objection. In doing so, the court found that "John has never cared for a child of any age. . . . Jewelyette has never been in John's care at any time during her life. . . . John has spent the vast majority of Jewelyette's life of five years and seven months either incarcerated or on parole. Counsel for Jewelyette accurately points out that [the Department of Children and Families (department)] has supplied no therapeutic or scientific evidence to support reunification. There is no credible evidence indicating that [the department] sought any psychological professional's review or insight before deciding that reunifica-

---

[4] The "acts of commission/omission" alleged in the petition referred to a 2019 larceny conviction, which John had failed to disclose to the Department of Children and Families.

In re Jewelyette M.

tion was appropriate. Under cross-examination by counsel for [Jewelyette], [the department's case worker] admitted that [the department had] failed to seek any update[d] [psychological] evaluation [of John] . . . . [John] has worked hard to accomplish his rehabilitation. However, his own personal rehabilitation does not automatically make him an appropriate parent for Jewelyette.''

Thereafter, the department ordered an updated psychological evaluation of John. Following the completion of that evaluation, in 2021, John filed a motion to revoke Jewelyette's commitment, asserting that he had ''successfully completed all expectations under his court-ordered specific steps . . . [and that] the court-ordered evaluation supports and recommends reunification . . . .'' By this time, Jewelyette was six years old and deeply bonded with her foster parents, whom John had long suspected of turning Jewelyette against him.[5]

---

[5] Stephen M. Humphrey, the clinical psychologist who conducted three psychological evaluations of John in 2017, 2019 and 2021, testified at the 2022 revocation hearing that, during the most recent evaluation, Jewelyette ''quite loudly'' and repeatedly told John that she did not ''want to be around him'' or to ''live with him.'' She stated many times ''that he's a liar. She [didn't] refer to him by any other name except for that man who lies . . . .'' John's attorney asked Humphrey why he thought Jewelyette was ''engaging in rejecting behaviors . . . .'' Humphrey replied that the level of antipathy Jewelyette exhibited toward John was reminiscent of custody disputes he had seen in family court, in which ''a child has developed an utter rejection, an absolute rejection [of] one parent.'' Humphrey further stated that, ''when Jewelyette refers to [John] as a liar, she focuses mostly on one thing, and that is that he has told her that her foster parents aren't her parents, and her foster sister is not her sister. She's . . . confused and disoriented and upset by that.'' According to Humphrey, Jewelyette's perception of John as a liar ''wasn't totally without basis'' because, in ''her reality, [the foster parents] were her parents . . . . [They were] her parents . . . and to tell her [that they were not was] . . . hurtful to her and beyond her comprehension.'' Humphrey testified that John's remarks challenged not only Jewelyette's reality, ''but one of the most important parts of her reality: who her family [was].'' Humphrey ultimately had to stop the 2021 evaluation because of the discord between John and Jewelyette. Humphrey testified that John ''didn't have the skill set or the sort of awareness'' to control his emotions

In re Jewelyette M.

In November, 2021, the commissioner notified the foster parents that Jewelyette would be removed from their care in approximately one week's time and placed in the care of John's sister. The foster parents responded by filing (1) an application for a writ of habeas corpus under General Statutes § 52-466 (f),[6] which allows foster parents to seek legal custody of their foster children, (2) an application for a temporary injunction barring Jewelyette's removal from their home until the court ruled on the habeas petition, and (3) a motion to intervene. The trial court granted the temporary injunction, as well as the foster parents' motion to intervene for the limited purpose of opposing the department's permanency plan and John's motion to revoke as contrary to Jewelyette's best interest. Thereafter, the commissioner filed a motion to vacate the temporary injunction, arguing that the foster parents "have and continue to take steps to further damage the relationship between Jewelyette and her biological family and that further time . . . in the home of the [foster parents] runs the risk of irreparably damaging the prospects of reunification." The trial court later consolidated the foster parents' habeas petition with John's motion to revoke and the commissioner's motion to vacate the temporary injunction.

With the foster parents participating as intervenors, a trial on the consolidated matters commenced in April,

_____

around Jewelyette or to refrain from saying things that alienated her. When asked how often in his twenty-seven year career he had been forced to stop an interactional study of a parent and child due to the parent's inability to control himself, Humphrey responded, "I would say I do about forty child protection evaluations [per] year. I would say I have to stop them very rarely, maybe I've done it six or seven times in my career . . . [so] every few years."

[6] General Statutes § 52-466 (f) provides: "A foster parent or an approved adoptive parent shall have standing to make application for a writ of habeas corpus regarding the custody of a child currently or recently in his care for a continuous period of not less than ninety days in the case of a child under three years of age at the time of such application and not less than one hundred eighty days in the case of any other child."

2022. In May, 2022, Jewelyette's attorney of almost seven years, Elizabeth Berman, filed a motion to withdraw as her counsel. Berman informed the court that John's behavior toward her had so "unnerved" her that she did not feel that she could continue representing Jewelyette. Although concerned that Berman's withdrawal would cause a lengthy delay in the proceedings, the trial court reluctantly granted the motion, stating that, while John's behavior was "extremely concern[ing]" and the court was thinking of turning Berman's allegations over to the state's attorney's office, it would have been preferable if Berman had "thicker skin" and remained Jewelyette's attorney.

The trial resumed six months later, in November, 2022. Over the course of six nonconsecutive days, the court heard testimony from numerous witnesses, including Stephen M. Humphrey, the clinical psychologist who conducted psychological evaluations of John in 2017, 2019 and 2021; Haley McDonald, Jewelyette's therapist; and various other social workers, visitation supervisors and department employees familiar with the case. At the conclusion of the evidence, Jewelyette's new attorney, Roger E. Chiasson II, urged the court to deny John's motion to revoke and to grant the foster parents' application for guardianship. Chiasson argued that Jewelyette's foster parents were the only parents she had ever known, that she strongly identified as a member of their family and that removing her from their care could cause irreparable, psychological harm. He further argued that Jewelyette had made it clear to him that she wanted "to be with [her] mommy and . . . daddy and her sister," not with John.

John's attorney countered that Jewelyette's antipathy toward John was the product of the foster parents' influence and that John had done everything the department had asked of him to achieve reunification. Michael J. Besso, the assistant attorney general representing the

commissioner, did not dispute that there was "a lot of evidence about the good relationship between the foster parents and [Jewelyette]. . . . Is that relationship stronger than it is with [John]? Yes, it is. . . . Humphrey notes that. The department recognizes that." He argued, however, that Humphrey had also testified that, although removing Jewelyette from her foster parents' home would present a number of "challenges," removal could be successful with the right psychological supports in place. He further argued that, to defeat the motion to revoke, Jewelyette's attorney and her foster parents had to prove that it would be "detrimental" to Jewelyette to be taken from her foster parents, and no such evidence had been produced. Besso also argued that the evidence strongly suggested that Jewelyette's anxiety and discomfort around John were attributable to her foster parents' influence rather than anything John was doing.

In a memorandum of decision dated May 15, 2023, the trial court denied the motion to revoke. The court began by explaining that the party seeking revocation has the burden of establishing by a preponderance of the evidence that cause for commitment no longer exists; if that burden is met, then the party opposing revocation must demonstrate by clear and convincing evidence that revocation is not in the child's best interest. The court found that, although "John ha[d] resolved some of the issues [that previously] plagued him," his "mental health and parenting issues ha[d] not adequately resolved so as to allow [him] to be a safe, responsible and nurturing father for Jewelyette."

In reaching its determination, the court rejected John and the commissioner's claim that the foster parents were responsible for Jewelyette's negative feelings toward John. The court found "no credible evidence to indicate that anyone [other than John himself had] done anything to alienate Jewelyette from him." The court

In re Jewelyette M.

further found that, "[d]espite [being given] information concerning the proper way to conduct himself in his visitation with Jewelyette, John . . . insisted on conduct[ing] himself . . . in the manner that he [saw] fit . . . regardless of the harm and anxiety that it cause[d] Jewelyette. His conduct [was] clearly not an appropriate way . . . to treat . . . [an] anxious and fragile child. . . . The record is replete with credible examples of conduct . . . indicating that John ha[d] failed to address his parenting issues." The trial court also credited the testimony of Jewelyette's therapist that Jewelyette recently had informed her "that, if she had to visit John again, she would run into traffic," as well as the testimony of Jewelyette's visitation supervisor and school tutor, who testified that Jewelyette often refused to attend visits with John and would hide from department personnel when they came to take her to visits. In light of the foregoing, the court determined that John "failed to demonstrate that the factors that resulted in his removal as guardian ha[d] been resolved satisfactorily."

Because John had failed to demonstrate that cause for commitment no longer existed, Jewelyette and the foster parents were not required to demonstrate that continued commitment was in Jewelyette's best interest. Nevertheless, "in an abundance of caution," the court proceeded to find by clear and convincing evidence that Jewelyette and the foster parents had established that it was in Jewelyette's best interest to remain with her foster family. The court stated in relevant part: "Jewelyette does not accept John as her parent. She sees the foster parents as her parents. The clear and [convincing evidence] shows that she will never accept John as her parent, regardless of whatever duress is placed [on] her to accept John in that role. The conduct of John has served to alienate Jewelyette from him. [The department] has allowed John to conduct himself

351 Conn. 511 APRIL, 2025 523

In re Jewelyette M.

in whatever manner that he wishes . . . during visitation and has done little to correct him, despite the anxiety and discomfort that [his conduct] causes Jewelyette. John shows no prospects of correcting his parenting to an acceptable level. He is hell-bent on parenting in his way, despite the fact that he has never previously raised a child and . . . has been told otherwise. In fact, [the department] has supported his aberrant parenting by removing professionals from the case who dared to dissent." The court concluded: "Jewelyette has experienced anxiety and discomfort in her short life. Her stability and her hope for the future lie in the stable placement that she has with [her] foster family. To remove her from it would be to blight her life in perpetuity."

Two months after the court issued its decision, the Appellate Court released its decision in *In re Ryan C.*, supra, 220 Conn. App. 507. On the basis of that decision, the commissioner filed in the trial court a motion to remove the foster parents as intervenors and to bifurcate the foster parents' habeas petition and the neglect proceeding, which the trial court granted on December 11, 2023. The foster parents filed the present appeal (SC 21055) from the order removing them as intervenors.

In the interim, the commissioner filed a new revocation motion and permanency plan, calling for revocation of Jewelyette's commitment and a transfer of guardianship to John's sister. The case was reassigned to a different judge, and, on July 16, 2024, the trial court, *Daniels, J.*, granted in part the commissioner's ex parte motion for emergency relief to vacate the 2021 injunction preventing Jewelyette's removal from her foster parents' home.[7] Specifically, the court "provide[d] tem-

_____

[7] In support of the ex parte motion for emergency relief, the commissioner alleged that, since Judge Taylor's denial of the previous motions to revoke and to vacate the temporary injunction, Jewelyette "has suffered and deteriorated while in the foster home placement." Attached to the motion for emergency relief was a letter written by Juliette Cole, a licensed professional

In re Jewelyette M.

porary relief from the temporary injunction'' by allowing Jewelyette to be placed in the home of her paternal aunt ''until such time as the court [could] hold a hearing to consider the request to vacate the temporary injunction . . . .'' Jewelyette, who had recently turned nine years old, was removed from her foster parents' home that same day, and, on August 26, 2024, she was placed with John for a trial reunification period. The commissioner then filed an amended permanency plan recommending revocation and a transfer of guardianship to John, rather than to John's sister.

A hearing on the commissioner's motion to revoke was held on November 4, 2024. The hearing was uncontested because the foster parents had been removed as intervenors. Prior to the start of the hearing, the foster parents sought to exercise their right to be heard pursuant to § 46b-129 (p). Their attorney, Rachael M. Levine, argued that, if the right to be heard meant anything, it must, at a minimum, permit foster parents to be present during the hearing and to give a sworn statement at the conclusion of the hearing, after hearing all of the evidence. ''[F]or clarity of the record,'' Levine stated that it was the foster parents' position that ''they were wrongfully removed under [*In re*] *Ryan C.*'' and that the trial court should refrain from deciding the commissioner's motion to revoke until after this court released its decision in their appeal from the order removing them as intervenors. The trial court stated its view that the law allowed the court to proceed on the commissioner's motion to revoke notwithstanding the pending appeal and that the foster parents' right to be heard entitled them only to make a statement prior to the

counselor to whom Jewelyette was referred by the department after Judge Taylor denied the first motion to revoke. Cole stated that, ''[w]hen I have seen Jewelyette with her [a]unt, [John], [and department] workers, she is smiling, laughing, euthymic, making jokes, and willing to engage. When I have seen Jewelyette with her [f]oster [p]arents . . . Jewelyette is tense, guarded, verbally aggressive, dysthymic, and minimally willing to engage.''

In re Jewelyette M.

start of the hearing. They did so and then were directed to leave.

At the conclusion of the hearing, Jewelyette's attorney, Deetta C. Roncone-Gondek, and guardian ad litem, Martha Stone, both of whom were appointed after the foster parents were removed as intervenors, asked the court to impose a six month period of protective supervision as a condition of revocation, arguing that protective supervision was warranted given Jewelyette's fragile emotional state, John's lack of parenting experience, and the fact that Jewelyette continued to express a desire to return to her foster parents.[8] Roncone-Gondek informed the court that she had visited Jewelyette the night before and that, while Jewelyette previously had expressed a desire to live with John, she spontaneously offered the previous night that she wanted to live with her foster parents, that she preferred their rules to John's, and that she did not like John's house or the fact that he smoked cigarettes. According to Roncone-Gondek, Jewelyette had also stated that, if she could not live with her foster parents, then she preferred to live with her aunt, but, if that were not possible, then she would like to live with John, although she feared he would not let her see her foster parents. According to Roncone-Gondek, Jewelyette informed her that she was "having a hard time because [she] didn't really get to say goodbye to [her foster parents]. It just happened really fast." Jewelyette further stated that she wanted Roncone-Gondek and the department to stay involved in her case. She "appeared anxious at the idea of [the department] and [Roncone-Gondek] not being around."

Roncone-Gondek concluded her remarks by stating: "I think it's clear that the system has failed Jewelyette.

_____

[8] At the November 4, 2024 hearing, the guardian ad litem informed the court that Jewelyette "was [in] a psychiatric unit less than [one] week ago. I think she ended up staying overnight there." Jewelyette was taken to the hospital after threatening to kill herself if she was not allowed to return to her foster parents.

In re Jewelyette M.

I won't remark on who specifically, or how it happened, because I think, quite frankly, we all played a role. We've played a role in that since the inception of this case many, many years ago. I strongly believe and assert that, should this court revoke commitment and close out without a period of [protective supervision], as [the department] is suggesting, that would be failing her once again. We have this threat of litigation constantly hanging over our heads, and we all want to resolve that, but not at the expense of [Jewelyette]. . . . [A]s to the revocation, I will leave that decision to the court's discretion. As Jewelyette's position has continued to vacillate and often vacillates in a single visit, I would ask the court absolutely to order a period of protective supervision should the revocation be granted.''

After Roncone-Gondek finished speaking, the trial court found by a preponderance of the evidence that cause for commitment no longer existed, that revocation of commitment was in Jewelyette's best interest, and that guardianship should be transferred to John subject to a six month period of protective supervision (November 4 order). The court then congratulated and complimented John for his persistence, observing that there must have been ''plenty of times during the life of this case that you might've been tempted to just throw in the towel, but your perseverance is paying off today.''

The foster parents thereafter filed a writ of error (SC 21068),[9] claiming, among other things, that the trial court had violated their right to be heard under § 46b-129 (p) by barring them from the November 4, 2024 revocation hearing and by not allowing them to give sworn testimony. On December 19, 2024, this court heard oral arguments on the foster parents' writ of error

_____

[9] The foster parents brought the writ of error in the Appellate Court, and we transferred the writ to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

In re Jewelyette M.

and appeal from the order removing them as intervenors.

Approximately three weeks later, John was admitted to the hospital for treatment of an unspecified illness, and he passed away on or about January 21, 2025. On January 23, 2025, the commissioner filed an "ex parte motion to open and modify the disposition of protective supervision and [to] transfer guardianship by agreement" to John's sister. The trial court granted this motion that same day. On January 24, 2025, the commissioner moved to dismiss this appeal and writ of error, arguing that both were moot because there was no practical relief this court could afford the foster parents in light of what the commissioner referred to as the trial court's "interim order" of January 23, 2025, which the commissioner argued "superseded" all previous orders.[10] This court denied the motions to dismiss[11] and, additionally, granted the foster parents' motion to stay the November 4 order until this court decided the merits

---

[10] The commissioner characterized the trial court's January 23, 2025 order as an "interim order" because the trial court ordered a full hearing on the motion, to be held on January 27, 2025, at which the foster parents would be afforded their statutory right to be heard on the proposed modification. See General Statutes § 46b-129 (p). Although it is not clear from the record when the trial court scheduled the January 27 hearing, because the foster parents, by statute, must have an opportunity to be heard in connection with any such motion, we agree with the foster parents that the January 23 order is best understood as an interim order for the paternal aunt to serve as temporary guardian following John's death, until a full hearing on the commissioner's motion to open and modify the judgment could be held.

[11] The commissioner claimed that the foster parents' appeal and writ of error should be dismissed as moot because there no longer was any practical relief this court could afford the foster parents in light of the trial court's January 23, 2025 ex parte order, which the commissioner argued "superseded" the November 4 order revoking commitment. We denied the motions to dismiss on February 6, 2025, for two reasons. First, the ex parte order was an interim and nonfinal order entered ex parte, without a hearing and without evidence. See footnote 10 of this opinion. For that reason alone, it did not moot any aspect of the matters sub judice in this court. The trial court's interim order itself plainly does not moot the appeal because it was entered on a temporary, ex parte basis, without a hearing, without evidence, and without meeting the statutory requirements of § 46b-129 (p). As such, it was neither final nor irrevocable. See, e.g., *Los Angeles County* v. *Davis*,

In re Jewelyette M.

440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979) ("jurisdiction, properly acquired, may abate if the case becomes moot because . . . interim relief or events have completely and irrevocably eradicated the effects of the alleged violation [giving rise to the appeal]" (citations omitted)); see also 13B C. Wright et al., Federal Practice and Procedure (3d Ed. 2008) § 3533.1, p. 739 ("when a case remains alive but faces the prospect of imminent mootness . . . [t]he ordinary conclusion is that a suit remains justiciable [even if there is] a strong probability that a mooting event will soon occur"); id., pp. 739–41 n.23 (citing cases); 13B C. Wright et al., Federal Practice and Procedure (Supp. 2011) § 3533.1, p. 54 n.23 (citing cases); cf. *J. Y.* v. *M. R.*, 215 Conn. App. 648, 654, 665–66, 283 A.3d 520 (2022) (disagreeing with defendant's argument that "interim [custody] orders" under *Yontef* v. *Yontef*, 185 Conn. 275, 440 A.2d 899 (1981), were final, as "the [trial] court plainly stated that the interim orders were temporary in nature and that final orders disposing of the initial modification motions were forthcoming").

Second, and more fundamental, the commissioner's motion to open and modify the judgment, even if granted on a noninterim basis, did nothing more than modify the judgment on appeal for the limited purpose of transferring guardianship to John's sister rather than to John himself. That modification does not alter the availability of the relief sought by the foster parents here. In deciding questions of mootness, "there is a substantive distinction between opening a judgment to modify or to alter incidental terms . . . leaving the essence of the original judgment intact, and opening a judgment to set it aside. Under the latter circumstances, the original judgment necessarily has been rendered void and any appeal therefrom would be rendered moot." *RAL Management, Inc.* v. *Valley View Associates*, 278 Conn. 672, 690, 899 A.2d 586 (2006). "[T]he appropriate question is whether the change to the judgment has affected the issue on appeal. If . . . the trial court reverses itself and resolves the matter at issue on appeal in the appellant's favor, it is clear that the appeal is moot as there is no further practical relief that may be afforded. . . . Conversely, if the judgment is opened to address issues entirely unrelated to the appeal, the opening of the judgment has had no effect on the availability of relief. A more difficult question may be presented if the trial court addresses the matter at issue on appeal, but does not entirely afford the appellant the relief sought. In such cases, the extent to which the trial court alters the judgment may require either a new appeal or an amended appeal," which "is [a] fact sensitive" determination. (Citations omitted; internal quotation marks omitted.) Id., 691–92. In comparing a prior and subsequent order for purposes of determining appellate jurisdiction, practical relief remains available when an appeal challenges any portion of the prior order that was not "nullified" or "in any other way vitiated" by the subsequent order. *Thunelius* v. *Posacki*, 193 Conn. App. 666, 686 n.17, 220 A.3d 194 (2019).

The relief sought by the foster parents in this court is reversal of the November 4, 2024 order revoking commitment, restoration of their rights as intervenors, and a new revocation hearing at which they will have the opportunity to present evidence and argument concerning Jewelyette's best interest. If the foster parents were to prevail on appeal (as, it turns out, they do), then the foster parents are entitled to a new revocation hearing

In re Jewelyette M.

of the foster parents' claims. Additional facts and procedural history will be set forth as necessary.

II

The foster parents first claim that the trial court improperly removed them as intervenors under the authority of *In re Ryan C.*, which they argue was wrongly decided and should be overruled. The facts of *In re Ryan C.* mirror the facts of the present case. There, the trial court granted the foster mother's motion to intervene for purposes of opposing a motion to revoke the commitment of her foster child, Ryan. See *In re Ryan C.*, supra, 220 Conn. App. 516. After a trial, the court found that revocation was not in Ryan's best interest and granted the foster mother's motion to transfer guardianship of him to her. See id., 517–18. Ryan's father appealed on the ground that the trial court lacked the authority to grant the foster mother's motion to intervene. See id., 518–19, 521–22. The Appellate Court agreed, concluding that, although Practice Book § 35a-4 (c)[12] authorizes the trial court to grant permissive

at which the necessary best interest determination is conducted with the foster parents allowed to participate in accordance with law. There are no findings in the January 23, 2025 order that nullify the trial court's November 4, 2024 findings concerning revocation. Because the trial court did not reverse itself with respect to revocation or otherwise resolve the issue in the foster parents' favor, the foster parents' claims concerning the order are not moot. See *RAL Management, Inc.* v. *Valley View Associates*, supra, 278 Conn. 691–92. It is, of course, true that John is no longer living, but that fact does not alter the legal landscape vis-à-vis the foster parents—the only change is that reversal of the order prior to John's death would have meant that custody of Jewelyette reverted back to the commissioner from John, whereas, now, custody would revert back to the commissioner from the aunt. Justice D'Auria disagrees that John's death did not alter the relief available to the foster parents in this appeal. In his dissenting opinion, Justice D'Auria contends that John's death mooted the foster parents' claims by "irreparably chang[ing] . . . the case in which the foster parents initially sought to intervene." In our view, as we explain more fully in footnote 30 of this opinion, Justice D'Auria's position lacks both legal and factual support.

[12] Practice Book § 35a-4 (c) provides in relevant part: "Other persons unrelated to the child or youth by blood, marriage or law . . . may move to intervene in the dispositional phase of the case, and the judicial authority may grant said motion if it determines that such intervention is in the best interests of the child or youth or in the interests of justice."

In re Jewelyette M.

intervenor status to nonrelatives, § 46b-129 (p) precludes the intervention of nonrelative *foster parents*. See id., 526–27, citing *In re Shanaira C.*, 297 Conn. 737, 750–53, 1 A.3d 5 (2010); see also *In re Shanaira C.*, supra, 750 (father's girlfriend was properly granted intervenor status to oppose revocation of child's placement with biological mother).

In reaching its determination, the Appellate Court relied principally on a 2001 amendment to General Statutes (Rev. to 2001) § 46b-129 (o) (now subsection (p)). See *In re Ryan C.*, supra, 220 Conn. App. 523, 525–26. The court observed that, "[p]rior to the legislature's adoption of No. 01-142, § 8, of the 2001 Public Acts (P.A. 01-142), § 46b-129 stated that '[a] foster parent shall have standing for the purposes of this section in Superior Court in matters concerning the placement or revocation of commitment of a foster child living with such parent.' General Statutes (Rev. to 2001) § 46b-129 (o). Significantly, in 2001, 'standing' was replaced with 'the right to be heard . . . .' P.A. 01-142, § 8." *In re Ryan C.*, supra, 523. The court reasoned that, "[w]hen the legislature amends the language of a statute, it is presumed that it intended to change the meaning of the statute and to accomplish some purpose. . . . Therefore, by enacting P.A. 01-142, § 8, the legislature purposefully limited a foster parent's participation in neglect proceedings to the right to be heard . . . ." (Citation omitted; internal quotation marks omitted.) Id., 526. The court expressed the view that, because

Subsection (d) of that section further provides: "In making a determination upon a motion to intervene, the judicial authority may consider: the timeliness of the motion as judged by the circumstances of the case; whether the movant has a direct and immediate interest in the case; whether the movant's interest is not adequately represented by existing parties; whether the intervention may cause delay in the proceedings or other prejudice to the existing parties; the necessity for or value of the intervention in terms of resolving the controversy before the judicial authority; and the best interests of the child or youth." Practice Book § 35a-4 (d).

§ 46b-129 (p) limits a foster parent's participation in neglect proceedings, that provision must take "precedence over the more general language of Practice Book § 35a-4 [insofar as] § 46b-129 (p) specifically addresses foster parents' rights in neglect proceedings." (Emphasis omitted.) Id.

In this appeal, the foster parents claim that the Appellate Court incorrectly concluded in *In re Ryan C.* that, by changing the word "standing" to "the right to be heard" in General Statutes (Rev. to 2001) § 46b-129 (o), the legislature intended to divest the trial court of its authority to grant foster parents permissive intervenor status under Practice Book § 35a-4. They argue that the legislative history belies any such intent. According to the foster parents, the purpose of the 2001 amendment was merely to conform the language of our juvenile statutes to the federal Adoption and Safe Families Act of 1997 (ASFA), Pub. L. No. 105-89, 111 Stat. 2115, which is widely perceived as having expanded the rights of foster parents, not restricted them. The foster parents also point out that courts that have interpreted "the right to be heard" language at issue have held that a foster parent's right to be heard exists in addition to any right they may otherwise have to intervene.

During oral arguments before this court, the commissioner's counsel conceded that § 46b-129 (p) is ambiguous as to whether it precludes foster parent intervention and that the legislative history cited by the foster parents supports their interpretation of the 2001 amendment. The commissioner argues, however, that *In re Ryan C.* reached the right result, even if it did so for the wrong reason. She contends that the 2001 amendment is "irrelevant" in light of a 2009 amendment to the statute enacting what is now § 46b-129 (d); see Public Acts 2009, No. 09-185, § 3; which, according to the commissioner, "sets forth a comprehensive scheme for intervention in neglect cases" that "plainly and unambiguously

In re Jewelyette M.

reserves intervention for 'any person related to the child or youth by blood or marriage . . . .' " Based on the 2009 amendment, the commissioner proposes that, "[e]ven if the foster parents are right that the 2001 amendment granting them a right to be heard left the door open to permissive intervention, the General Assembly closed that door in 2009 by enacting subsection (d). In other words, it does not matter what certain 2001 legislators thought subsection (p) meant. We know now [as a result of the 2009 amendment] that the legislature . . . wants [only] relatives intervening." As an alternative ground for affirmance, the commissioner argues that, even if we conclude that *In re Ryan C.* was wrongly decided and that subsection (d) does not bar foster parents from intervening, under the circumstances of this case, we should conclude that the trial court abused its discretion in granting the foster parents' motion to intervene.

To the extent this appeal turns on a question of statutory construction under General Statutes § 1-2z,[13] our review is plenary. See, e.g., *131 Beach Road, LLC* v. *Town Plan & Zoning Commission*, 349 Conn. 647, 670, 321 A.3d 382 (2024).

It is undisputed that our rules of practice authorize nonrelatives to intervene in the dispositional phase of juvenile proceedings. Practice Book § 26-1 (m) (3) defines "parties" to a juvenile proceeding to include "any person who is permitted to intervene in accordance with [Practice Book §] 35a-4." Practice Book § 35a-4 (c), in turn, provides that "persons unrelated to the child or youth by blood, marriage or law . . . may

[13] "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z.

351 Conn. 511 APRIL, 2025 533

In re Jewelyette M.

move to intervene in the dispositional phase of the case, and the judicial authority may grant said motion if it determines that such intervention is in the best interests of the child or youth or in the interests of justice.'' It is well established that a revocation hearing is a dispositional phase of a neglect proceeding. See, e.g., *In re Santiago G.*, 318 Conn. 449, 469–70, 121 A.3d 708 (2015); *In re Shanaira C.*, supra, 297 Conn. 758–59; see also Practice Book § 35a-14A.

Prior to *In re Ryan C.*, we are not aware of any court, party, agency or legislator ever questioning the trial court's authority to grant foster parents permissive intervenor status in the dispositional phase of a neglect proceeding. Indeed, until 2001, what is now § 46b-129 (p) unambiguously granted foster parents *automatic* standing in such proceedings. See *In re Ryan C.*, supra, 220 Conn. App. 525 (''prior to 2001, foster parents historically had standing to intervene''). This court has long held that, in juvenile proceedings, ''questions of permissive intervention are committed to the sound discretion of the trial court . . . .'' *In re Baby Girl B.*, 224 Conn. 263, 277, 618 A.2d 1 (1992); see also *In re Shanaira C.*, supra, 297 Conn. 744 (''[the father's girlfriend was] properly . . . granted intervenor status . . . for the purpose of . . . exercising her right to oppose the commissioner's motion to revoke''); *In re Vincent D.*, 65 Conn. App. 658, 665–66, 783 A.2d 534 (2001) (''[a]lthough foster or preadoptive parents are barred from intervening in the *adjudicatory* phase of termination proceedings, neither our statutes nor our case law bar[s] such intervention in the *dispositional* phase of such proceedings'' (emphasis in original)).

That said, we readily acknowledge that the legislature possesses the authority to enact legislation barring foster parents from intervening. It is well established that ''the expectations and entitlements of foster families can be limited by the state.'' (Internal quotation marks

In re Jewelyette M.

omitted.) *Hunte* v. *Blumenthal*, 238 Conn. 146, 164, 680 A.2d 1231 (1996); see id. ("[t]he rights of foster parents are defined and restricted by statute"). "[A]lthough [t]he Superior Court is empowered to adopt and promulgate rules regulating pleading, practice and procedure . . . [s]uch rules shall not abridge, enlarge or modify any substantive right . . . ." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 639, 847 A.2d 883 (2004). Thus, when "a statute creates a substantive right [or prohibition], a conflicting [P]ractice [B]ook rule cannot stand." (Emphasis omitted; internal quotation marks omitted.) Id., 639 n.24. The issue, therefore, is not whether the legislature can prohibit foster parents from intervening in the dispositional phase of a proceeding held pursuant to § 46b-129, thereby nullifying the authority conferred on trial courts in Practice Book § 35a-4 (c). Rather, we must determine whether the legislature has in fact done so via various amendments to that statute.

We begin with the language of the statute. Section 46b-129 (p) provides in relevant part that "[a] foster parent . . . shall receive notice and have the right to be heard for the purposes of this section in Superior Court in any proceeding concerning a foster child living with such foster parent . . . ." For purposes of subsection (p), "this section" refers only to § 46b-129, which governs orders of temporary custody, temporary and permanent legal guardianship, permanency planning and revocation of commitment hearings.

It is not evident to us that, by affording foster parents an automatic right to be heard in neglect proceedings, subsection (p) of § 46b-129 prohibits foster parents from seeking permissive intervenor status to participate as parties in those proceedings. Intervention is not even mentioned in subsection (p), and nothing in the text of the provision can be understood to prohibit intervention. In fact, the express terms of the statute expand

In re Jewelyette M.

rather than restrict the rights of foster parents within its scope (i.e., foster parents whose care of the child is ongoing or occurred not more than one year prior to the proceeding being brought) by providing them with an automatic right to be heard. This is a right that *privileges* foster parents by guaranteeing them a right that most other people—including most family members—do not have. For this reason, the text of subsection (p) does not support a construction that imposes a limitation on the trial court's authority to permit a foster parent to intervene in accordance with Practice Book § 35a-4 (c). In our view, subsection (p) clearly and unambiguously guarantees foster parents a right to be heard on the best interests of their foster children in any proceeding under the statute, if they so wish, without the need to request permissive intervention.

In *In re Ryan C.*, the Appellate Court reached a different conclusion on the basis of the changes implemented by the 2001 amendment. See *In re Ryan C.*, supra, 220 Conn. App. 525–26. As the Appellate Court explained, prior to 2001, what is now subsection (p) of § 46b-129 provided that " '[a] foster parent shall have standing for the purposes of this section in Superior Court in matters concerning the placement or revocation of commitment of a foster child living with such parent.' " *In re Ryan C.*, supra, 523, quoting General Statutes (Rev. to 2001) § 46b-129 (o). In 2001, the legislature replaced "shall have standing" with "shall have the right to be heard . . . ." P.A. 01-142, § 8. Because standing connotes party status, the Appellate Court reasoned that, by ending foster parents' automatic party status, the legislature must have intended to foreclose the right of foster parents to seek permissive party status, as well. See *In re Ryan C.*, supra, 525–26. Again, we do not agree that, by eliminating *automatic* party status (standing as of right), it reasonably follows that the legislature intended to end *permissive* intervention, as well.

In re Jewelyette M.

Although we find the statute unambiguous with respect to this issue, we will nonetheless examine the legislative history for the purpose of responding substantively to, and out of due regard for, the analysis set forth by the Appellate Court in *In re Ryan C.*[14] The limited relevant legislative history of the 2001 amendment refutes the notion that the legislature had any intention of withdrawing the trial court's authority to allow foster parents to intervene in a proceeding within the purview of § 46b-129. When discussing what would later become § 8 of P.A. 01-142, the bill's sponsor, Senator Mary Ann Handley, explained that the proposed amendment "changes the rights of foster parents in permanency hearings and expands the number of interested parties who will be given information about the . . . hearings . . . ." 43 S. Proc., Pt. 6, 2000 Sess., p. 2076. When asked by Senator John McKinney whether the amendment changed the word "standing" to "the right to be heard" to conform the language of General Statutes (Rev. to 2001) § 46b-129 (o) to the federal ASFA,[15] Senator Handley responded that it did. See id., p. 2077. Senator McKinney then expressed, "for purposes of legislative intent," his "concern" that the proposed change could be interpreted as "prohibit[ing] a

---

[14] Although the Appellate Court's decision does not examine whether § 46b-129 (p) is ambiguous, and the court does not otherwise reference the analysis prescribed in § 1-2z, we assume that that court found that § 46b-129 (p) was ambiguous as it relates to intervention because the court delved into the statute's genealogy and legislative history, which it ultimately found dispositive. See *In re Ryan C.*, supra, 220 Conn. App. 525–26.

[15] As originally enacted, the ASFA required states to ensure "the foster parents (if any) of a child and any preadoptive parent or relative providing care for the child are provided with notice of, and an opportunity to be heard in, any review or hearing to be held with respect to the child, except that this subparagraph shall not be construed to require that any foster parent, preadoptive parent, or relative providing care for the child be made a party to such a review or hearing solely on the basis of such notice and opportunity to be heard." Adoption and Safe Families Act of 1997 (ASFA), Pub. L. No. 105-89, § 104 (3), 111 Stat. 2115, 2120 (codified at 42 U.S.C. § 675 (5) (G) (Supp. III 1997)).

In re Jewelyette M.

court if it thought it was in the best interest of [the child, from] granting standing to foster parents." Id., p. 2078. Senator Handley responded, "[t]he federal law does not preclude nor does this law preclude foster parents or others having standing if a judge so decides." Id. Senator McKinney responded, "Thank you, Senator Handley. . . . Again, I support this amendment. I just want to [ensure] that should a foster parent believe that there are problems with a permanency plan and [wish] to seek leave of [the] court [to intervene], they have the right to do so and I . . . thank Senator Handley for her help." Id., pp. 2078–79.

The discussion between Senators Handley and McKinney makes two things clear. The 2001 amendment (1) eliminated the automatic standing that foster parents previously enjoyed under General Statutes (Rev. to 2001) § 46b-129 (o), and (2) was not intended to prevent foster parents from seeking permissive intervenor status.[16]

Like Connecticut, many states amended their child protection statutes following passage of the ASFA.[17]

[16] Although the discussion between Senators Handley and McKinney took place at the end of the 2000 legislative session, the amendment did not pass until the next legislative session. We do not know the reason for this delay, but the commissioner has not argued that the cited history should be disregarded because of its timing. In fact, the commissioner's counsel acknowledged during oral argument before this court that this legislative history supported the foster parents' interpretation of § 46b-129 (p).

[17] The ASFA was "enacted largely in response to growing criticisms directed at the reasonable [reunification] efforts requirement [of federal law], which included charges that children were . . . in foster homes too long. The charge was that they lingered . . . not because of agency inaction, but because agencies were engaged in excessive efforts to repair hopelessly dysfunctional families. Instead of the permanency intended by the federal reasonable efforts clause, impermanency result[ed]." (Internal quotation marks omitted.) *In re James G.*, 178 Md. App. 543, 575, 943 A.2d 53 (2008). "In 1997, after again looking at the child protection system, Congress sought to clarify 'reasonable efforts' and [to] respond to concerns that [earlier laws] had encouraged states to go too far in preserving parent-child relationships that were more harmful than beneficial. It did so in [the] ASFA, primarily by making the child's health and safety 'paramount.' In line with this change,

In re Jewelyette M.

See, e.g., *In re Elvin G.*, 310 Conn. 485, 505 n.18, 78 A.3d 797 (2013) (changes made to juvenile statutes after 1998 were "prompted by the federal [ASFA] . . . which set a number of prerequisites for qualification for certain federal funding"); *In re Adoption of Sherry*, 435 Mass. 331, 337 n.5, 757 N.E.2d 1097 (2001) (Massachusetts law requiring that foster parents receive notice and right to be heard "tracks the requirements of the [ASFA] . . . which offers [f]ederal funding to [s]tates in compliance").

Our research has not uncovered any case law from other states interpreting "the right to be heard" language at issue as precluding permissive intervention.[18]

permanency for children moved to the forefront. Under [the] ASFA, children were no longer doomed to spend their years waiting for reunification efforts to make their homes safe. Some situations were exempted from the reasonable efforts requirement, the time period for making reunification efforts was shortened, and adoption was encouraged. If efforts to reunite parent and child were not effective within a limited time, parental rights were to be terminated and adoption sought." Id., 576.

[18] The commissioner contends that "[t]he only relevant sister state authority cuts against the foster parents" and cites four cases that she maintains demonstrate that "[s]ister state courts do not allow foster parent intervention [in the absence of] express statutory authorization." The cited cases, however, do not support the commissioner's argument. To the contrary, in two of the cases, *Roberto F.* v. *Arizona Dept. of Economic Security*, 232 Ariz. 45, 50–51, 301 P.3d 211 (App. 2013), review denied, Arizona Supreme Court, Docket No. 1 CA-JV 11-0253 (October 29, 2013), and *In re Doe*, 134 Idaho 760, 763, 9 P.3d 1226 (2000), the courts applied their respective state's version of rule 24 (b) of the Federal Rules of Civil Procedure. Unlike Practice Book § 35a-4 (c), rule 24 (b) (1) allows permissive intervention only (1) when a statute confers a conditional right to intervene, or (2) when the proposed intervenor's claim or defense and the main action have a question of law or fact in common. See Fed. R. Civ. P. 24 (b) (1) (A) and (B). In *Roberto F.*, the court rejected the foster parents' contention that Arizona's "Foster Parents' Bill of Rights" conferred on them a conditional right of intervention. *Roberto F.* v. *Arizona Dept. of Economic Security*, supra, 50. In doing so the court stated, "[w]e assume that if the legislature had desired to create a right to intervene for foster parents, it would have done so [expressly]." Id., 50–51. The commissioner relies on this language for the proposition that "[s]ister state courts do not allow foster parent intervention [in the absence of] express statutory authorization." In our view, it is more accurate to say that *Roberto F.* and *In re Doe* stand for the proposition that sister state courts *with rules similar to but not coextensive with rule 24*

351 Conn. 511 APRIL, 2025 539

In re Jewelyette M.

See, e.g., *F.W.* v. *T.M.*, 140 So. 3d 950, 957 (Ala. Civ. App. 2013) ("the plain language of the statute does not prohibit a foster parent from petitioning to intervene in an action before the juvenile court"); *Dept. of Health & Social Services, Office of Children's Services* v. *Zander B.*, 474 P.3d 1153, 1171 (Alaska 2020) ("[w]hen the cautious use of . . . permissive intervention is necessary to promote the child's best interest, the trial court has the discretion to employ it"), overruled in part on other grounds by *Blythe P.* v. *Dept. of Health & Social Services, Office of Child Services*, 524 P.3d 238 (Alaska

---

(*b*) (*1*) do not allow foster parent intervention in the absence of express statutory authorization, unless intervention is justified under the common question of law or fact provision. Notably, the court in *Roberto F.* concluded that the trial court did not abuse its discretion in granting the foster parents' request for intervention on the ground that there were common questions of law and fact between the foster parents' termination petition and the dependency proceeding. See *Roberto F.* v. *Arizona Dept. of Economic Security*, supra, 52.

The third case on which the commissioner relies, *In re Interest of Enyce J.*, 291 Neb. 965, 870 N.W.2d 413 (2015), is also distinguishable because, unlike in Connecticut, which "has a unified court system" in which "[a]ll . . . matters"—criminal, civil and juvenile—"fall within the subject matter jurisdiction of the Superior Court"; *State* v. *Angel C.*, 245 Conn. 93, 108 n.17, 715 A.2d 652 (1998); Nebraska's Juvenile Court "is a statutorily created court of limited and special jurisdiction" *that lacks the authority to permit equitable intervention* in any juvenile proceeding. *In re Interest of Enyce J.*, supra, 976–77. Finally, the commissioner cites *In re G.C.*, 558 Pa. 116, 735 A.2d 1226 (1999), which held that a Pennsylvania foster parent lacked standing to seek or contest awards of custody of their foster children. Id., 117. Pennsylvania, however, has a statute expressly providing that only foster parents who have been awarded custody of their foster child have standing to intervene in neglect proceedings. See 42 Pa. Stat. and Cons. Stat. Ann. § 6336.1 (a) (West Cum. Supp. 2024). Connecticut law is different. Like the Nebraska Supreme Court in *In re Interest of Enyce J.*, this court in *Nye* v. *Marcus*, 198 Conn. 138, 139, 502 A.2d 869 (1985), held that foster parents have no standing under Connecticut law to seek custody of their foster children. In response, however, the legislature enacted No. 88-332, § 3, of the 1988 Public Acts (P.A. 88-332), which amended our habeas statute to provide that "[a] foster parent or an approved adoptive parent *shall have standing* to make application for a writ of habeas corpus regarding the custody of a child currently or recently in his care . . . ." (Emphasis added.) P.A. 88-332, § 3, codified as amended at General Statutes § 52-466 (f). In light of the foregoing, we are not persuaded that the out-of-state cases relied on by the commissioner carry any weight in this case.

In re Jewelyette M.

2023); *Schubert* v. *Arkansas Dept. of Human Services*, Docket No. CA 09-695, 2010 WL 374183, *3 (Ark. App. February 3, 2010) (state law modeled after ASFA does not preclude foster parent intervention); *State ex rel. C. H.* v. *Faircloth*, 240 W. Va. 729, 737, 815 S.E.2d 540 (2018) ("What [West Virginia case law] properly illustrates is that the right to be heard afforded under West Virginia Code § 49-4-601 (h) exists and operates independently of the rights and privileges afforded to intervening parties. Foster parents and others designated in the statute have a right to be heard without the necessity of requesting intervenor status. We find nothing, however, in [this statute that] *precludes* foster parents from likewise procedurally being granted party-intervenor status [when] appropriate." (Emphasis in original.)).[19]

The commissioner contends that, even if subsection (p) of § 46b-129 does not preclude foster parent intervention, subsection (d) of that statute does so. That subsection provides in relevant part: "(1) (A) If not later than thirty days after the preliminary hearing, or within a reasonable time when a relative resides out of state,

---

[19] Numerous states have statutes expressly authorizing foster parent intervention in neglect proceedings. See, e.g., *A.M.* v. *A.C.*, 296 P.3d 1026, 1031 (Colo. 2013) (Colorado statute "provides for intervention [in the dispositional phase of a neglect proceeding] by certain individuals who . . . (1) have the child in their care for more than three months; and (2) have knowledge or information concerning the care and protection of the child"); *In re E.G.*, 738 N.W.2d 653, 655 (Iowa App. 2007) (under § 232.91 (2) of 2005 version of Iowa Code, "[a] foster parent 'may petition the court to be made a party' to juvenile proceedings"); *In re Kimberly J.*, 191 App. Div. 2d 984, 984, 595 N.Y.S.2d 146 (1993) (§ 383 (3) of New York Social Services Law authorizes foster parent intervention in " 'any proceeding involving the custody of the child' "); *Cooper* v. *South Carolina Dept. of Social Services*, 428 S.C. 402, 412, 835 S.E.2d 516 (2019) (foster parents have statutory right to intervene in neglect proceedings); *In re N.L.G.*, 238 S.W.3d 828, 830 (Tex. App. 2007) (same). To our knowledge, only Nebraska categorically prohibits foster parent intervention in neglect proceedings. See *In re Interest of Enyce J.*, 291 Neb. 965, 976–77, 870 N.W.2d 413 (2015); see also footnote 18 of this opinion.

In re Jewelyette M.

the Commissioner of Children and Families determines that there is not a suitable person related to the child or youth by blood or marriage who can be licensed as a foster parent or serve as a temporary custodian, and the court has not granted temporary custody to a person related to the child or youth by blood or marriage, any person related to the child or youth by blood or marriage may file, not later than ninety days after the date of the preliminary hearing, a motion to intervene for the limited purpose of moving for temporary custody of such child or youth. If a motion to intervene is timely filed, the court shall grant such motion except for good cause shown. . . .'' General Statutes § 46b-129 (d). The commissioner argues that, because § 46b-129 (p) confers on a particular class of persons a right to participate in a neglect proceeding in one manner or one context, the provision therefore must impliedly bar participation in any other manner or context. Thus, according to the commissioner, subsection (p) provides foster parents the right to be heard in any proceeding under § 46b-129, and, therefore, they have no ability to intervene in those proceedings; similarly, subsection (d) provides that, under certain circumstances, relatives of the child may intervene for the purpose of obtaining temporary custody within ninety days of a preliminary hearing on a petition alleging that a child is neglected, uncared for or abused, and, therefore, foster parents are not permitted to intervene at any time in any proceeding brought under § 46b-129.

The commissioner's reliance on subsection (d) of the statute fails for the same reason that her claim that subsection (p) bars foster parent intervention fails. Specifically with respect to subsection (d), the fact that the provision grants a child's relatives the right to intervene for the purpose of seeking temporary custody in the earliest stages of a case when no suitable custodian has been identified in no way suggests or implies that,

In re Jewelyette M.

at a later stage in the process, a foster parent may not intervene in the proceeding for some other purpose.

We see nothing in the text of § 46b-129 (d), whether viewed alone or in combination with other statutes, to support the commissioner's sweeping assertions that it (1) "plainly and unambiguously reserves intervention for 'any person related to the child or youth by blood or marriage,' " (2) evinces a legislative intent to exclude "all others—including nonrelative foster parents—from seeking intervention," or (3) "established for the first time a scheme controlling intervention in neglect cases." In our view, subsection (d) is concerned only with the expeditious placement of children with family members at the outset of proceedings under the statute. It does not provide a blanket revision or modification of the rules of permissive intervention in connection with neglect proceedings generally.[20]

Accordingly, we conclude that § 46b-129 does not bar a trial court from granting a foster parent's request for permissive intervention in the dispositional phase of a neglect proceeding. Contrary to the determination of the Appellate Court in *In re Ryan C.*, there is no conflict between § 46b-129 and Practice Book § 35a-4 (c). Practice Book § 35a-4 (c) permits our trial courts to grant permissive intervenor status to any person, so long as the court determines that it is in the child's best interest

---

[20] Even if the statute were ambiguous on this point, a characterization we reject, we believe that the legislative history of § 46b-129 (d) erases any doubt as to its meaning. See, e.g., 52 H.R. Proc., Pt. 19, 2009 Sess., p. 6066, remarks of Representative Karen M. Jarmoc ("this bill requires courts to look for a suitable caretaker relative, and when we say that we mean someone who is related by blood or marriage . . . [i]n the early stages of cases [in which] children have been or are at risk of being removed from the home due to allegations of abuse or neglect"); id., pp. 6070–71, remarks of Representative Jarmoc ("'[this legislation] requires the [d]epartment . . . [to] consider . . . a relative caregiver early and consistently").

351 Conn. 511 APRIL, 2025 543

In re Jewelyette M.

to do so.[21] To the extent *In re Ryan C.* holds otherwise, it is hereby overruled.[22]

Because we conclude that the foster parents were improperly removed as intervenors, their rights as inter-

---

[21] The commissioner argues throughout her brief that, as a matter of public policy, foster parents should be prohibited from intervening in neglect proceedings. It is axiomatic that policy decisions of this nature are left to the legislature, not this court. What is clear, however, is that the legislature has historically exhibited a strong policy preference for giving foster parents, even former ones, a prominent voice in these proceedings. See 41 S. Proc., Pt. 8, 1998 Sess., pp. 2456–57, remarks of Senator M. Adela Eads (Discussing No. 98-185 of the 1998 Public Acts, a predecessor to P.A. 01-142, the senator stated: "This bill extends the right of [former] foster parents by permitting them to comment on the best interests. . . . [I]t gives the person who has invested a great deal of love, and affection, with this child, and who knows this child better than any social worker or the [department] people, to be able to have a say in the [placement] of the child."); see also *In re Adoption of Sherry*, supra, 435 Mass. 338 ("Because foster parents often possess the most detailed and the most current information available [about a child], the [l]egislature had good reason to permit them to be heard [on these matters]. The best interests of the child are served by ensuring that judges have all the relevant information about the child at their disposal before making such important decisions."). We trust our trial courts will continue to make appropriate decisions when it comes to requests for intervention, guided always by the child's best interest and the factors set forth in Practice Book § 35a-4 (d). We are confident that our courts exercise their discretion in this area cautiously and with a great deal of sensitivity.

In this regard, contrary to the assertion in Judge Elgo's dissenting opinion, the "interest" of the foster parents when seeking permissive intervention is not their interest in pursuing their own desire to obtain or extend their status as caregiver and custodian of the child but, rather, their unique interest in seeing that the future welfare of the child that they have lived with, cared for, and loved for a long time is placed into the hands of the person(s) best equipped to ensure the best interest of the child. As the commissioner acknowledged in her brief opposing intervention in the trial court: "Regarding the proposed intervenors interest in the case, it cannot be denied that they have an interest in Jewelyette's care." It is precisely because of the unique knowledge and perspective possessed by the foster parents in some cases that the interests of a foster parent will not necessarily be adequately represented by the existing parties.

[22] As an alternative ground to affirm the trial court's order removing the foster parents as intervenors, the commissioner argues that the trial court abused its discretion in granting the foster parents' motion to intervene because "intervention transformed the case into a custody battle [between the foster parents and] John . . . and led the court to improperly compare them to one another." We agree with the foster parents that the commissioner's alternative ground for affirmance is an improper attempt to raise an unpreserved legal claim concerning the 2023 revocation decision by dressing the claim as a challenge to the court's discretionary ruling on intervention

In re Jewelyette M.

venors must be restored and the case must be remanded for a new revocation hearing.[23] See, e.g., *Reilly* v. *State*, 119 Conn. 217, 221, 175 A. 582 (1934) ("the effect of a reversal is to destroy the judgment in that action, to restore the parties to the position in which they were before the judgment was rendered, and to permit the [reentry] of the case in the trial court for disposition as though no judgment had been [rendered]"); *Mulholland* v. *Mulholland*, 31 Conn. App. 214, 219, 624 A.2d 379 (1993) ("appellate reversal restore[s] the parties to the position in which they were before the judgment was rendered" (internal quotation marks omitted)), aff'd, 229 Conn. 643, 643 A.2d 246 (1994); see also *In re Shanaira C.*, supra, 297 Conn. 762–63 (reversing judgment and remanding case for new revocation hearing when trial court improperly had limited intervenor's right to participate at hearing); *In re Nasia B.*, 98 Conn. App. 319, 329–30, 908 A.2d 1090 (2006) (reversing judg-

made eighteen months prior to the revocation decision. The commissioner never raised this claim of error in the trial court, either as a ground in opposition to intervention or later as a basis to remove the foster parents as intervenors. During oral argument on the motion to intervene, the commissioner's counsel argued that, although the foster parents had no standing to intervene as a matter of right, the trial court had discretion under Practice Book § 35a-4 to grant them permissive intervention. At that time, the commissioner argued that the court, in the exercise of its discretion, should deny intervention because, among other reasons, the foster parents' concerns were adequately represented by Jewelyette's counsel, who also opposed revocation and would likely call the foster parents as witnesses, which would give them an opportunity to be heard on the matter. The commissioner did not claim that intervention should be denied because it would require the trial court to engage in an improper comparison between the foster parents and John.

Our rules of practice vest the trial court with discretion to grant permissive intervention. Because the commissioner never raised in the trial court the discretionary consideration that is now raised on appeal as an alternative ground for affirmance, "[w]e cannot determine whether the trial court abused an exercise of discretion that it neither made nor was asked to make. Under these circumstances, we decline to review the [commissioner's] unpreserved claim." *State* v. *Fernando V.*, 331 Conn. 201, 213, 202 A.3d 350 (2019).

[23] On remand, nothing in this opinion should be read as prohibiting the commissioner from filing a new motion to remove the foster parents as intervenors. See, e.g., Practice Book § 35a-4 (f).

In re Jewelyette M.

ment and remanding case for new revocation hearing when trial court had violated foster parent's right to be heard). In reaching this conclusion, we are acutely aware that much has happened in the more than eight months since Jewelyette was removed from her foster parents' home. John's death doubtlessly has compounded the pain, dislocation and uncertainty she experienced as a result of the changes imposed since last summer, and even prior to that time. What is in Jewelyette's best interest now may have changed from what was in her best interest in 2023, or last year, and the focus of any new dispositional hearing must be on her status and her best interest at the time of that hearing.[24]

## III

Because the issue could arise again on remand, and to prevent any further delay in those proceedings, we will address the foster parents' claim in SC 21068 that the trial court deprived them of their right to be heard under § 46b-129 (p) by, among other things, not allowing them to be present during the November 4, 2024 revocation hearing.

The following additional facts and procedural history are relevant to this claim. At the start of the November 4, 2024 hearing, counsel for the foster parents argued that her clients' right to be heard under § 46b-129 (p) included the right to remain in the courtroom for the duration of the hearing and to give a sworn statement after the presentation of evidence. "As we sit here today," she argued, "with [the] extremely limited information that we have, [the foster parents] anticipate that

___

[24] At oral argument before this court in December, 2024, Jewelyette's appellate counsel and guardian ad litem represented that Jewelyette had decided sometime in November that she wished to live with John. The record also reveals, however, that, as recently as early November, according to Jewelyette's trial counsel and guardian ad litem, Jewelyette continued to vacillate on this question and, on more than one occasion, threatened to harm herself if she was not allowed to return to her foster parents.

In re Jewelyette M.

they would object to the revocation of commitment, but, [without] the benefit of [knowing] all the evidence, [they cannot take a fully] informed position . . . .'' Counsel further argued that allowing the foster parents to be present for the hearing protected not only their right to be heard and to comment on Jewelyette's best interest, but also served Jewelyette's right to have before the court the fullest, most accurate picture concerning that issue.

The trial court responded that the foster parents should have received a copy of the motion to revoke and the revocation study, and, therefore, their claim of being uninformed was "not entirely accurate . . . .'' The court further stated: "I'm not sure, given the current procedural posture of this case, that [the foster parents] necessarily enjoy the rights afforded foster parents. Nonetheless, the court is extending to them that right to be heard, even though, in their current legal status, they are not currently and have not been for several months the foster parents of [Jewelyette].'' The court further stated that, although the court was aware that the foster parents were appealing from the order removing them as intervenors, the removal order was "based [on] the law [in *In re Ryan C.*] as it exists today. Certainly . . . allowing them to be heard, either at the start of this hearing or [at] the conclusion of the hearing . . . satisfies the spirit of their right to be heard with regard to best interest.'' The court continued: " I think, at this point . . . it's quite clear to everybody what the [foster parents'] position is vis-à-vis the motion before the court this morning. I don't think that comes [as] any great surprise. Nonetheless, I am going to give them the right to be heard. I'm going to allow them to make a statement, and then [I] will excuse them. I . . . think that . . . that certainly affords them the rights that they are provided under the law. But it also respects the fact that, as nonparties, the balance of this proceeding

In re Jewelyette M.

is confidential, and I don't see that they have the right to participate in the balance of the proceeding.''

After the court finished speaking, the foster parents, through their attorney, made the following statement: ''[For nearly seven years, the foster parents] provided the day-to-day care [for] Jewelyette and parented her as their own. . . . In July of 2024, after being removed, the department required that all [their] contact with Jewelyette be supervised, despite [their] years as licensed foster parents, a license which remains current. . . . Jewelyette has considered [them] her mother and father for several years and continues to see them this way, to this very day. [The foster parents] also have another daughter . . . who Jewelyette considers to be her sister.

''Since the removal, the [foster parents] have had approximately five in-person visits with Jewelyette . . . . During the in-person visits, Jewelyette runs to [them] to embrace them, asking when she can return home. At the end of [the] visits, Jewelyette struggles to leave [them], often crying, reaching out to them and not understanding why she can't return to their home. The removal in July was based on an ex parte motion filed with this court, which included a statement provided by [Jewelyette's current] therapist,'' Juliette Cole, who ''opined that Jewelyette was suffering from Stockholm syndrome, a diagnosis not recognized by the [fifth edition of the Diagnostic and Statistical Manual of Mental Disorders].'' Counsel argued that it was outrageous to suggest that Jewelyette's love for her foster parents was similar to the feelings a captive may develop for her captors. ''Outside of this outrageous idea that foster parents . . . are somehow akin to kidnappers, the continued love and desire that Jewelyette has for [her foster parents constitute] evidence that there is a true bond between them. . . . Jewelyette's attorney has made it clear on several occasions that Jewelyette continues to

In re Jewelyette M.

view [her foster parents] as her mom and dad and wishes to have contact with them going forward.

"In May of 2023, there was a decision . . . by Judge . . . Taylor, [who] found that [John] had not rehabilitated and that cause for commitment still existed. To the [foster parents'] knowledge, there has been no substantial change in this case since the hearing that resulted in that decision. Rather, on the same evidence, less . . . evidence [in fact] . . . the department is asking a different trier of fact [to] make the opposite finding and [to] revoke commitment [and to place] Jewelyette [with John].

"Based on the limited information available to the [foster parents] and their interactions with Jewelyette regarding her expressed desires, the [foster parents] object to the revocation of commitment and ask this court to fully assess how [John] has rehabilitated, since May, 2023, [when] the court found he had not [rehabilitated]." Counsel also reiterated the foster parents' request that the court refrain from making any decision on the motion to revoke while their appeal from the order removing them as intervenors was pending.

After the foster parents were excused from the hearing, the court asked the parties how it should proceed given that there was no written objection to the motion to revoke. Jewelyette's counsel responded that the matter was not as straightforward from her perspective because Jewelyette continued to "waffle" on the issue of revocation and continued to express a desire to live with her foster parents. She further stated that, "at [a] minimum, we should . . . put on the social worker and allow for questioning, just to make the record very clear on where things were at and how we got here." The court agreed, stating that, given the nature of the proceeding, it made sense to "put the [commissioner] through the paces of calling a witness and making [her]

In re Jewelyette M.

case,'' even if there was no formal objection to the motion. The assistant attorney general responded that she had not prepared any witnesses because she thought the matter was uncontested. She further argued that Jewelyette's wishes with respect to the foster parents were irrelevant. John's attorney similarly argued: ''Your Honor, can I just ask, I get, you know, Jewelyette's position. However, I think we should all be [cognizant] that we are in child protection court, and I have never in [my] twenty plus years had a case determined solely by . . . [a] nine year [old's] wishes.''

The court ordered a recess until the afternoon, when the commissioner presented the testimony of department social worker Ashley Cotto, a strong proponent of reunification with extensive knowledge of the case. Cotto, who had authored the revocation study, testified regarding the various steps John had completed over the years to achieve reunification, as well as the services he and Jewelyette were receiving to assist them in this regard. Cotto testified that Jewelyette was presently living with John for a trial reunification period and described John's and Jewelyette's daily routines and the supports in place to facilitate their reunification. In response to questioning, Cotto acknowledged that the ''trial home visit has not been without some struggles,'' which she explained mainly concerned Jewelyette's desire to be with her foster parents. When asked to elaborate, Cotto described an incident during which ''Jewelyette reported that she wanted to harm herself if she was not able to go back to [her foster parents' house],'' and her therapist had thought it best that she not return to John's house that evening. She further testified that Jewelyette's therapist, Cole, attributed Jewelyette's ''dysregulation'' to having contact with the foster parents. According to Cotto, ''Jewelyette struggles . . . after her visit [with them], prior to her visit, and it takes her a few days [after her visit] for her

In re Jewelyette M.

behavior, I want to say, to go back to normal. After her visit, she'll be really dysregulated. [She'll tell John], you know, you're not my real dad; [my foster father is] my real dad.''

At the conclusion of the hearing, the trial court found by a preponderance of the evidence that cause for commitment no longer existed, that revocation of commitment was in Jewelyette's best interest, and that guardianship should be vested in John subject to a six month period of protective supervision.

The foster parents argue on appeal that, for the right to be heard conferred by § 46b-129 (p) to be meaningful, foster parents must have timely notice of and adequate information about the evidentiary bases for any proceeding to which the right to be heard attaches, and must be permitted to attend that hearing and to comment on the child's best interest after observing the evidence and arguments presented. The commissioner responds that nothing in the text of § 46b-129 (p) supports the foster parents' claim that their right to be heard includes a right to attend the hearings in question, which, the commissioner argues, could raise potential confidentiality concerns. The commissioner asks this court to hold ''that trial courts may, in their sound discretion, decide on a case-by-case basis when to take foster parents' statements,'' and that the level and type of participation that foster parents are allowed with respect to a given hearing are within the sound discretion of the trial court.

This court has yet to consider the meaning of the right to be heard under § 46b-129 (p). The statute itself does not define or otherwise delineate the contours of that right. It simply provides, in relevant part, that ''[a] foster parent . . . who has cared for a child or youth shall have the right to be heard and comment on the best interests of such child or youth in any proceeding

under this section which is brought not more than one year after the last day the foster parent, prospective adoptive parent or relative caregiver provided such care. . . .'' General Statutes § 46b-129 (p). We conclude that the meaning of the statutory "right to be heard" is ambiguous as applied to the facts of this case. Based on the legislative history, however, we are aware that foster parents are not made parties to a neglect proceeding by virtue of the rights conferred on them by § 46b-129 (p). Accordingly, the right to be heard does not encompass the right to call or cross-examine witnesses, or to appeal an adverse ruling, which are rights reserved exclusively for parties. See, e.g., *In re Santiago G.*, 325 Conn. 221, 229, 157 A.3d 60 (2017) ("[t]he statutory right to appeal is limited to appeals by aggrieved parties from final judgments" (internal quotation marks omitted)); *State ex rel. H.S.* v. *Beane*, 240 W. Va. 643, 649, 814 S.E.2d 660 (2018) (nonintervening foster parents' right to be heard did not include right to cross-examine witnesses); *In re C.H.*, 115 N.E.3d 244, 246 (Ill. App.) ("[t]he right to be heard does not afford [foster parents] party status or the right to appeal the trial court's ruling"), appeal denied, 106 N.E.3d 1036 (Ill. 2018).

On the other hand, the right to be heard is not a trivial entitlement in this context and should be understood to be significant and meaningful. See, e.g., *State ex rel. H.S.* v. *Beane*, supra, 240 W. Va. 649 (foster parents' right to be heard includes "[the right to be] informed of the evidence presented during the . . . hearing" and "most certainly . . . a right to be heard on these issues in a meaningful way," and "[the] lack of information about the [family members'] motion [for custody and visitation] deprived the [foster parents] of a meaningful opportunity to be heard"); cf. *Mathews* v. *Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) ("[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a

In re Jewelyette M.

meaningful manner'' (internal quotation marks omitted)).[25] We are persuaded that the right to be heard and to comment on the best interest of a child in a proceeding concerning the child's placement must at the very least include, in the normal course, the right to be present throughout the proceeding in question and to argue at the appropriate time as to the child's best interest in light of the evidence presented relating to that issue.[26]

The commissioner argues that interpreting the right to be heard to encompass a right to be present throughout the proceeding runs afoul of the confidentiality provisions of General Statutes §§ 46b-122 and 46b-124. We disagree. To begin with, the applicable confidentiality provisions are always subject to exception, even with respect to persons having no statutory right to participate in the proceeding. Section 46b-122 (c) provides in relevant part that ''[a]ny judge hearing a juvenile matter, in which a child is alleged to be uncared for, neglected, abused or dependent or in which a child is the subject of a petition for termination of parental rights, may permit any person whom the court finds has a legitimate interest in the hearing or the work of the court to attend such hearing. . . .'' Section 46b-122 (d) further provides in relevant part that ''[n]othing in this section shall be construed to affect . . . the right of foster parents to be heard pursuant to subsection (p) of section 46b-129.'' We understand subsection (d) to mean that the trial court's discretionary authority under subsection (c) cannot be exercised so as to impair a foster parent's right to be heard under § 46b-129 (p).

_____

[25] The right at stake in the present case is a statutory one and does not originate in the due process clause. Nonetheless the statutory ''right to be heard'' unmistakably echoes the familiar ''opportunity to be heard'' integral to the due process right, and it is sensible to construe the statutory right to require that the right to be heard be meaningful.

[26] As we explain more fully hereinafter, the standard we announce today is not absolute, and the trial court has discretion to modify these procedures for good cause in light of the particular circumstances of any given case.

In re Jewelyette M.

As for juvenile court records, § 46b-124 (b) authorizes the trial court to order the disclosure of any juvenile record;[27] the trial court in the present case acted in conformity with this provision when it ordered that the foster parents be provided with copies of the motion to revoke and the revocation study prior to the November 4, 2024 hearing. We imagine that most foster parents eligible to exercise their right to be heard under § 46b-129 (p) are already intimately familiar with the contents of their foster child's juvenile records by virtue of having cared for the child over the course of many months or years. To the extent they are not, the trial court has ample tools at its disposal to protect the confidentiality of these records that do not require the removal of the foster parents from the hearing. See, e.g., General Statutes § 46b-122 (c) ("[t]he court may, for the child's safety and protection and for good cause shown, prohibit any person or representative of any agency, entity or association, including a representative of the news media, who is present in court from further disclosing any information that would identify the child, the custodian or caretaker of the child or the members of the child's family involved in the hearing").

We attach an important caveat to the foregoing framework. Although we hold that the right of eligible foster parents to be heard under § 46b-129 (p) ordinarily will include the right to be present throughout the proceeding in question, and to argue at the appropriate time as to the child's best interest in light of the evidence, in implementing the statutory requirements in any particular case, the trial court retains discretion, for good cause shown and within reasonable limits, to broaden or restrict

---

[27] With exceptions inapplicable to this appeal, § 46b-124 (b) provides in relevant part that "[a]ll records of cases of juvenile matters, as provided in section 46b-121, except delinquency proceedings, or any part thereof . . . shall be confidential and for the use of the court in juvenile matters, and open to inspection or disclosure to any third party . . . only upon order of the Superior Court . . . ."

In re Jewelyette M.

a foster parent's right to be heard if the court concludes that such a modification is necessary to ensure that the proceeding is conducted in a manner that best serves the rights at stake and objectives to be achieved.[28] See, e.g., *In re Adoption of Sherry*, supra, 435 Mass. 338 n.6 ("[w]e leave it for the trial court to determine the best procedure for the exercise of [the foster parents'] right [to be heard]"); *In re H.W.*, 247 W. Va. 109, 120, 875 S.E.2d 247 (2022) ("[t]he level and type of participation in such cases is left to the sound discretion of the [trial] court with due consideration of the length of time the child has been cared for by the foster parents and the relationship that has developed").

## IV

Judge Elgo's dissent consists primarily of policy arguments that are neither embodied in the statutory text nor found in the legislative history of § 46b-129 (p) or any other relevant law. Specifically, she argues that our construction of § 46b-129 (1) threatens "the fundamental substantive due process rights that biological parents have in family integrity"; part I of Judge Elgo's dissenting opinion; (2) "invites trial courts to make . . . improper and unconstitutional comparison[s]" between natural and foster parents; part II of Judge Elgo's dissenting opinion; (3) could result in unnecessary delays in dispositional phase proceedings; and (4) possibly could "be viewed as an impediment to reunification, [which] risks undermining the option of termination of parental rights and adoption of a child" under General Statutes § 17a-112 (k) (4), insofar as that statute requires the court to consider " 'the extent to which a parent has been prevented from maintaining a meaning-

---

[28] Subject to the discretion of the trial court, and when circumstances warrant, such modifications may include, for example, allowing nonintervening foster parents to present otherwise admissible documentary evidence in support of their position or precluding foster parents from hearing or viewing particular evidence when the need for confidentiality outweighs their right to comment on that evidence.

In re Jewelyette M.

ful relationship with the child by . . . the unreasonable act of any other person . . . .' '' Part III B of Judge Elgo's dissenting opinion. We disagree with each of these contentions.

With respect to Judge Elgo's assertions that our construction of § 46b-129 "wholly ignores a biological parent's substantive due process right to family integrity"; part II of Judge Elgo's dissenting opinion; we observe, first of all, that she does not cite a single case—from Connecticut or any other state—that supports the view that allowing permissive intervention by foster parents in the dispositional phase of a neglect proceeding implicates (much less threatens to infringe) a biological parent's constitutional rights. Indeed, this court has long recognized the authority of trial courts to grant this type of intervention. See part II of this opinion (citing cases).

This court has said repeatedly that, "[w]hile the rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions . . . [those] rights are not absolute. We [have] reject[ed] the claim of the so-called parental rights theory under which the parent has rights superior to all others except when he is proved unfit." (Citations omitted; internal quotation marks omitted.) *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 661, 420 A.2d 875 (1979). "We have consistently held in matters involving child custody that while the rights, wishes and desires of the parents must be considered it is nevertheless the ultimate welfare of the child [that] must control the decision of the court. . . . In fact, the best interest of the child standard is implicitly incorporated into the commitment statute . . . which authorizes the Juvenile Court to commit the custody of a child to another if it finds that the child needs the care, discipline or protection of the state." (Internal quotation marks omitted.) *In re Ava W.*, 336 Conn. 545, 570, 248 A.3d 675 (2020).

In re Jewelyette M.

In this regard, it bears repeating that, under our statutory scheme, intervention is permitted only during the dispositional phase of a neglect proceeding, the focus of which is exclusively on the best interest of the child, which often may diverge from that of the parent, particularly when the child has lived apart from the parent for a significant period of time.[29] See, e.g., *In re Natalie S.*, 325 Conn. 833, 847, 160 A.3d 1056 (2017) ("[i]t is

[29] All of the cases on which Judge Elgo relies in support of her contention involve a nonparent's attempt to intervene *as a matter of right*, usually in the *adjudicative* phase of a termination of parental rights proceeding. In such cases, we have held that foster parents have no constitutional standing to intervene because, unlike natural parents, they have no liberty interest in the integrity of their family units. See, e.g., *Hunte* v. *Blumenthal*, supra, 238 Conn. 164. Judge Elgo's contention overlooks the fundamental distinction we have drawn in these same cases between the adjudicative and dispositional phases of a neglect proceeding as the proceeding relates to *permissive intervention*. To reiterate, this court has held that intervention is prohibited in the adjudicative phase of a termination proceeding because "termination of parental rights proceedings concern *only* the rights of the respondent parent" and not those of the child; (emphasis in original) *In re Santiago G.*, supra, 325 Conn. 234; and "[i]t is . . . essential . . . to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable." *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 673. We have held, therefore, that, "[a]lthough petitions for termination are presumably seldom brought unless prospective adoptive parents are available, there still must be a [two step] process to determine, first, the threshold question of whether cause for termination under [General Statutes § 17a-112] has been proved. The best interests of the child, as such, [are] not . . . [grounds for termination] and [are] not involved in this threshold question." (Internal quotation marks omitted.) Id. It simply does not follow that foster parent intervention is prohibited at the dispositional phase, when the best interest of the child becomes the paramount consideration. To the contrary, we have repeatedly held that permissive intervention is permitted in the dispositional phase of a neglect proceeding, including the dispositional phase of a termination proceeding, because the focus at that stage is exclusively on the welfare of the child. See, e.g., *In re Baby Girl B.*, supra, 224 Conn. 277 ("[w]hen the issue is the validity of the termination of a parent's rights to her child . . . we continue to adhere to the sharp line drawn between the adjudication of termination of parental rights and the future disposition of the child for purposes of determining whether foster or preadoptive parents are entitled to intervene"); *In re Vincent D.*, supra, 65 Conn. App. 665–66 ("[a]lthough foster or preadoptive parents are barred from intervening in the adjudicatory phase of termination proceedings, neither our statutes nor our case law bar[s] such intervention in the dispositional phase of such proceedings" (emphasis omitted)).

In re Jewelyette M.

axiomatic that, once a child has been adjudicated neglected, the dispositional decision must be based on the best interest of the child and that the interest of the child and the parent may diverge''). In determining best interests, the trial court acts well within its authority to consider the stability and well-being a child has achieved in his or her current placement and the impact returning the child to a biological parent could have on the child's emotional, physical and psychological well-being.[30] See *In re Juvenile Appeal (Anonymous)*, supra,

___

[30] In support of his view that the trial court's January 23, 2025 interim order mooted the foster parents' claims, Justice D'Auria contends in his dissenting opinion that ''[t]he problem . . . with providing the foster parents the renewed right to intervene in the neglect proceeding is that, with [John's] death, the landscape for that neglect proceeding is markedly different. By granting the foster parents this relief, this court is providing them the opportunity to intervene in a proceeding that is, if not hollow, then, at the very least, irreparably changed from the case in which the foster parents initially sought to intervene.'' We agree that John's death is a change that will need to be taken into account in any proceeding under § 46b-129 relating to Jewelyette's best interest. But that is not the issue with respect to mootness. The issue, rather, is whether this court can afford the foster parents any practical relief in the matters currently pending before this court, and the answer is yes. At the time of their intervention, the sole issue before the trial court, as framed by the parties, was whether, notwithstanding John's personal rehabilitation efforts, it was in Jewelyette's best interest to remain with her foster parents given her deep emotional and psychological ties to them. Section 46b-129 (m) authorizes the trial court to deny revocation, even if it finds that the original cause for commitment (in this case, John's addiction, mental health issues and criminal recidivism) no longer exists. See, e.g., *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 658 (''[r]ecognizing that cause for commitment no longer existed from the time the petition for revocation was brought, the court nevertheless concluded that separation of the child from her foster family at that time would be contrary to her best interests, and consequently denied the [mother's] petition for revocation''). At the conclusion of the 2023 revocation trial, the trial court found that, notwithstanding John's efforts to rehabilitate, ''[Jewelyette's] stability and her hope for the future lie in the stable placement that she has with [her] foster family. To remove her from it would be to blight her life in perpetuity.'' The best interest inquiry plainly remains front and center after the death of John, and, had the foster parents not been improperly removed as intervenors on the basis of the now overruled holding in *In re Ryan C.*, their restored status as intervenors (unless successfully challenged on remand on other grounds) entitles them to participate in the hearings

In re Jewelyette M.

177 Conn. 663 ("[t]he factors to be considered in [determining whether to revoke commitment] include: (1) the length of [the child's] stay with her foster parents; (2) the nature of her relationship [with] her foster parents; (3) the degree of contact maintained with the natural parent; and (4) the nature of her relationship [with] her natural parent").

The foregoing discussion also answers the concern expressed in Judge Elgo's dissenting opinion that intervention should not be permitted at the dispositional phase because the participation of foster parents as intervenors will cause trial courts to make improper "comparisons" between natural and foster parents. Part III of Judge Elgo's dissenting opinion. We reiterate that "[t]he parent's loss of custody should not . . . be premised solely on tangible material benefits to the child at the expense of the intangible, [nonmaterial] advantages [that] a parent's care can provide even when the parent has only limited financial resources. . . . Rather, [courts] must continue to be guided by what is best for the child's welfare, but . . . place the advantages of a parent's care high in the scale of factors conducive to that welfare. In any controversy between a parent and

_____

that now must be held regarding Jewelyette's best interest in light of John's death. If anything, the changed circumstances make all the more pressing the need to resolve that issue in accordance with proper procedures.

With respect to the stay of further trial court proceedings issued by this court on January 24, 2025, pending resolution of the matters sub judice in this court, the stay was issued because, among other reasons, it appeared likely that doing so would expedite rather than delay the ultimate resolution of this case. Our concern was that adopting the wait and see approach commended by Justice D'Auria would likely result in substantial additional delays as the foster parents pursued appeals from the new orders raising the very same claims of error raised in the matters now before us, i.e., that they were excluded from the proceedings improperly under the authority of *In re Ryan C.*, which was wrongly decided, and that their statutory right to be heard was improperly limited in the same manner it was violated at the hearing held by the same trial judge on November 4, 2024, only two and one-half months earlier.

In re Jewelyette M.

a stranger the parent as such should have a strong initial advantage, to be lost only [when] it is shown that the child's welfare plainly requires custody to be placed in the stranger.'' (Citation omitted; footnote omitted; internal quotation marks omitted.) *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 661–62.

When her opinion reaches the issue of statutory construction that is the proper subject of this appeal, Judge Elgo is left to argue that our construction of § 46b-129 is at odds with the obligation of foster parents, under various department regulations, ''to support the [commissioner's permanency] goals or, at least, not to act in contravention of them . . . .'' Part II of Judge Elgo's dissenting opinion. She contends that, ''[b]ecause the role and responsibility of foster parents are circumscribed by statute and regulation, the doctrine of permissive intervention, which requires a movant to advance an interest distinct from that of existing parties, is simply incompatible with the existing statutory and regulatory framework that allows the department to define and to control the responsibilities of foster parents, especially with respect to the child and their biological parents.'' Id.

This argument fails to confront the fact that the statutory and regulatory framework relied on by Judge Elgo existed throughout the time that foster parents enjoyed automatic standing to intervene in cases such as the present one. That framework was not perceived by the legislature prior to 2001 as a reason to deny foster parents automatic standing, and there is no indication that the same framework factored into the legislature's decision in 2001 to remove the right to automatic standing from General Statutes (Rev. to 2001) § 46b-129 (o). The legal obligations of foster parents identified by Judge Elgo have never been understood to prohibit foster parents from intervening to advocate for the child's best interest in a proceeding pursuant to § 46b-

In re Jewelyette M.

129. If the legislature wishes to enact such a prohibition, it may do so, but we will not read that policy into the statute**.** See, e.g., *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 316 Conn. 790, 803–804, 114 A.3d 1181 (2015) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language").[31]

Judge Elgo's final two points involve concerns about delays that may be caused by permitting intervention. Again, both of these assertions are policy based as opposed to textual or strictly statutory. She contends that allowing permissive intervention in neglect proceedings could prolong the proceedings to the detriment of the child and points to the present case as an example of such a delay. See part III C of Judge Elgo's dissenting opinion. Again, we trust our trial courts to adhere to the directives of Practice Book § 35a-4 (d) when ruling on a motion to intervene. That subsection directs the judicial authority to consider, among other things, "the timeliness of the motion as judged by the circumstances of the case" and "whether the intervention may cause delay in the proceedings or other preju-

---

[31] The legislature's response to this court's decision in *Nye* v. *Marcus*, 198 Conn. 138, 502 A.2d 869 (1985), further undercuts Judge Elgo's argument. In *Nye*, this court held that only natural parents or legal guardians, not foster parents, had standing to bring a petition for a writ of habeas corpus pursuant to § 52-466 to prevent the department from removing a foster child from their care in contravention of the department's permanency plan. See id., 144. In response, the legislature enacted No. 88-332, § 3, of the 1988 Public Acts (P.A. 88-332), which amended the habeas statute to provide that "[a] foster parent or an approved adoptive parent shall have standing to make application for a writ of habeas corpus regarding the custody of a child currently or recently in his care . . . ." P.A. 88-332, § 3, codified as amended at General Statutes § 52-466 (f). That the legislature abrogated our decision in *Nye* adds further support for the view that permissive intervention is not inconsistent with the statutory and regulatory framework governing foster parents generally.

In re Jewelyette M.

dice to the existing parties . . . .'' Practice Book § 35a-4 (d). As to the present case, the record contradicts Judge Elgo's assertion that intervention by the foster parents caused any undue delay in the proceedings below.

The fact that a decision on the June, 2021 motion to revoke commitment was not rendered until May, 2023, had nothing to do with the foster parents' intervention; the delay appears to have been caused by the combined effect of pandemic related court delays and the unexpected withdrawal of Berman as Jewelyette's counsel. Indeed, the trial court placed primary responsibility for the case's longevity on the department and John. No doubt there has been additional delay caused by the complications arising from the Appellate Court's decision in *In re Ryan C.*, but, in fairness, responsibility for those delays cannot be attributed to the foster parents.

Relatedly, Judge Elgo suggests that our construction of § 46b-129 could have the effect of delaying permanency insofar as a natural parent could point to a foster parent's intervention as evidence that the natural parent ''has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of [another],'' which is one of seven factors a trial court must consider when determining whether to terminate parental rights under § 17a-112 (k). General Statutes § 17a-112 (k) (7). This policy concern is purely speculative and is not borne out by the case law. The very premise of the argument—intervention in the dispositional phase of a neglect proceeding could be seen as an unreasonable act of interference within the meaning of § 17a-112—finds no support in the statutory scheme itself, which expressly authorizes any party, including any intervenor, to oppose the department's permanency plan for a child. See General Statutes § 46b-129 (k) (1) (A) (''Any party seeking to oppose the commissioner's permanency plan . . . shall file a motion

In re Jewelyette M.

in opposition not later than thirty days after the filing of the commissioner's motion for review of the permanency plan, which motion shall include the reason therefor. . . . The court shall hold evidentiary hearings in connection with any contested motion for review of the permanency plan . . . . The court shall provide notice to the child or youth, the parent or guardian of such child or youth, *and any intervenor* of the time and place of the court hearing on any such motion not less than fourteen days prior to such hearing.'' (Emphasis added.)). And, again, we are confident that our trial courts are more than capable of discerning between reasonable and unreasonable conduct when called on to determine whether a foster parent has prevented a parent from maintaining a meaningful relationship with his or her child.[32]

The December 11, 2023 order of the trial court removing the foster parents as intervenors is reversed in SC 21055, the writ of error in SC 21068 is granted in part and the trial court's November 4, 2024 revocation order is vacated, and the case is remanded for further proceedings consistent with this opinion.

In this opinion McDONALD, ALEXANDER and DANNEHY, Js., concurred.

---

[32] Judge Elgo also suggests that the foster parents' intervention in the present case is an example of the type of interference that would constitute an unreasonable act of interference under § 17a-112 (k) (7). She asserts, among other things, that ''[t]he record before us, and Humphrey's 2021 report in particular, contains evidence that, if credited, suggests that the foster parents did in fact interfere with reunification in the present case.'' Footnote 36 of Justice Elgo's dissenting opinion. But the fact is that the trial court did *not* credit this evidence. See, e.g., *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 304, 112 A.3d 1 (2015) (noting ''the state constitutional prohibition against fact-finding by an appellate tribunal''). To the contrary, the trial court found ''*no credible evidence*'' that the foster parents had interfered with John's relationship with Jewelyette. (Emphasis added.) The trial court further found, based on witness testimony, ''that the foster parents . . . never overstepped boundaries and never denigrated John in Jewelyette's presence.'' These findings dispose of Judge Elgo's contention.

In re Jewelyette M.

MULLINS, C. J., with whom ALEXANDER, J., joins as to part I, concurring in part and dissenting in part. I agree with and join part II of the majority opinion insofar as it concludes that permissive intervention by foster parents in neglect proceedings is not prohibited by statute. I write separately to express my view that it should be, and likely will be, a rare circumstance in which foster parents will be able to satisfy the factors for permissive intervention.

I respectfully disagree with part III of the majority opinion insofar as it concludes that "the right to be heard" provided to foster parents by General Statutes § 46b-129 (p)[1] ordinarily will include the right to be present throughout the proceeding and that a trial court may limit that right only "for good cause shown and within reasonable limits . . . ." Instead, I agree with Judge Elgo's dissent that "the right to be heard" in § 46b-129 (p) entitles foster parents to give an oral or written statement to the court, which may be either sworn or unsworn. See part IV B of Judge Elgo's dissenting opinion. The trial court retains broad discretion to determine when in the course of the proceeding the foster parents may give their statement and also whether foster parents may be present throughout the proceeding based on confidentiality, scheduling, and other concerns that may arise in the course of the proceeding. See id.

I

I agree with the majority that the statutory scheme does not prohibit trial courts from allowing foster parents to intervene if they satisfy the factors for permis-

[1] Although § 46b-129 (p) has been amended by the legislature since the events underlying this case; see, e.g., Public Acts 2024, No. 24-126, § 6; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

In re Jewelyette M.

sive intervention. But I do not think that this is an easy hurdle for foster parents to surmount. Instead, I think it is quite the opposite. When a trial court decides "whether to grant a motion for permissive intervention," it "balances several factors [including]: the timeliness of the intervention, the proposed intervenor's interest in the controversy, the adequacy of representation of such [interest] by other parties, the delay in the proceedings or other prejudice to the existing parties the intervention may cause, and the necessity for or value of the intervention in resolving the controversy [before the court]." (Internal quotation marks omitted.) *In re Santiago G.*, 325 Conn. 221, 226–27 n.6, 157 A.3d 60 (2017).

I expect that it would be rare that foster parents would be able to satisfy these factors. Although foster parents often develop a deep and meaningful connection with the child in their care and have an interest in the future welfare of that child, it is axiomatic that "[f]oster parents do not enjoy a liberty interest in the integrity of their family unit." (Internal quotation marks omitted.) *Hunte* v. *Blumenthal*, 238 Conn. 146, 164, 680 A.2d 1231 (1996). On the other hand, it is axiomatic that the child and the parents both have constitutionally protected rights at issue in a child protection proceeding. See, e.g., *In re Zakai F.*, 336 Conn. 272, 291–92, 255 A.3d 767 (2020); *In re Teagan K.-O.*, 335 Conn. 745, 755–56, 242 A.3d 59 (2020). In light of the constitutional rights involved and the need for the expeditious resolution of child protection matters, it is difficult to imagine how the interests of the foster parents would weigh in favor of their intervention.

Perhaps the stiffest barrier for foster parents to satisfy under the existing factors for permissive intervention is that a trial court find that the interests that the foster parents seek to represent are not already represented by one of the other parties to the proceed-

In re Jewelyette M.

ing. See, e.g., *In re Santiago G.*, supra, 325 Conn. 226 n.6. In a child protection proceeding, the parties typically consist of the parents; the Commissioner of Children and Families, who is responsible for developing and pursuing a permanency plan that is in the best interest of the child; the child's attorney, who represents what the child wants; and, in many cases, a separate guardian ad litem, who is mandated to represent what is in the child's best interest. With all these parties involved, it will be difficult—although perhaps not impossible—for foster parents to demonstrate that they have an interest relative to the child's best interest that would not already be represented. Put simply, if the foster parents are intervening to represent the best interest of the child, that interest should already be represented by one of the other parties to the proceeding.

Moreover, given that the legislature has granted foster parents the statutory right to be heard and to comment on the best interest of the child pursuant to § 46b-129 (p), it seems unlikely that a trial court would find "the necessity for or value of the [foster parents'] intervention in resolving the controversy [before the court]." (Internal quotation marks omitted.) Id., 227 n.6. As I explain in part II of this opinion, the trial court has broad discretion to implement the statutory right to be heard so as to allow foster parents to present information regarding the child's best interest. Accordingly, I would expect that only in exceptional cases would this statutory right not be sufficient to convey any relevant information or concerns foster parents want to bring to the court's attention. Indeed, allowing foster parents to intervene as parties risks unwarranted delay in reaching a resolution in these types of cases, in which a timely resolution is vital for the permanency and stability of the child.

I recognize, however, that there might be a unique scenario in which a trial court could determine that foster

In re Jewelyette M.

parents have surmounted the various hurdles for permissive intervention. My point is simply that, although foster parents are not prohibited from intervening by statute, satisfying the factors for permissive intervention, in my view, will be quite rare.

II

In part III of the majority opinion, the majority concludes that "the right of eligible foster parents to be heard under § 46b-129 (p) ordinarily will include the right to be present throughout the proceeding in question . . . [but that] the trial court retains discretion, for good cause shown and within reasonable limits, to broaden or restrict a foster parent's right to be heard if the court concludes that such a modification is necessary to ensure that the proceeding is conducted in a manner that best serves the rights at stake and objectives to be achieved." I cannot agree. I see nothing in the statute or the legislative history that guides me to the conclusion that the legislature intended nonparty foster parents to be present during the whole proceeding. In fact, the legislature has been clear that, generally, nonparties should not be present during child protection proceedings unless they receive permission from the presiding judge. See General Statutes § 51-30 (b) ("[w]hen the court is hearing juvenile matters, no person may be allowed in the room except as permitted by the presiding judge in accordance with section 46b-122"). Instead, I agree with Judge Elgo's dissent to the extent it concludes that "the right to be heard for foster parents under § 46b-129 (p) includes the right to make a statement with respect to the child's best interest at a time left to the discretion of the trial court." Part IV B of Judge Elgo's dissenting opinion.

In my view, the trial court retains broad discretion to manage the docket and the proceeding, including the right to limit or expand, within reason, the presence

In re Jewelyette M.

of the foster parents when it deems it to be appropriate. Should a trial court deem it necessary for foster parents to remain in the courtroom throughout the proceeding, or for any portions thereof, it may, of course, do so. See General Statutes § 46b-122 (c) ("Any judge hearing a juvenile matter, in which a child is alleged to be uncared for, neglected, abused or dependent or in which a child is the subject of a petition for termination of parental rights, may permit any person whom the court finds has a legitimate interest in the hearing or the work of the court to attend such hearing. Such person may include a party . . . [or] foster parent . . . ."). As a result, I would not conclude that foster parents' right to be heard in a child protection proceeding requires that they be present for the entire proceeding at issue.

Accordingly, I respectfully concur in parts I and II of the majority opinion, and I respectfully dissent from part III of the majority opinion.

D'AURIA, J., with whom ELGO, J., joins, dissenting. It has been nearly two months since this court granted the motion filed by the foster parents, John N. and Diana N. (foster parents), to stay the trial court's January 27, 2025 proceeding, prohibiting the court from considering whether it should finalize the transfer of guardianship of the minor child, Jewelyette M., to her paternal aunt, given the unexpected and untimely passing of the respondent father, John M., on January 21, 2025. In doing so, the majority prevented the trial court from taking any further action in Jewelyette's best interest at a critical time in that child's life, following the death of her father, so that we could continue our deliberations in the foster parents' appeal and on the writ of error. At the same time, the majority denied the motions filed by the petitioner, the Commissioner of Children and Families (commissioner), to dismiss the appeal and writ of error as moot. I was in the minority on these

orders. I believed at the time that this court issued these orders that the majority was indulging in the fallacy that intervening events had not mooted the principal issues arising in this case. I continue to believe that it was a mistake to grant the stay and to decline to dismiss what were and remain clearly moot cases. I therefore respectfully dissent.

The day after the respondent father passed away, on January 22, 2025, the foster parents moved to stay the trial court's November 4, 2024 order that granted the commissioner's motion to revoke the commitment of Jewelyette from the commissioner's custody and to prohibit the trial court from terminating the period of protective supervision that had been scheduled for review. On January 23, 2025, the trial court transferred guardianship of Jewelyette from the respondent father to her paternal aunt pending a full hearing, which had been set for January 27. On January 24, the commissioner moved to dismiss both the foster parents' appeal and writ of error on the ground that the death of the respondent father rendered both moot. That same day, on January 24, this court sua sponte stayed the guardianship proceeding scheduled for January 27 until it issued orders responding to the commissioner's motions to dismiss. On February 6, by a four to three vote, this court granted a continuation of the stay it had issued on January 24, 2025, and denied the motions to dismiss.

Two months is hardly a heartbeat in the life of a case before this court. But it is an eternity to a nine year old child whose life has been full of tumult. I have full confidence in the pure motivations of my colleagues who determined that it was more important to grant the foster parents a stay and to see these appeals through than to allow the trial court to provide Jewelyette, the minor child at the center of this case, some semblance of stability. I simply think they were mistaken. Under the unusual and tragic circumstances pre-

In re Jewelyette M.

sented, I am confident that the trial judge was able, and best suited, to manage a case that will continue to impact this child's life long after this decision is published, on an issue that is bound to repeat itself in other cases. A majority of this court chose to put the brakes on the trial court's ability to take further action, even considering those circumstances. Rather than forcing the parties, including Jewelyette, to wait for today's lesson in dueling statutory construction exercises—so detached from her life of friends, family and school—I would have let the trial court move forward with its consideration of the best course of action considering the death of the child's biological father and guardian.

The following additional procedural history of these appeals is foundational to my disagreement with the majority. Jewelyette was born in the summer of 2015 and has been in the care and custody of the commissioner since that time. The commissioner filed petitions to terminate the parental rights of Jewelyette's biological parents, including the respondent father, in November, 2016. Her mother's parental rights were terminated in May, 2017, and Jewelyette began living with the foster parents in October, 2017. At that time, the foster parents might have believed that the respondent father's parental rights would be terminated and that they could proceed with legally adopting Jewelyette. But, in 2019, circumstances changed, and the commissioner withdrew the petition to terminate the respondent father's parental rights and ultimately supported his reunification with Jewelyette.[1] The trial court nevertheless held on March 15, 2021, that the commissioner had not proven that reunification was in Jewelyette's best interest, despite the respondent father's enthusiasm about

_____

[1] The commissioner filed another petition to terminate the respondent father's parental rights in 2019, which she later characterized as "erroneous" at the hearing to amend Jewelyette's permanency plan to reflect reunification as the goal of that plan.

In re Jewelyette M.

reunifying with Jewelyette and that he had "made substantial progress . . . [had] undertaken many services, has been employed, has a place to live and has some family support." The foster parents successfully obtained an order enjoining the Department of Children and Families (department) from removing Jewelyette from their home on November 22, 2021, perhaps seeing the writing on the wall—that the respondent father, then rehabilitated, equipped, and eager to reunify with young Jewelyette, threatened the foster parents' prospects for adopting Jewelyette.

Nearly two years after the foster parents secured that injunction, on December 11, 2023, the trial court removed the foster parents as intervenors in the neglect proceeding the commissioner had filed based on the Appellate Court's ruling in *In re Ryan C.*, 220 Conn. App. 507, 299 A.3d 308, cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023), which held that General Statutes § 46b-129 (p) does not authorize the intervention of persons unrelated to a child or youth in neglect proceedings. Id., 525. The foster parents appealed from that removal to the Appellate Court, and this court transferred their appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Jewelyette continued to live with the foster parents for several months after they were removed as intervenors while the department worked toward its stated goal of reunifying her with the respondent father. On July 16, 2024, the trial court removed Jewelyette from the foster parents' care and placed her with her paternal aunt following the commissioner's ex parte motion for emergency relief, which stated that, "[s]ince November, 2021, because of the temporary injunction, the department has been unable to execute appropriate foster care and permanency planning for the child . . . [and] the child has suffered and deteriorated while in the foster home placement." One month later, on August 26, 2024, Jew-

In re Jewelyette M.

elyette was placed with the respondent father to continue reunification efforts.

On November 4, 2024, while the foster parents' appeal was still pending before this court, the trial court held a hearing on the commissioner's motion to revoke the commitment of Jewelyette. Immediately prior to that hearing, the foster parents sought to exercise their right to be heard pursuant to § 46b-129 (p) and asked the trial court to refrain from ruling until after this court heard their appeal emanating from the trial court's December 11, 2023 ruling, maintaining that they were wrongfully removed as intervenors at that hearing. The trial court rejected this contention and, after granting the foster parents the ability to make a statement before the start of the hearing, proceeded to find that (1) cause for the commissioner's commitment of Jewelyette no longer existed, (2) revocation of that commitment was in Jewelyette's best interest, subject to a six month period of protective supervision, and (3) guardianship should be transferred from the commissioner to the respondent father. The foster parents then filed a writ of error contesting the trial court's application of § 46b-129 (p), which we consolidated with their appeal for the purpose of hearing oral arguments on December 19, 2024.

No one, as far as we know from the record, expected at the time that oral arguments took place that an intervening event like the respondent father's death would occur, mooting this appeal and writ of error. But it did occur. When this court hears controversies that subsequently become moot, we should not stretch the bounds of our mootness doctrine to decide issues that only potentially could aggrieve a party. This is particularly true when the issue revolves around a child because of the increased likelihood of irreparable harm, and is even more true when the very same issue— whether *In re Ryan C.*, supra, 220 Conn. App. 507,

In re Jewelyette M.

should be overruled, permitting foster parents the right to intervene in abuse and neglect proceedings—is already scheduled to be determined in another pending appeal; see *In re Andrew C.*, 350 Conn. 932, 326 A.3d 1107 (2024); *In re Andrew C.*, 350 Conn. 931, 326 A.3d 1107 (2024); which will be heard before this court in just a few weeks.

There is no debate that the existence of an actual controversy is essential to appellate jurisdiction, both at the inception of the appeal and throughout its pendency. As we have stated so many times, we do not "decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow." (Internal quotation marks omitted.) *Ayala* v. *Smith*, 236 Conn. 89, 93, 671 A.2d 345 (1996). "When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *In re Allison G.*, 276 Conn. 146, 165, 883 A.2d 1226 (2005). When a case becomes moot because of intervening events, it can result in the court's resources and deliberations falling by the wayside. It is often tempting to finish what we started, rather than accepting that the court's collective efforts might have gone for naught. Our motivations in succumbing to that temptation may be nothing but honorable: we do not want to deprive the remaining parties, future parties, or the lower courts of our collective wisdom or direction on what is undoubtedly an important legal issue. It is an occupational hazard of dispute resolution, however, that our efforts might not always end up in the law books. See, e.g., *CT Freedom Alliance, LLC* v. *Dept. of Education*, 346 Conn. 1, 28–29, 287 A.3d 557 (2023) ("our charge is to resolve only live disputes, no matter how interesting the moot issues presented might be to

351 Conn. 511 APRIL, 2025 573

In re Jewelyette M.

us or to the parties before us, or how important the case might have been at an earlier time'').

In my view, it is telling that, to save this court's continued appellate jurisdiction, the majority does not adopt the foster parents' argument that their right to intervene in neglect proceedings is capable of repetition yet evading review, the most tried and true exception to the mootness doctrine. This is likely because that exception is so clearly unavailable. Although the issue is certainly likely to arise again, it will not evade review— indeed, it has already come to the forefront of this court's attention considering the impending oral argument in *In re Andrew C*. Instead, determined to see through to conclusion our consideration of an issue that will not evade review in so many future appeals,[2] the majority invents two reasons why the foster parents' appeal and writ of error are not moot in the first place. Neither work, in my view.

First, the majority contends that the January 23, 2025 order transferring guardianship from the deceased respondent father to the paternal aunt was merely ''interim'' and, ''[f]or that reason alone, it did not moot any aspect of the matters sub judice in this court.'' What the majority omits from this discussion, however, is that the only reason the trial court did not conduct a full hearing and issue a final order is *because this court stayed any further proceedings that would have, without question, mooted the appeal and writ of error*. The majority finds support for its contention that a case facing imminent mootness remains justiciable not from the case law of this state, but from a secondary source

_____

[2] It is not apparent to me why we would hasten a decision in the present case when the argument in *In re Andrew C.* has already been set. In fact, that case was to be argued before the release of the decision in the present case, but this court marked argument over to the following term. By doing so, this court effectively prevents counsel for the parties in that case from making their arguments in an undoubtedly live controversy because the majority's decision in the present case almost certainly preempts those arguments.

In re Jewelyette M.

that equivocates on the question, the full quotation providing that "a prediction that an action may become moot can weigh in the decision whether a preliminary injunction is appropriate. In a strategy so familiar as to go unremarked in most settings, a court may cooperate in avoiding decision by deferring to settlement negotiations that will moot the dispute. And a court that is confident that a mooting event is imminent may even seize the event as a justification for not deciding the case." (Footnotes omitted.) 13B C. Wright et al., Federal Practice and Procedure (3d Ed. 2008) § 3533.1, pp. 742– 43. To the extent that the mootness doctrine has prudential elements, even if I were to agree that we have discretion to issue orders to protect against a case becoming moot, I have little trouble concluding that the majority has abused that discretion in this case by issuing a stay.

Moreover, the majority has manufactured the notion that the "interim" order in the present case did not moot the appeal and the writ of error by putting far too much weight on the timing of a particular proceeding while minimizing the substance of the extraneous events that precipitated that proceeding. Whether an initial ruling is superseded, and therefore moot, concerns the effect of the extraneous events that nullify the first ruling, not the timing of the subsequent ruling, interim or otherwise. See, e.g., *State* v. *Santiago*, 219 Conn. App. 44, 56, 293 A.3d 977 (challenge to criminal sentence was superseded because it had already been modified), cert. denied, 346 Conn. 1028, 295 A.3d 944 (2023). In *J. Y.* v. *M. R.*, 215 Conn. App. 648, 654–56, 283 A.3d 520 (2022), the single case from this state that the majority references in comparison to the secondary sources it relies on to support its contention that an imminently moot case remains justiciable, the Appellate Court held that it could not provide relief based on an interim custody order. The temporary nature of the

In re Jewelyette M.

"interim" order was not the reason why the defendant in *J. Y.* could not obtain relief, however. See id., 661. Rather, it was because any relief the court could have afforded the defendant became untenable once the final order captured the entirety of the first order; the proper redress would therefore be to "challenge the propriety of the final orders." Id., 662. Conversely, if there had been no final order in *J. Y.*, the Appellate Court ostensibly *could* have granted relief based on the interim order. See id. ("the interim orders became inoperative *following the issuance of the final orders*" (emphasis added)). In the present case, the fact that the January 23, 2025 order contemplated a final hearing does not mean that it did not supersede the prior order transferring guardianship to the now deceased respondent father. The majority's hyperfocus on the temporal nature of the hearing distracts from what should be the central question—whether the extraneous event that demanded the hearing—the respondent father's death—mooted the substance of the November 4, 2024 judgment. The majority attempts to answer this question in its second argument for why this appeal is not moot, asserting that the January 23, 2025 hearing "does not alter the availability of the relief sought by the foster parents here." I disagree. An outline of the foster parents' requested relief in their appeal and writ of error reveals why, in my view, these matters are moot. See footnote 11 of the majority opinion ("[t]he relief sought . . . is [the] reversal of the November 4 order revoking commitment, restoration of their rights as intervenors, and a new revocation hearing").

The foster parents, in their appeal, ask that this court "reverse the trial court's December 11, 2023 order, which granted the [commissioner's] motion to remove the intervening foster parents as parties to the neglect petition matter . . . ." The problem, of course, with providing the foster parents the renewed right to inter-

In re Jewelyette M.

vene in the neglect proceeding is that, with the respondent father's death, the landscape for that neglect proceeding is markedly different. By granting the foster parents this relief, this court is providing them the opportunity to intervene in a proceeding that is, if not hollow, then at the very least, irreparably changed from the case in which the foster parents initially sought to intervene. The only reason that the neglect proceeding continued beyond November 4, 2024, was to ensure that the respondent father had the access to parenting resources that the department was to provide.[3] Permitting the foster parents to intervene in this sort of proceeding is precisely the type of impractical relief that our mootness doctrine prohibits.

With respect to the writ of error, the foster parents asked this court to reverse the trial court's November 4, 2024 order "granting [the commissioner's] motion to revoke commitment, restoring custody and guardian-

---

[3] The record reveals that the only reason the commissioner continued to maintain protective supervision over Jewelyette was for the respondent father, then alive, to have easier access to parenting programs and other resources. During that November 4, 2024 hearing, Jewelyette's guardian ad litem stated: "I agree with the testimony that [the respondent father has] provided a loving, supportive family for [Jewelyette] . . . and I don't see any concerns from a safety point of view. . . . I do think that he needs services and . . . [i]f there is protective supervision, those services will continue. There was testimony that he reach[ed] out to [the department for resources]. . . . He's been referred to the fatherhood engagement services. . . . I believe if there's no protective supervision, he would not be able to get access to that service. . . . He right now has [the intensive family preservation program], which is a [department] service, which he's in the middle of receiving help with. I think that needs to continue for a period of time, and [the Intensive In-Home Child and Adolescent Psychiatric Services (ICAPS) program, which provides parenting and therapeutic support services], you know. I know from my experience with ICAPS, there's like 500 people on the wait-list. . . . I do sometimes think that [individuals with an open department matter] get priority access . . . ." In fact, the commissioner's counsel noted that "the period of protective supervision has nothing to do with [the] foster parents. It has to do solely with the family that we have here and addressing any child protection concerns. *That would be the only reason that the department would stay open and monitor the family.*" (Emphasis added.)

In re Jewelyette M.

ship of the minor child to the respondent father, and ordering a period of protective supervision.'' The problem is, again, that that relief is also no longer available: the trial court's determinations in the November 4, 2024 proceeding required the respondent father to be a party because each was premised on the fact that that *the father was a fit guardian for Jewelyette.* Because he is now deceased, that premise no longer applies, and the determinations from that proceeding are nullified. Even if this court disregards that the basis of the neglect proceeding is no longer viable, reinstatement of the commissioner's commitment of Jewelyette based on the writ of error would mean little to the foster parents if they were not also granted the right to intervene based on their separate appeal, considering that their claimed right to intervene derives from a separate request for relief, and that the department, the child's attorney, and the guardian ad litem support revoking commitment.[4]

The majority suggests that the only difference between the status of this case presently and before the respondent father's death is that ''reversal of the order prior to [the respondent father's] death would have meant

---

[4] Even if I were to assume that the relief the foster parents seek is not moot, the fact that the commissioner, the child's attorney, the child's guardian ad litem, and the child's therapist all oppose the foster parents' intervention puts into question the foster parents' likelihood of success on the merits. It is black letter law that granting a stay requires a court to engage in an equitable balancing test, which at least in part considers the ''likely outcome of the appeal'' and ''the irreparability of the prospective harm . . . .'' *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 196 Conn. 451, 458, 493 A.2d 229 (1985). The majority does not attempt to justify the stay this court issued following the death of the respondent father, which is now approaching two months, much less specifically address the foster parents' likelihood of success on the merits, considering the change in events and the amount of time that has passed. In my view, the stay should have been denied, principally because the relief sought by the foster parents was no longer viable, but also because the foster parents were unlikely to succeed on the merits of their claims.

In re Jewelyette M.

that custody of Jewelyette reverted back to the commissioner from [the respondent father], whereas, now, custody would revert back to the commissioner from the aunt.'' Footnote 11 of the majority opinion. This is no small difference. I view this explanation as a logical leap by the majority to keep alive a controversy that no longer exists, or that at least has been transformed into a different controversy. The majority concedes that the issue has been irreparably changed but maintains that this court can still afford the foster parents practical relief because Jewelyette's best interest remains ''front and center'' after the death of her father. I agree wholeheartedly that Jewelyette's best interest remains at the forefront of the trial court's consideration—that is why I believe it was a mistake to grant the foster parents' motion to stay, given that doing so only delayed that consideration. What I disagree with, however, is that the case in which the foster parents initially intervened remains the proper vehicle for them to litigate their claim. As the majority states, the issue before the trial court at the time of the foster parents' intervention was whether it was in Jewelyette's best interest to remain with the foster parents or to take another step toward reunifying her with the respondent father. *Half of that equation is no longer there.* Although, against this new factual landscape, it is possible that the majority's decision might benefit the foster parents, that is often true of advisory opinions. They help the parties and the trial court. But the majority's insistence that the foster parents will practically benefit from this advice presumes that the trial court at the January 27, 2025 hearing would not have provided the foster parents with the most expansive version of the right to be heard in light of the new factual landscape. Simply put, the relief that the majority characterizes as practical is, in my opinion, pure conjecture. As was the case in *J. Y.*, the foster parents may properly challenge the trial

court's January 23, 2025 order, but they may not turn back time to when the respondent father was alive and the beneficiary of the commissioner's revocation of commitment.

There is no doubt in my mind that the majority believes that the foster parents got a raw deal in this case. "Hard cases make bad law," goes the old legal maxim. But from our lofty perch, appellate courts also make bad law when we detach ourselves from the realities that trial judges, juvenile court lawyers, social workers, biological parents, relatives, and, yes, foster parents, face each day in the trenches of our state's complex, integral, and at times fallible child welfare system. The foster parents—who unquestionably have been doing important, necessary, and painstaking work—undoubtedly saw the respondent father as an unwanted interloper and sought to intervene to vindicate their own "right to family integrity" as preadoptive foster parents.

What the majority neglects to consider is that, sometimes, the position of the department can be driven by changed circumstances. Sometimes, as was the case with the respondent father, a parent can turn his or her life around in time to play a responsible parental role in the child's life. State policy encourages and rejoices in that type of uncommon change. Moreover, the department's position must be informed, with input from counsel, by the art of the possible. As Judge Elgo properly points out in her dissenting opinion, terminating the parental rights of the respondent father (or any parent for that matter) by clear and convincing evidence is no easy feat. And it shouldn't be. It would be objectively reasonable for the commissioner's counsel to advise, as we can infer occurred in this case, that continuing to press to terminate the respondent father's parental rights so that Jewelyette could remain with her foster parents could be ill-fated. Finally, what also is subject to change is that a parent can suddenly become unavail-

In re Jewelyette M.

able, due to death, illness, or other circumstances. This type of change results in an entirely different factual and legal landscape, requiring a trial court to quickly pivot in the interests of what is now not just a neglected child, but a grieving one.

We will never know if the trial court proceeding that was scheduled for January 27, 2025, would have inflicted the type of irreparable harm to the foster parents that the majority apparently believed it would have based on its issuance of a stay. Nor will we ever know if the trial court might have provided the foster parents with all the process they could have hoped to receive at that hearing,[5] given the changed factual landscape and the development of the legal issues raised in the foster parents' appeal and writ of error before this court. The majority defends the court's granting of the foster parents' motion to stay because the "wait and see approach" might result in further delays for the foster parents in advancing their interests. Perhaps. Or, perhaps a resolution would have been reached, and perhaps there would have been no further need for appellate proceedings. In any case, given all that has occurred in the meantime, there is no reason to credit the majority's expectation that the foster parents' exclusion from the November 4, 2024 hearing would have necessarily repeated itself if the trial court had been permitted to hold the January 27, 2025 hearing after the respondent father's death.

If this court had any expectation that the stay issued in this case would result only in a brief delay, that

_____

[5] If the reason for the majority's insistence in delivering this opinion before any further hearing took place in the trial court was so that it could provide instruction on what the "right to be heard" means under § 46b-129 (p), I would say it was not worth the wait. After this buildup, the majority defines "the right to be heard" as "the right to be present throughout the proceeding in question and to argue at the appropriate time as to the child's best interest in light of the evidence presented relating to that issue," which the majority quickly equivocates is "not absolute" because a trial court, of course, has discretion to modify that procedure for good cause.

In re Jewelyette M.

expectation was unrealistic. This court should have denied the foster parents' motion to stay further proceedings because the respondent father's death mooted the legal landscape that informed the November 4, 2024 judgment. The foster parents' requested relief in their appeal and writ of error is neither practical nor tangible. Because I believe this court should have denied the foster parents' motion to stay, permitted the trial court to move forward in the case, and declared the issues on appeal and in the writ of error moot, I respectfully dissent.

ELGO, J., with whom D'AURIA, J., joins, dissenting. By importing into our statutory scheme an implied right for foster parents to seek permissive intervention, the majority today undermines and confuses the long established precedent holding that a foster parent has no right to family integrity relative to a foster child in his or her care. The state entrusts foster parents with the awesome power of caring for these children as wards of the state while working to achieve the permanency plan goals of the petitioner, the Commissioner of Children and Families. The majority's holding enables foster parents to use that position of trust to advance their own personal interests in the child, even when those interests contravene the permanency plan and reunification efforts in place for the foster child, despite no express authorization by our statutes.

It is axiomatic that statutes must be construed in a manner that comports with constitutional safeguards. Because the laws governing the litigation of child protection cases implicate the fundamental rights of both children and their parents, that precept is of utmost importance in construing the statutory scheme at issue in this appeal. In doing so, we must keep in mind that a child in foster care at all times is in temporary care. As this court is keenly aware, "[t]he well-known delete-

In re Jewelyette M.

rious effects of prolonged temporary placement on the child . . . makes continuing review by [the Department of Children and Families (department)] of all temporary custody and commitment cases imperative. Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings.'' *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 292, 455 A.2d 1313 (1983).

The department, as a guardian, is therefore charged with ensuring that the best available permanency option for a child is pursued, but it must do so ever mindful that it operates within the constraints of law, the inherently dynamic nature of a developing child, the ever changing and sometimes unforeseen circumstances in the lives of parents and children, and, most importantly, the fundamental liberty interest that a parent has in his or her child, which at times exists in tension with a child's best interest. When the petitioner must exercise the awesome power of the state by invoking the provisions of our General Statutes that authorize her to seek court remedies for a child in order to justify intrusion in the sanctity of a family, those constraints do not end simply because a court has adjudicated the child neglected. And while the best interest standard affords significant flexibility in fashioning remedies for a child, because of the degree to which it is recognized that a child's needs will continue to grow, change and respond to a child's environment, including but not limited to the overarching goal for permanency and stability, it does not mean that a parent's rights to a child are eviscerated.

Moreover, foster parents are first and foremost state actors, entrusted by the department, as guardian for the child, to provide care for the child. In carrying out their statutory and regulatory obligations, foster parents are provided an inherent and necessary but,

In re Jewelyette M.

nevertheless, inordinate amount of access to the child psychologically, emotionally, and physically. As a result, the department has an absolute duty and obligation to ensure that a foster parent walks the very same line that the department must carefully tread in attempting to secure the best and most appropriate permanency option—whether that is reunification, transfer of guardianship, or termination of parental rights—without infringing on a parent's right to family integrity. That degree of control over foster parents, as this court recognized in *Hunte* v. *Blumenthal*, 238 Conn. 146, 680 A.2d 1231 (1996), not only serves the children, who are the wards of the state, but also ensures that the department does not unduly infringe on the rights of biological parents. See id., 156–57.

The majority concludes that, in enacting and amending General Statutes § 46b-129, the legislature "did not intend . . . to prohibit a trial court from granting permissive intervention to a foster parent when appropriate." I respectfully disagree. Biological parents possess a fundamental constitutional right to family integrity. The rights of foster parents by contrast are rooted in—and strictly limited by—statute.[1] Accordingly, this court has recognized that "[f]oster parents do not enjoy a liberty interest in the 'integrity of their family unit.' " *Hunte* v. *Blumenthal*, supra, 238 Conn. 164.

With respect to the statute at issue in this appeal, which pertains to participation in child neglect proceedings, the legislature has carefully crafted a detailed statutory scheme that protects neglected and uncared for children while also "enhancing the parental capacity for good [childcare]" and, at the same time, "provid[ing]

---

[1] For purposes of this opinion, the phrase "biological parent" refers to both a biological parent and an adoptive parent. See General Statutes § 46b-471 (1) and (6).

In re Jewelyette M.

a temporary or permanent nurturing and safe environment for children when necessary . . . .'' (Internal quotation marks omitted.) *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 352, 488 A.2d 790 (1985). Within that scheme, the legislature has specifically addressed the roles that both relative and nonrelative foster parents play in juvenile court proceedings. The legislature has vested ''[a]ny person related to a child or youth'' with the right to seek to intervene in a neglect petition ''for purposes of seeking guardianship . . . .'' General Statutes § 46b-129 (d) (4). The legislature has not, however, vested a right to intervene in a nonrelative foster parent. Rather, the legislature explicitly conferred on nonrelative foster parents ''the right to be heard'' in ''any proceeding'' related to a foster child under § 46b-129. General Statutes § 46b-129 (p). In so limiting a nonrelative foster parent's participation in child neglect proceedings, the statutory scheme properly safeguards a biological parent's fundamental right to family integrity and also avoids the inherent and often inordinate delay attendant to adding additional, unnecessary parties to neglect proceedings, as this case exemplifies. Because I believe that this court should defer to the legislature's decision not to extend the ability to intervene in neglect proceedings to foster parents, I respectfully dissent.

I

The following relevant facts are reflected in the record before us and are not in dispute. Approximately seven months after the minor child, Jewelyette M., was adjudicated neglected, the petitioner placed her in the care of the nonrelative foster parents Diana N. and John N. (foster parents), who are licensed by the department. See General Statutes § 17a-114. The foster parents were planning to adopt Jewelyette in accordance with the approved permanency plan, which, at that time, sought to terminate the parental rights of the respondent

In re Jewelyette M.

father, John M. (respondent).[2] After this case suffered through delays due to the COVID-19 pandemic, the petitioner changed course and sought to reunify Jewelyette and the respondent. As the record reflects, the department at that time was in receipt of a psychological evaluation report, prepared in 2019 by Stephen M. Humphrey, a clinical psychologist. In that report, Humphrey expressed "ambivalence about what to recommend in terms of reunification."

Humphrey opined that the decision was an "exceptionally difficult matter, as [the respondent] appeared to have largely rehabilitated as measured by his engagement in treatment, and apparent cessation of problems with substances and criminal behavior. Further, he had established a residence and was employed." In his report, Humphrey recounted how, in 2017, the respondent exhibited a "remarkable lack of understanding of what will likely be required of him to maintain sobriety."[3] In 2019, however, Humphrey found it notable that the respondent "had largely complied not only with recommended services, but that there appeared to have been a substantial change in his engagement in antisocial behaviors. Despite his lengthy criminal record, there had not been any apparent criminal recidivism. Further, he was employed and had started his own business. He had attended treatment and appeared to have benefited. He reported attending twelve-step meetings."[4] Indeed, although various psychiatric diagnoses

___

[2] The respondent mother's parental rights previously were terminated in 2017. As the majority notes, the respondent father died on January 21, 2025.

[3] "[Humphrey's] primary concern during the 2017 evaluation was [the respondent's] extensive history of antisocial behavior." In 2019, however, he stated that the respondent's behavior "[was] not explained solely by substance abuse." (Emphasis omitted.) It is evident, however, that the respondent's diagnosis of antisocial behavior was retained on the basis of the respondent's history, as there are no reports that he engaged in any such behaviors since being released from prison.

[4] Humphrey additionally opined in his report that a "continuing involvement in a lifestyle geared toward sobriety, including attending meetings, would greatly increase the prognosis for [the respondent's] remaining sober

In re Jewelyette M.

were ascribed or contemplated over time to the respondent, by 2019, Humphrey "opined that none of these [was] supported by his presentation, history, or testing." He also noted how the respondent's treatment providers and parole officer "did not identify significant concerns about his engagement, cooperation, or progress in any services. . . . He had rehabilitated to an extent [that Humphrey had] deemed unlikely as of January, 2018."[5]

Humphrey also noted the close relationship between Jewelyette and the respondent, as his "impression of Jewelyette's interaction with her father was that she knew him, trusted him, and enjoyed spending time with him. She referred to him as 'Daddy,' and thus appears to identify two men, psychologically, as 'Daddy' . . . ." Humphrey further stated that he "found it especially difficult to be in the role of [decision maker]," particularly because Humphrey "believed Jewelyette would be adequately cared for by either her father or her current caretakers . . . ." Indeed, he opined that the respondent "presented at that time as capable of occupying a responsible position in Jewelyette's life." This was in light of the respondent's openness to receiving guidance regarding how to communicate with Jewelyette if she were to reunify at that time and if she wanted contact with her foster family, given his understanding that Jewelyette had a "close bond and connection with her present caretakers . . . ."[6]

and maintaining a grounded, rational approach to addiction-related matters." The respondent "appeared to have genuinely gained an understanding of why he would benefit from staying sober, and more importantly, how he might do so."

[5] During this period, the respondent was also engaged in individual psychotherapy with Blerim Rexhaj, a licensed professional counselor, for an extended period. Rexhaj stated that the respondent had engaged in the recommended cognitive behavioral therapy and that he had been " 'working hard' " and had made " 'significant progress.' " Rexhaj noted that he "did not see any concerns and there were 'no outstanding goals [the respondent] has not met.' " As Humphrey notes in his report, "[t]hese opinions were echoed by other treatment providers."

[6] Humphrey noted that the respondent had claimed "he was told [that]

In re Jewelyette M.

Humphrey ultimately did not recommend reunification in 2019, due largely to the "psychological difficulty Jewelyette would likely face at losing her relationship with the [foster] family . . . ." Although Humphrey did not recommend reunification at that time, he nevertheless stated, "[i]n my opinion, [the respondent] presents at this time as capable of occupying a responsible position in Jewelyette's life." That backdrop provides necessary context for the department's subsequent decision to change course and to seek to reunify Jewelyette and the respondent.[7] In my view, the petitioner's decision to seek approval of a permanency plan that called for reunification in September, 2020, was reasonable, prudent, and in accordance with its statutory obligations. At that point, the child had been placed with the foster family for almost three years and just had turned five. The trial court, *C. Taylor, J.*, nevertheless sustained the objection, which was advanced by Jewelyette's attorney, to that proposed permanency plan on March 15, 2021.

Around that time, which was four years ago, the foster parents began to challenge the petitioner's stated goal of reunification. After they were informed on November 1, 2021, that "the psychological evaluation [report] rec-

_____

he would be receiving parenting coaching, and reiterated that he expected to learn how to talk to Jewelyette if they reunited and she wanted to see her foster mother or foster sister." Humphrey recounted that the respondent stated he wanted family therapy with Jewelyette because if "she wanted to see her foster mother, he would 'not have a problem' with them communicating through Facebook or 'setting up a play date' with the other girl in her present home."

[7] It can hardly be disputed that an objectionably reasonable assessment would indicate that the petitioner's hurdle in prevailing on a termination of parental rights petition—with its clear and convincing burden of proof with respect to the adjudicatory grounds of failure to rehabilitate—would have been exceedingly high, if not insurmountable, particularly in light of Humphrey's observations of the warm and positive interactions between the respondent and Jewelyette in 2017 and 2019.

In re Jewelyette M.

ommends reunification''[8] and that a hearing had been scheduled on whether to revoke Jewelyette's commitment to the petitioner, the foster parents sought to intervene in the neglect proceedings. On November 8, 2021, the foster parents filed a motion to intervene "as a matter of right and at the court's discretion," citing as authority *Horton* v. *Meskill*, 187 Conn. 187, 445 A.2d 579 (1982), and Practice Book § 35a-4.[9] They sought intervention for the purposes of "presenting evidence, including cross-examination of witnesses, and argument regarding the best interests of the child in relation to the pending motion to revoke commitment and the motion to review the permanency plan."

With respect to the merits of their motion to intervene, the foster parents asserted "a direct and immediate interest" in "family integrity" with Jewelyette on the ground that she had been in their care for years, attempting to distinguish the Appellate Court's decision in *In re Joshua S.*, 127 Conn. App. 723, 14 A.3d 1076

[8] In his report, Humphrey opined that, "if all of the adults involved were capable of placing Jewelyette's interests first, [then] they would seek to allow her father to take on the role of being her primary parent, but preserve the role of her foster family as extremely important people in her life. This would allow a broad network of support that, ideally, would remove the tension between the results and replace it with a plan to provide the enriching and empathetic environment for Jewelyette."

[9] As this court has explained, "[i]t is well settled by statutory . . . and decisional law . . . that the courts do not have the authority to enact rules governing substantive rights and remedies. Certainly, where a statute creates a substantive right, a conflicting practice book rule cannot stand." (Citations omitted; footnote omitted.) *Mitchell* v. *Mitchell*, 194 Conn. 312, 324, 481 A.2d 31 (1984); see also *In re Samantha C.*, 268 Conn. 614, 639, 847 A.2d 883 (2004) ("we are obliged to interpret [the rules of practice] so as not to create a new right, but rather to delineate whatever rights may have existed, statutorily or otherwise, at the time of the proceedings underlying the present appeal" (emphasis omitted)). Because § 46b-129 (p) specifically sets forth the substantive right of nonrelative foster parents to notice and to be heard in child protection proceedings, I do not believe that our courts may alter or expand that statutory right. For that reason, I confine my analysis to the question of statutory interpretation presented in this appeal. See footnote 17 of this opinion.

351 Conn. 511 APRIL, 2025 589

In re Jewelyette M.

(2011), which held that the "limited and narrow set of rights" provided to foster parents did not include "intervention as a matter of right . . . ." Id., 730. In the present case, the foster parents argued that, unlike in *In re Joshua S.*, they "are preadoptive foster parents and received an adoption disclosure form at the time of placement" and "[t]he matter has been scheduled for [termination of parental rights] trials on more than one occasion and [has been] repeatedly delayed. . . . [T]he interests of the foster parents in the right to family integrity are clearly different than those presented in *In re Joshua S*. Under these facts, the foster parents have a direct and substantial interest in protecting the integrity of *their* family, which includes Jewelyette."[10] (Emphasis added.)

The foster parents further argued that intervention was necessary to allow them an opportunity to contest both the petitioner's and the respondent's assertions that they had "interfered with reunification." They specifically contended that the question of interference "has become intertwined" with the child's best interest. They denied the allegations of interference and contended that "[n]o other party can meaningfully respond to such accusations [or] present evidence regarding the actions of the foster parents." Moreover, the foster parents argued that intervention was necessary because a finding that they had interfered with reunification "may impact their ability to foster and adopt other children" going forward. Finally, they represented that their motion was timely and that intervention "will neither delay the proceedings nor prejudice other parties." Judge Taylor granted the foster parents' motion to intervene on January 20, 2022.

___

[10] In their motion to intervene, the foster parents neither acknowledged nor attempted to distinguish *Hunte* v. *Blumenthal*, supra, 238 Conn. 164, in which this court held that "[f]oster parents do not enjoy a liberty interest in the 'integrity of their family unit.' "

In re Jewelyette M.

Following a trial on the respondent's motion to revoke, which concluded on January 19, 2023—more than fourteen months after the foster parents sought intervention—Judge Taylor denied the respondent's motion to revoke commitment in a decision issued on May 15, 2023. Two months later, on July 20, 2023, the Appellate Court officially released its decision in *In re Ryan C.*, 220 Conn. App. 507, 299 A.3d 308, cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023), in which the court construed § 46b-129 and held that nonrelative foster parents lack standing to intervene in the dispositional phase of a neglect petition. Id., 526. Relying on that precedent, the petitioner promptly moved to remove the foster parents as intervenors in the present case on July 21, 2023. Nearly five months later, on December 11, 2023, Judge Taylor granted that motion and removed the foster parents as intervening parties. From that judgment, the foster parents appealed, arguing that *In re Ryan C.* should be overruled because the Appellate Court misinterpreted § 46b-129 (p).

While that appeal was pending, on November 4, 2024, the trial court, *Daniels, J.*, granted the petitioner's motion to open and to modify the disposition of the underlying petition so as to return Jewelyette to the custody of the respondent under a period of protective supervision that was scheduled to terminate in May, 2025. The foster parents thereafter filed a writ of error challenging the November 4, 2024 decision to return Jewelyette to the respondent's custody, claiming that Judge Daniels violated their "right to be heard" under § 46b-129 (p) because they were only permitted to give a statement through their attorney at the outset of that proceeding. Oral argument before this court[11] on both

---

[11] These matters were originally filed in the Appellate Court, and this court transferred them to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

In re Jewelyette M.

the foster parents' appeal and the writ of error was held on December 19, 2024.

On January 22, 2025, the foster parents moved to stay the November 4, 2024 dispositional order and to preclude the trial court from terminating the period of protective supervision during an in-court review that had been scheduled for February 3, 2025. They implied that, if this court did not issue a stay and the period of protective supervision was terminated, then these appellate matters would be rendered moot. Two days later, the petitioner filed a motion to dismiss the appeal, in which she informed this court that the respondent had died on January 21, 2025, and that, on January 23, 2025, Judge Daniels had transferred guardianship of Jewelyette to her paternal aunt on an interim basis "pending a full hearing." On February 6, 2025, this court granted the foster parents' motion in part and "stayed [further proceedings] until further order of this court."[12] Jewelyette therefore remains in the custody of a relative, whom the department has investigated and approved for placement, while the foster parents' appeal and writ of error remain pending before this court. In subsequent correspondence to this court, the child's attorney represented that the child was adamant about remaining in the care of her paternal aunt following the death of the respondent, while the child's therapist in November, 2024, had recommended monthly visitation with the foster parents only if Jewelyette is willing to do so.

_____

[12] On that same day, a majority of this court denied the petitioner's motion to dismiss. For the reasons set forth in Justice D'Auria's dissenting opinion, I would have granted the motion to dismiss and "let the trial court move forward with its consideration of the best course of action" as "the relief sought by the foster parents [in this appeal and writ of error] was no longer viable . . . ." Footnote 4 of Justice D'Auria's dissenting opinion. Nonetheless, because I believe that the opinion articulated by the majority today sets a precedent with profound and damaging consequences for children and families in our child protection courts, I am compelled to write separately. See *State* v. *McCoy*, 331 Conn. 561, 587, 206 A.3d 725 (2019) ("we are mindful of the old adage that bad facts make bad law").

In re Jewelyette M.

The principal question presented in this appeal concerns the extent of the rights conferred on nonrelative foster parents by the legislature in § 46b-129. That question involves an issue of statutory interpretation, over which our review is plenary. See, e.g., *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 213, 38 A.3d 1183, cert. denied, 568 U.S. 940, 133 S. Ct. 425, 184 L. Ed. 2d 255 (2012). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) *Seramonte Associates, LLC* v. *Hamden*, 345 Conn. 76, 83, 282 A.3d 1253 (2022). "In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Gilmore* v. *Pawn King, Inc.*, 313 Conn. 535, 542–43, 98 A.3d 808 (2014).

In construing the statutory rights of nonrelative foster parents, this court does not write on a blank slate. For that reason, in part II of this opinion, I review the fundamental substantive due process rights that biological parents have in family integrity, which arise naturally

In re Jewelyette M.

from the parent-child relationship, and the precedent of this court holding that foster parents have only those rights that "are defined . . . by statute" such that "[f]oster families do not have the same rights as biological families or adoptive families." (Internal quotation marks omitted.) *Hunte* v. *Blumenthal*, supra, 238 Conn. 164.

In part III of this opinion, I discuss the unacceptable, yet inevitable, consequences that will flow from the majority's holding that the trial court has the authority to entertain motions for permissive intervention by non-relative foster parents. The effect of allowing permissive intervention by nonrelative foster parents is incompatible with their limited, albeit enormously important, role in the child protection system. I contend, as the record in the present case clearly demonstrates, that permissive intervention by nonrelative foster parents clashes with the department's statutory obligation to work toward reunification while ensuring that the child's physical, social, educational, and emotional needs are met, including their need for a permanency plan that is effectuated as safely, appropriately, and expeditiously as possible, consistent with the child's best interest. See General Statutes §§ 17a-112 (j) (1) and 46b-129 (k) (4) (D). In part III of this opinion, I also explain why permissive intervention of a nonrelative foster parent is unnecessary and ill-advised because that foster parent is obligated to support the department's reunification efforts as well as the petitioner's permanency plan goals. In other words, a foster parent cannot properly intervene as a party with an interest distinct from the department because, as creatures of statute, a foster parent's interest, to the extent that it is purportedly aligned with the child's best interest, is already represented more than adequately by either the petitioner, the attorney for the minor child (AMC), or the guardian ad litem (GAL).[13]

[13] If a foster parent seeks to present information to a court that the department does not see fit to advance, then the AMC and the GAL have the

In re Jewelyette M.

The most significant consequence of allowing nonrelative intervention in a neglect proceeding is the enormous risk that biological parents will impermissibly be compared to the intervening nonrelative foster parents. That impingement on a biological parent's constitutional rights, in turn, necessarily taints a trial court's best interest analysis. Furthermore, the consequences of allowing nonrelative foster parent intervention will also reverberate within the termination of parental rights context. Because the majority's holding effectively authorizes foster parents to wield a legally sanctioned wedge in the relationship between a biological parent and his or her child, the viability of any subsequent attempt to seek a termination of a parent's rights, should reunification fail, will be significantly compromised, and the permanency options available for the child will be limited, as the juvenile court is statutorily obligated to take into account whether a person has unreasonably prevented the biological parent from having a relationship with his or her child. See General Statutes § 17a-112 (k) (court "shall consider and shall make written findings regarding . . . (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the . . . unreasonable act of any other person"). A biological parent who asserts a defense based on that provision, most vividly exemplified by the record in this case, would have a compelling case that may well prevail. This is especially so if there is any viable claim that a foster parent has attempted to alienate a child from his or her biological parent, as the facts of this case suggest.

I also believe that the intervention of nonrelative foster parents will inevitably lead to unnecessary and

obligation to assess and to advocate for the child's wishes and the child's best interest, respectively. If the foster parents' position is deemed meritorious by the AMC and is either consonant with the child's wishes or best interest, the AMC also has an independent duty to advise and advocate, as appropriate, obviating the need for nonrelative foster parent intervention.

In re Jewelyette M.

unacceptable delays in permanency for the child in question, as well as for children in the system in general, which is "inconsistent" with a child's best interest. *In re Davonta V.*, 285 Conn. 483, 494, 940 A.2d 733 (2008). The course of the litigation will be extended, including on appeal, as Justice D'Auria powerfully explicates in his dissenting opinion, because the majority's holding enables the trial court, in its discretion, to permit an intervening foster parent to call their own witnesses, to cross-examine other parties' witnesses, and to introduce evidence, which will each consume time on the trial court's docket. An intervening foster parent also can file motions, as the foster parents did here, to pursue remedies like injunctions and discovery with respect to the respondent's treatment records, as well as confidential files from the department. Moreover, a foster parent's "right" to litigate the quality and propriety of their care relative to children entrusted to them by the department must, in the first instance, be litigated in the proper forum—an administrative hearing—which is not only the more appropriate venue, but also does not risk unconstitutionally tainting dispositional proceedings before the court over the course of the child's temporary care and guardianship with the department. All of the foregoing support the legislature's decision to promulgate a statutory scheme that does not provide for the intervention of nonrelative foster parents in neglect petitions and, instead, wisely limits a nonrelative foster parent's role in those proceedings to the right to be heard and comment as to the child's best interest under § 46b-129 (p). In my view, principles of separation of powers and judicial restraint compel this court to defer to that legislative prerogative.

In the fourth and final part of this opinion, I interpret what the legislature has specifically conferred on nonrelative foster parents in § 46b-129, which plainly provides them with the "right to be heard" under the

In re Jewelyette M.

unambiguous language of § 46b-129 (p). A foster parent's right to be heard is fundamentally distinct from the right to intervene, which the legislature separately accounted for and specifically addressed in subsection (d) of § 46b-129. Because this court construes statutes so as to comply, rather than conflict, with applicable constitutional requirements; see *In re Valerie D.*, 223 Conn. 492, 534–35, 613 A.2d 748 (1992); I would conclude that, in enacting and later amending § 46b-129 in 2001; see Public Acts 2001, No. 01-142, § 8; the legislature sought to ensure that foster parents are provided an opportunity to have a voice in dispositional hearings—but nothing more. Unless and until the court makes a finding that reunification efforts are no longer warranted,[14] a construction that permits any other reading both structurally and impermissibly stacks the odds against a respondent parent and compromises the duty of the department to pursue permanency options for the child.

In light of the foregoing, I would not overrule *In re Ryan C.* and would conclude that permissive intervention is not available to nonrelative foster parents in neglect proceedings. I therefore would affirm the December 11, 2023 order of the trial court removing the foster parents as intervening parties. In addition, I would deny the foster parents' writ of error, as the record unequivocally indicates that they were not denied their "right to be heard and comment" on November 4, 2024, when Judge Daniels granted the petitioner's motion to open and modify the disposition

---

[14] See General Statutes § 17a-111b (b) (petitioner "or any other party may, at any time, file a motion with the court for a determination that reasonable efforts to reunify the parent with the child are not required"); see also General Statutes § 46b-129 (k) (4) (at hearing on permanency plan, "the court shall . . . (E) determine the services to be provided to the parent if the court approves a permanency plan of reunification and the timetable for such services").

351 Conn. 511 APRIL, 2025 597

In re Jewelyette M.

of the neglect petition. General Statutes § 46b-129 (p). Accordingly, I respectfully dissent.

II

In ascertaining the proper meaning of § 46b-129, we do not write on a blank slate but, rather, must be guided by prior decisions of this court and the United States Supreme Court. I respectfully submit that the majority's holding today will have the impact of improperly interfering with a biological parent's fundamental constitutional right to family integrity, in contravention of decades of precedent that had insulated a biological parent's right to family integrity from impermissible considerations and comparison by strictly construing the role that foster parents are permitted to play in dispositional proceedings. The majority opinion wholly ignores a biological parent's substantive due process right to family integrity, which "encompasses the reciprocal rights of both parent and children . . . the interest of the parent in the companionship, care, custody and management of his or her children . . . and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association . . . with the parent . . . ." (Internal quotation marks omitted.) *In re Zakai F.*, 336 Conn. 272, 291, 255 A.3d 767 (2020); see also *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) ("the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court"); *In re Teagan K.-O.*, 335 Conn. 745, 755, 242 A.3d 59 (2020) ("[a] constellation of constitutional . . . rights serve to protect the integrity of the family unit [and] the parent-child relationship"); *In re Jacob W.*, 330 Conn. 744, 756, 200 A.3d 1091 (2019) ("the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference

In re Jewelyette M.

and, absent a powerful countervailing interest, protection'' (internal quotation marks omitted)); *Nye* v. *Marcus*, 198 Conn. 138, 144, 502 A.2d 869 (1985) (''[b]iological and adoptive families have a liberty interest in the integrity of their family unit which is part of the fourteenth amendment's right to familial privacy'').

As this court has explained, ''the right to family integrity . . . encompasses the reciprocal rights of both [the] parents and [the] children . . . the interest of the parent in the companionship, care, custody and management of his or her children . . . and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association . . . with the parent . . . .'' (Internal quotation marks omitted.) *In re Zakai F.*, supra, 336 Conn. 316 (*Mullins*, *J.*, concurring in part and dissenting in part). ''In other words, parents and children share a compelling interest in remaining together as a family unit. See, e.g., *In re Christina M.*, 280 Conn. 474, 486–87, 908 A.2d 1073 (2006) ([i]n cases involving parental rights, the rights of the child coexist and are intertwined with those of the parent . . . ); see also, e.g., *Santosky* v. *Kramer* [455 U.S. 745, 760, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)] . . . . It is well established that the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court. . . . The rights to conceive and to raise one's children have been deemed essential . . . basic civil rights of man . . . and [r]ights far more precious . . . than property rights . . . . It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. . . . The integrity of the family unit has found protection in the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment . . . and the

In re Jewelyette M.

[n]inth [a]mendment [to the United States constitution] . . . .'' (Citation omitted; internal quotation marks omitted.) *In re Zakai F.*, supra, 291–92.

A biological parent's fundamental right to family integrity has been expressly affirmed by the United States Supreme Court, which stated that ''freedom of personal choice in matters of marriage and family life is one of the liberties protected by the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment.'' *Cleveland Board of Education* v. *LaFleur*, 414 U.S. 632, 639–40, 94 S. Ct. 791, 39 L. Ed. 2d 52 (1974); see *Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 845, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) (''unlike the property interests that are also protected by the [f]ourteenth [a]mendment . . . the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights'' (citation omitted; footnote omitted)). Indeed, ''[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child . . . . [P]arents retain a vital interest in preventing the irretrievable destruction of their family life.'' (Internal quotation marks omitted.) *In re James O.*, 160 Conn. App. 506, 516, 127 A.3d 375 (2015), aff'd, 322 Conn. 636, 142 A.3d 1147 (2016).

Foster parents stand in stark contrast to biological parents, as the former are creatures of statute. Their rights and obligations are strictly ''defined and restricted by statute.'' *Hunte* v. *Blumenthal*, supra, 238 Conn. 164; see *In re Juvenile Appeal (Docket No. 10718)*, 188 Conn. 259, 261–62, 449 A.2d 165 (1982) (foster parents have statutory standing ''in any proceeding concerning the placement or revocation of commitment of a foster child . . . this standing does not spill over into a proceeding involving termination of parental

In re Jewelyette M.

rights'' under different chapter of General Statutes (citation omitted; footnote omitted)); see also *Smith* v. *Organization of Foster Families for Equality & Reform*, supra, 431 U.S. 845 ("[f]irst, unlike the earlier cases recognizing a right to family privacy, the [s]tate here seeks to interfere, not with a relationship having its origins entirely apart from the power of the [s]tate, but rather with a foster family which has its source in state law and contractual arrangements"). It is well established that "[f]oster families do not have the same rights as biological families or adoptive families," and foster parents always must be conscious of the fact that their "expectations and entitlements . . . can be limited by the state." (Internal quotation marks omitted.) *Hunte* v. *Blumenthal*, supra, 164. No one questions the proposition that foster parents play a vital role in the lives of these children, but it cannot be overlooked that foster parents are "entrusted with foster children on a temporary basis only" and are "warn[ed] *against* [cultivating] any deep emotional involvement with the child . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 164–65, quoting J. Goldstein et al., Beyond the Best Interests of the Child (1979) p. 24.[15]

Consequently, unlike biological parents, foster parents are required to be licensed by the department and

[15] I respectfully suggest that a foster parent who can provide a deeply loving and caring environment in which a child feels loved, secure, and safe while, at the same time, respecting a biological parent's fundamental right to seek reunification and the child's legal right to family integrity, represents the highest standard of foster parenting. See, e.g., *In re Victor D.*, Superior Court, judicial district of Middlesex, Docket No. CP-100007160-A (November 7, 2014) (foster parents' training and experience include awareness of difficulty for children and support for biological parents in transitioning children for visits), aff'd, 161 Conn. App. 604, 128 A.3d 608 (2015). To the extent that any "deep emotional involvement" morphs into an improper sense of entitlement, as represented by a foster parent's claim of family integrity with respect to the child of a biological parent whose rights have not been terminated, Professor Goldstein's warning against foster parents so entangling themselves is still meaningful and warranted. J. Goldstein et al., supra, p. 24.

In re Jewelyette M.

are subject to a slew of regulatory oversight. See General Statutes § 17a-145 (a) ("[n]o person or entity shall care for or board a child without a license obtained from the [petitioner]"). See generally Regs., Conn. State Agencies § 17a-145-130 et seq. This court has directed that "[t]he fountainhead of the state's right to control foster parents is the statutory scheme requiring the department to guarantee the welfare of foster children." *Hunte* v. *Blumenthal*, supra, 238 Conn. 155. In furtherance of that scheme, the legislature has authorized the petitioner to promulgate regulations governing foster parents. See General Statutes § 17a-90 (c) ("[the petitioner] shall adopt such procedures as the [petitioner] may find necessary and proper to assure the adequate care, health and safety of children under the [petitioner's] care and general supervision"). Those regulations control the conduct of foster parents, as state actors, by placing limits and requirements on various aspects of foster care, including a foster parent's home and what is acceptable as the child's bedroom. Regs., Conn. State Agencies §§ 17a-145-137 and 17a-145-139; see also *Hunte* v. *Blumenthal*, supra, 166 (concluding that "department ha[s] the right to control foster parents" for purposes of determining whether foster parents are entitled to statutory immunity as "employees" of department).

Significantly, and particularly relevant to the present appeal, is the fact that foster parents are obligated, at all times, to support the petitioner's goals or, at least, not to act in contravention of them, regardless of whether those goals include a role for the foster parents. The department's regulations require in relevant part that a foster parent "*shall comply with the treatment plan for the child and work cooperatively with the department* . . . in all matters pertaining to the child's welfare. . . . Foster parents shall accept, cooperate with and support arrangements made for the child to have contact including visits and correspondence with

In re Jewelyette M.

the child's biological family in keeping with the frequency indicated by the treatment plan. . . . Foster parents *shall be active participants in reunification of the child with the child's biological family.*" (Emphasis added.) Regs., Conn. State Agencies § 17a-145-149 (a) and (b). Even when a foster parent disagrees with the child's permanency plan, that foster parent must put his or her personal feelings aside because a foster parent "shall comply" with the permanency plan as well as "work cooperatively with the department . . . ." Regs., Conn. State Agencies, § 17a-145-149 (a); see also *Hunte* v. *Blumenthal*, supra, 238 Conn. 165 ("foster parents must comply with the guardian's plan for the child without regard to when the department implements that plan" (internal quotation marks omitted)). Because the role and responsibility of foster parents are circumscribed by statute and regulation, the doctrine of permissive intervention, which requires a movant to advance an interest distinct from that of existing parties, is simply incompatible with the existing statutory and regulatory framework that allows the department to define and to control the responsibilities of foster parents, especially with respect to the child and their biological parents. See *Horton* v. *Meskill*, supra, 187 Conn. 197 (permissive intervention considers "the proposed intervenor's interests in the controversy [and] the adequacy of representation of such interests by existing parties"); see also part III A of this opinion.

Because this court construes statutes so as to comply, rather than conflict, with constitutional requirements; see *In re Valerie D.*, supra, 223 Conn. 534–35; I would conclude that the legislature, in enacting and amending § 46b-129, carefully crafted a specific and limited role for foster parents in child protection proceedings that does not infringe on the fundamental rights of biological parents. I respectfully submit that the majority improperly expands that limited role in child protection pro-

In re Jewelyette M.

ceedings involving biological parents whose rights have not been terminated. Indeed, this court has long recognized limitations on the ability of foster parents to participate in child protection proceedings because, in light of a biological parent's fundamental interest, allowing foster parents to intervene could "permit them to shape the case in such a way as to introduce an impermissible ingredient . . . ." (Internal quotation marks omitted.) *In re Baby Girl B.*, 224 Conn. 263, 278, 618 A.2d 1 (1992).

Moreover, this court has specifically recognized the very real possibility that foster parents will impermissibly shape the litigation on a petition to terminate a biological parent's rights and has held that intervention under those circumstances violates a biological parent's rights. See *In re James O.*, 322 Conn. 636, 651, 142 A.3d 1147 (2016) ("[w]e do not permit foster or preadoptive parents to intervene in termination proceedings because to do so would permit them to shape the case in such a way as to introduce an impermissible ingredient into the termination proceedings" (internal quotation marks omitted)); see also *Hunte* v. *Blumenthal*, supra, 238 Conn. 164 (foster parents cannot "intervene in proceedings to terminate the rights of natural parents . . . nor do they automatically have standing to serve as 'next friend' of a removed foster child" (citation omitted)). Had the legislature intended to permit foster parents to intervene in such proceedings, it would have done so explicitly. See, e.g., *Costanzo* v. *Plainfield*, 344 Conn. 86, 108, 277 A.3d 772 (2022) ("[i]t is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly" (internal quotation marks omitted)); *Branford* v. *Santa Barbara*, 294 Conn. 803, 813, 988 A.2d 221 (2010) ("[w]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained" (internal quotation marks omitted)).

In re Jewelyette M.

In addition, I note that, as with termination of parental rights proceedings, neglect proceedings "are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's [biological] parents with those of [foster] parents and therefore to reach a result based on such comparisons rather than on the statutory criteria." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 672–73, 420 A.2d 875 (1979); see also *In re Baby Girl B.*, supra, 224 Conn. 275 ("[i]t is . . . essential, in considering a petition to terminate parental rights, to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable" (internal quotation marks omitted)). While the specter of this kind of insidious effect has been discussed in the context of termination of parental rights proceedings, it is no less dangerous—and may be more so—in the context of a hearing on the disposition of neglect proceedings, in which the burden of proof is governed by the less demanding preponderance of the evidence standard and because such proceedings occur before a termination petition is filed and adjudicated. See *In re Kamari C-L.*, 122 Conn. App. 815, 830, 2 A.3d 13, cert. denied, 298 Conn. 927, 5 A.3d 487 (2010); cf. *In re James O.*, supra, 322 Conn. 649 (clear and convincing evidence is burden of proof for termination of parental rights petition).

When a child is in foster care, there is always a risk that a trial court will engage in an improper comparison between the biological family and the foster family because the court is required to examine the needs of that particular child and whether those needs are being met in the child's current placement. See *In re Zarirai S.*, 229 Conn. App. 239, 263, 326 A.3d 1148 (2024) (trial court properly "considered several factors, one of which was the context of the children's foster place-

In re Jewelyette M.

ment, in finding that the children need a caregiver who provides permanency in their lives''). For example, in *In re James O.*, supra, 322 Conn. 636, the trial court ''properly considered evidence of the children's foster placement as relevant'' to whether the respondent mother had ''fail[ed] to rehabilitate . . . [as] rehabilitation must be assessed with reference to the needs of the particular children at issue.'' Id., 652, 657. This court concluded that the trial court, in "the context of [its] overall analysis . . . appropriately centered on the specific needs of [the children], a necessary consideration when determining whether a respondent has failed to rehabilitate.'' Id., 654; see also *In re November H.*, 202 Conn. App. 106, 138, 243 A.3d 839 (2020) (concluding that court did not make improper comparison between respondent and foster mother in adjudicatory phase); *In re Corey C.*, 198 Conn. App. 41, 82, 232 A.3d 1237 (''the reference to the lack of affect [the child] showed with the [biological] mother, compared to the warmth and attachment he showed with the foster parent, was used not to opine that the foster parent ought to be the person to meet [the child's] needs but, rather, was made on the basis of what the [therapeutic] professionals determined were [the child's] specific needs''), cert. denied, 335 Conn. 930, 236 A.3d 217 (2020). In *In re James O.*, this court reaffirmed the time-honored proposition that a comparison between the biological parent and a foster parent is improper, as it infringes on the constitutionally protected parent-child relationship, ''reach[ing] a result based on such comparisons rather than on the statutory criteria.'' (Internal quotation marks omitted.) *In re James O.*, supra, 650. The majority ignores that fundamental precept and invites trial courts to make that improper and unconstitutional comparison by holding that foster parents may seek to permissively intervene in neglect proceedings.

As detailed more fully in part III of this opinion, the majority's holding will also enable foster parents to intro-

duce improper considerations, consciously or uncon-
sciously, before the trial court. The mere physical pres-
ence of foster parents in the courtroom, armed with
private counsel and the undisputed fact that they pro-
vide care for the child twenty-four hours a day and
seven days a week, immediately puts them in a superior
position to that of a biological parent, who is seeking
a revocation of commitment or moving to modify the
disposition to protective supervision and whose strug-
gle with his or her own parenting deficiencies is the
reason that the child is in the foster parents' care in
the first instance. In my view, such a scenario raises
grave constitutional concerns and strikes me as funda-
mentally unfair. Foster parents play a vital role in this
state's child protection system, which frequently requires
their participation in the early stages of litigation as
witnesses and persons whose insights and firsthand
information are invaluable. Furthermore, a child's fos-
ter parents, as the primary caregivers, are likely to have
relevant evidence that courts should take into account.
See id., 651 (this court has "never held . . . that a fos-
ter parent may not testify during the adjudicative phase
of a termination proceeding or that a trial court may
not consider evidence that arises within the context of
a foster placement that is relevant to one of the statutory
grounds raised for termination of parental rights").
Indeed, the need to trust that foster parents can be
advocates for the child without impeding reunification
efforts is critical to their credibility. See id., 653 (trial
court highlighted that foster mother was "willing to
participate intensively in the children's therapy" and
that child's progress with foster mother "makes clear
[that] the process of healing and recovery must also
occur in a home environment which the children have
come to learn is safe and caring" (internal quotation
marks omitted)). Moreover, any evidence by a foster
parent relative to the child's best interest, including

In re Jewelyette M.

sensitive issues around how a child responds to visits, for example, would be *less credible* if advanced from his or her posture as a party, because that posture must necessarily be to advance the foster parent's interest under the doctrine of permissive intervention.

The fact that foster parents play a vital role and may provide relevant information nevertheless does not give the trial court the authority to consider permissive intervention for nonrelative foster parents. The majority, however, inappropriately expands the foster parents' statutory role in these proceedings and thereby diminishes the "intrinsic human rights" that a biological parent has in his or her child. *Smith* v. *Organization of Foster Families for Equality & Reform*, supra, 431 U.S. 845. Accordingly, I would conclude that foster parents cannot permissively intervene in dispositional proceedings because allowing them to do so would elevate their role in such a way that is structurally and fundamentally unfair and in violation of a biological parent's, along with the child's, fundamental right to family integrity. As I discuss more fully in part IV of this opinion, I believe that the legislature, in enacting § 46b-129 and limiting a foster parent's participation in child protection proceedings to a right to be heard and comment on the best interest of the child, struck the proper balance between recognizing the extraordinary insights that a foster parent may provide and ensuring that a foster parent has a voice in such proceedings without tainting these proceedings with the risk of impermissible considerations.

III

The majority's conclusion that nonrelative foster parents have standing to permissively intervene in the dispositional phase of a neglect petition grossly underestimates the impact that such intervention likely will have on those proceedings and overestimates the trial

In re Jewelyette M.

court's ability to limit that impact on the child protection system's paramount goal of ensuring permanency for children with due regard for the constitutional rights of parents and children alike. The majority's holding will increase the risk and specter of prolonged foster care, which will only work to deprive these children of the permanency that the system is designed to provide. Because the law governing permissive intervention is inconsistent with the statutorily circumscribed, but significant, role that foster parents have in the child protection system, the legislature prudently provided nonrelative foster parents with the limited "right to be heard" under § 46b-129 (p) and avoided the various procedural hurdles that often accompany such intervention, such as the filing of motions for injunctive relief and discovery, like the foster parents did in the present case.

There are a myriad of ways for the trial court to be provided with the information that it needs. The limited and specifically defined nature of the evidence that a foster parent is authorized to provide under this statutory scheme is inconsistent with the majority's holding that nonrelative foster parents may permissively intervene in neglect proceedings and proffer whatever evidence they choose under the inherently broad legal best interest standard. An intervenor is allowed into a case to assert his or her "interests in the controversy" only when those interests are not adequately represented already by the existing parties. *Horton* v. *Meskill*, supra, 187 Conn. 197. In this state, foster parents are required to support the goal of the approved permanency plan as well as the department's efforts at reunification, which the department is obligated by statute to provide. See General Statutes § 46b-129 (k) (2) (A); see also General Statutes § 17a-112 (j) (1). As a result, any appropriate interest advanced by a foster parent is, as a matter of law and policy, already represented adequately by the department and the petitioner. At the same time,

351 Conn. 511 APRIL, 2025 609

In re Jewelyette M.

the AMC and the GAL themselves play a vital role in representing the child's wishes and best interest, respectively. Their duties require them to meet with the child, consult with various providers, and, in particular, meet with the foster parents. In their vitally important function, the AMCs operate as a check on the department's actions relative to the child. The AMC and the GAL are empowered and, indeed, obligated to independently advance and convey the child's best interest. For those reasons, nonrelative foster parents have no appropriate interest under the rubric of a permissive intervention analysis that already is not represented by the existing parties as a matter of necessity. Nonetheless, recognizing the importance of foster parents in having a voice in these proceedings, the legislature proscribed a limited "right to be heard" for nonrelative foster parents under § 46b-129 (p).[16]

The majority's holding goes far beyond what was contemplated by the plain language of the statute[17] and,

---

[16] General Statutes § 46b-129 (p) provides in relevant part: "A foster parent, prospective adoptive parent or relative caregiver shall receive notice and have the right to be heard for the purposes of this section in Superior Court in any proceeding concerning a foster child living with such foster parent, prospective adoptive parent or relative caregiver. A foster parent, prospective adoptive parent or relative caregiver who has cared for a child or youth shall have the right to be heard and comment on the best interests of such child or youth in any proceeding under this section which is brought not more than one year after the last day the foster parent, prospective adoptive parent or relative caregiver provided such care. . . ."

[17] In my view, a principal flaw in the majority's analysis is that it places undue weight on whether the Practice Book § 35a-4 conflicts with § 46b-129 (p) and, in doing so, overlooks the more fundamental question of whether § 46b-129 itself authorizes the permissive intervention of foster parents. See part II of the majority opinion ("there is no conflict between § 46b-129 and Practice Book § 35a-4 (c)"). My analysis, instead, focuses on whether the legislature authorized permissive intervention for foster parents in § 46b-129, as our rules of practice cannot confer any rights not authorized by the General Statutes or other law. See footnote 9 of this opinion. The Appellate Court's analysis in *In re Ryan C.* appropriately adhered to that long established precedent that our rules of practice have limited authority and are constrained by the General Statutes. See *In re Ryan C.*, supra, 220 Conn. App. 526 (expressly recognizing that "Practice Book § 35a-4 cannot be inter-

In re Jewelyette M.

in doing so, increases the risk of impermissible comparisons between biological parents and foster parents at a time when the biological parents' rights to a child have not been terminated and the department remains obligated to work with them toward reunification. This heightened risk of an impermissible comparison will make it more difficult for trial judges to determine the best interest of the child without that taint, thereby increasing the likelihood of reversible error and causing further delays in permanency for the children who are the subject of these neglect petitions. The negative effects of the majority's holding today, however, will not be limited to neglect proceedings. By authorizing nonrelative foster parents to intervene in child protection proceedings, the mere advancement of a motion to intervene that is premised on *their* right to family integrity or any other interest not otherwise already subsumed by either the petitioner or the AMC imperils any attempt by the department to pursue a termination of parental rights. If reunification fails and termination of parental rights is pursued, the trial court must determine whether the biological parent has been prevented from maintaining a meaningful relationship with the child due to an unreasonable act of a third person. See General Statutes § 17a-112 (k) (trial court "shall make writing findings regarding . . . (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by . . . the unreasonable act of any [third] person").

In that vein, I note that the extraordinary act of seeking intervention by a foster parent, where he or she must establish his or her *own* interest that is not adequately represented by another party is in and of itself compelling fodder for a claim by respondent parents that they have been prevented from maintaining a meaningful

preted in a manner that enlarges a foster parent's rights under § 46b-129 (p)"). As such, my analysis focuses on § 46b-129.

In re Jewelyette M.

relationship with their child. I cannot conceive of any claim for permissive intervention that would not be used by a respondent vigorously and with compelling force to defend and to defeat a termination of parental rights case. It effectively establishes a legally sanctioned wedge between a respondent and his or her child, and that is simply untenable. I do not believe that the legislature, in enacting and amending § 46b-129, intended such a bizarre and unworkable result. See, e.g., *In re Flanagan*, 240 Conn. 157, 183, 690 A.2d 865 (when construing statutes, "we will avoid constructions that lead to absurd, unworkable or bizarre results"), cert. denied sub nom. *Flanagan* v. *Judicial Review Council*, 522 U.S. 865, 118 S. Ct. 172, 139 L. Ed. 2d 114 (1997).

Moreover, the majority overlooks the practical effect of its holding on judicial economy, as the intervention of nonrelative foster parents will inevitably cause delays in permanency while the children languish in extended foster care for the conclusion of trial court proceedings. These delays will be caused, in part, by the fact that foster parents have the authority to interject extraneous matters into the child protection proceedings, as the foster parents did here, such as when they refocused the proceedings on the question of whether they had interfered with reunification efforts. Instead of intervening and delaying these proceedings, the foster parents could have, instead, vindicated their right to be heard under § 46b-129 (p) and, also, requested an administrative hearing if any allegations of interference had an impact on their foster care license, as they argued in the trial court. See Regs., Conn. State Agencies § 17a-145-55.

A

Permissive intervention is inconsistent with a nonrelative foster parent's limited role in the statutory scheme

In re Jewelyette M.

governing neglect petitions. That inconsistency explains why the legislature specifically provided non-relative foster parents with a "right to be heard" under § 46b-129 (p), because allowing permissive intervention leads to impermissible comparisons between the biological parent and the foster parent. When a nonparty seeks to intervene, he or she must demonstrate an interest in the controversy that is not already represented adequately by the parties to that action. See *Horton* v. *Meskill*, supra, 187 Conn. 197. The question of "permissive intervention [is] committed to the sound discretion of the trial court," and the party challenging an order regarding permissive intervention "bear[s] the heavy burden of demonstrating an abuse of that discretion if they are to prevail. . . . [I]n determining whether to grant a request for permissive intervention, a court should consider several factors: the timeliness of the intervention, the proposed intervenor's interest in the controversy, the adequacy of representation of such interests by other parties, the delay in the proceedings or other prejudice to the existing parties the intervention may cause, and the necessity for or value of the intervention in resolving the controversy." (Citations omitted.) *In re Baby Girl B.*, supra, 224 Conn. 277. In part II of this opinion, I described a foster parent's interest in the controversy, which interest emanates solely from our General Statutes and is unlike the inherent constitutional interest of a biological parent. I now detail how, in light of a foster parent's limited role under the statutory framework to support the petitioner and the department, the doctrine of permissive intervention is simply incompatible with that framework because it requires the foster parent to advance his or her own interest distinct from the existing parties, including the petitioner, the AMC, and the GAL. I also note the prejudice that will result from allowing nonrelative foster parents to intervene will cause, specifically, unneces-

In re Jewelyette M.

sary delays in child protection proceedings and permanency for the children.

When considering whether the proposed intervenor's interest is adequately represented, or if intervention is warranted, "[t]he most significant factor . . . is how the interests of the [proposed intervenor] compare with the interests of the present parties . . . ." (Internal quotation marks omitted.) *Litwin* v. *Ryan*, 131 Conn. App. 558, 564, 27 A.3d 71 (2011). The proposed intervenor faces a heavy burden when his or her interests and those of the parties "are identical or there is a party charged by law with representing a proposed intervenor's interest . . . ." (Internal quotation marks omitted.) Id. In such cases, there is "a presumption of adequate representation" that may be overcome "only through a compelling showing of why this representation is *not* adequate." (Emphasis in original; internal quotation marks omitted.) Id. There is a contrary presumption, however, that a proposed intervenor's interest is not adequately represented when he or she "must rely on his [or her] opponent or one whose interests are adverse to his [or hers]." (Internal quotation marks omitted.) Id.

In order to be granted permissive intervention, a foster parent therefore must demonstrate an interest in the disposition of the petition, as foster parents have no interest in the adjudication of neglect. See *In re Vincent D.*, 65 Conn. App. 658, 665, 783 A.2d 534 (2001) (foster parents "have no personal legal interest at stake"); see also *In re Santiago G.*, 325 Conn. 221, 234, 157 A.3d 60 (2017) (foster parents have "no right to intervene in the adjudicatory phase of a termination of parental rights action"). Foster parents also have no proper personal interest, distinct from that of the petitioner, in the disposition of the neglect petition and other dispositional, postneglect hearings, as foster parents are obligated to put their personal feelings aside

In re Jewelyette M.

in order to support the approved permanency plan as well as the department's reunification efforts.

Irrespective of a foster parent's personal interest, the department's regulations, which are binding on the foster parents, require them to support the permanency plan adopted by the department and to facilitate reunification, even when a foster parent disagrees with both. See *Abreu* v. *Leone*, 120 Conn. App. 390, 408, 992 A.2d 331 ("department possesses the authority to control foster parents in the discharge of their duties"), cert. denied, 297 Conn. 926, 998 A.2d 1193 (2010). The department is obligated to facilitate reunification with the biological parent and has a variety of ways to ensure that foster parents support reunification. See General Statutes § 17a-111b (a); see also *In re Paul M.*, 148 Conn. App. 654, 662–63, 85 A.3d 1263, cert. denied, 311 Conn. 938, 88 A.3d 550 (2014). Initially, when applying to be a foster family, the department "shall . . . determine the ability of the foster family . . . to work with the . . . department to pursue the child's treatment plan including reunification with the biological family." Regs., Conn. State Agencies § 17a-150-90. Once an application has been granted, the department's regulations expressly require a foster parent to support the services that facilitate reunification, and "[f]oster parents shall be active participants in reunification of the child with the child's biological family." Regs., Conn. State Agencies § 17a-145-149 (b). Even if the goal is not reunification, foster parents are obligated to "work cooperatively with the department . . . in all matters pertaining to the child's welfare," which include ensuring "[compliance] with the treatment plan for the child . . . ." Regs., Conn. State Agencies § 17a-145-149 (a). The department's policies further obligate foster parents to make a "strong commitment to the child and to be supportive whether the child remains with them permanently or is returned to the birth family." 2 Dept. of

In re Jewelyette M.

Children & Families, Policy Manual (August 30, 2019) Policy 23-3, p. 6, available at https://portal.ct.gov/-/media/dcf/policy/chapters/233-childrens-bill-of-rights-82019.pdf (last visited March 18, 2025). Consequently, a foster parent's interest in the neglect proceeding is aligned with the petitioner's interest as a matter of law because department regulations and policy require a foster parent to support the child's permanency plan and reunification efforts.

Indeed, even if the department's plan is not reunification with the biological parent, the statutory scheme illustrates that foster parents must continue to assist the department in those efforts. As specified in § 46b-129 (k) (2), the "court shall approve a permanency plan that is in the best interests of the child or youth and takes into consideration the child's or youth's need for permanency." The department's permanency plan "may include the goal of (A) revocation of commitment and reunification of the child or youth with the parent or guardian, with or without protective supervision; (B) transfer of guardianship or permanent legal guardianship; [or] (C) filing of termination of parental rights and adoption . . . ." General Statutes § 46b-129 (k) (2).

If the permanency plan is for revocation of commitment and reunification, then a foster parent clearly is obligated to assist the department in those reunification efforts. See Regs., Conn. State Agencies § 17a-145-149 (b). Additionally, if the approved permanency plan is a permanent legal guardianship, "[t]he court shall order specific steps that the parent must take to facilitate the return of the child or youth to the custody of such parent." General Statutes § 46b-129 (j) (4). Accordingly, the foster parents must assist with the department's reasonable efforts toward reunification despite the planned transfer of guardianship or permanent legal guardianship. See *In re Pedro J. C.*, 154 Conn. App. 517, 537, 105 A.3d 943 (2014) (noting that "[t]here are well

In re Jewelyette M.

established, mandated procedures [employed] to promote reunification once a child has been adjudicated neglected,'' which include ''[issuance of] specific steps to the [petitioner] and the respondent to facilitate reasonable efforts toward a safe and successful reunification''), overruled on other grounds by *In re Henrry P. B.-P.*, 327 Conn. 312, 173 A.3d 928 (2017). If the permanency plan is termination of parental rights and adoption, as was the case initially here, then the department is still required to provide reunification efforts under that statutory scheme, which, again, foster parents are obligated to support. See General Statutes § 17a-112 (j) (1) (termination of parents rights requires finding that department ''has made reasonable efforts to locate the parent and to reunify the child with the parent'');[18] see also General Statutes § 46b-129 (j) (5) (''[u]pon the issuance of an order committing the child or youth to the [petitioner] . . . the court shall determine whether the department made reasonable efforts to keep the child or youth with his or her parents or guardian prior to the issuance of such order and, if such efforts were not made, whether such reasonable efforts were not possible''); General Statutes § 46b-129 (k) (3) (''the department shall document for the court: (A) [t]he manner and frequency of efforts made by the department to return the child home or to secure placement for the child with a fit and willing relative, legal guardian or adoptive parent''); General Statutes § 46b-129 (k) (4) (''[a]t a permanency hearing . . . the court shall . . . determine whether the [petitioner] has made reasonable efforts to achieve the permanency plan'').

Moreover, to the extent that a foster parent claims an interest in the best interest of the child that is not

_____

[18] It bears repeating that, should the petitioner pursue a termination of parental rights, the respondent parent would have, in my opinion, a more than colorable claim that a foster parent who intervened in a neglect proceeding interfered with that parent's efforts at reunification.

351 Conn. 511 APRIL, 2025 617

In re Jewelyette M.

advanced by the petitioner already, it is necessarily subsumed by the AMC and the GAL, who represent the child's wishes and best interest, respectively.[19] Significantly, unlike a foster parent, both GALs and AMCs are required to exercise their own judgment, independent from the department. See General Statutes § 46b-129a (2) (D); see also *Carrubba* v. *Moskowitz*, 274 Conn. 533, 539, 877 A.2d 773 (2005) ("[A]n [AMC] should provide independent representation of the child's interests . . . . In other words, the [AMC] is just that, an attorney, arguing on behalf of his or her client, based on the evidence in the case and the applicable law." (Internal quotation marks omitted.)). When a foster parent advances concerns about a child and is not credited by the petitioner, he or she can raise those concerns with either the AMC or the GAL, who would have an independent obligation to evaluate and bring those concerns to the trial court and to pursue whatever remedies he or she sees fit, so long as the AMC or GAL agreed that they were in the child's legal interest or best interest, respectively. See, e.g., *In re Victor D.*, 161 Conn. App. 604, 610, 128 A.3d 608 (2015) (AMC opposed depart-

[19] There is "often no bright line between the roles of a [GAL] and [an AMC, yet] the legal rights of a child may be distinct from the child's best interest. . . . While the best interest of a child encompasses a catholic concern with the child's human needs regarding his or her psychological, emotional, and physical well-being, the representation of a child's legal interests requires vigilance over the child's legal rights. Those legal rights have been enumerated as the right to be a party to a legal proceeding, the right to be heard at that hearing and the right to be represented by a lawyer. . . . Generally speaking, then, [the AMC] bears responsibility for representing the legal interest of a child while a [GAL] must promote and protect the best interest of a child." (Citation omitted; internal quotation marks omitted.) *In re Christina M.*, supra, 280 Conn. 491–92; accord *In re Kadon M.*, 194 Conn. App. 100, 106–107, 219 A.3d 985 (2019). Additionally, a GAL often possesses specialized training in family therapy or psychology, as the requirements for being appointed a GAL include proper training and a license in either the law or "in the areas of clinical social work, marriage and family therapy, professional counseling, psychology or psychiatry . . . ." Practice Book § 25-62 (b) (1); see also Practice Book § 25-62A (AMC requirements).

In re Jewelyette M.

ment's plan for reunification and respondent's motion for revocation of commitment and subsequently filed and prevailed on termination of parental rights petition). It is not unusual for the children's attorneys to take positions adverse to the department, and, when necessary, to produce their own witnesses, including the foster parents. In my view, the sole way to advance claims by the foster parents relative to the best interest of the child that are not also adopted by the department, without unconstitutionally tainting the proceedings, is through the AMC and GAL.

Moreover, because any interest that a foster parent has in neglect proceedings already is represented by the petitioner, the AMC, and the GAL, it was logical for the legislature to limit a foster parent's ability to participate in neglect proceedings to "the right to be heard . . . ." General Statutes § 46b-129 (p); see also *C. W. B.* v. *A. S.*, 410 P.3d 438, 440 (Colo. 2018) (holding that, because GALs are "statutorily obligated to advocate for the best interests of the child, including on appeal, there [was] no need to confer standing on foster parents to represent the best interests of the child on appeal"). An interest advanced by the foster parents that is neither assumed by the department or the children is either irrelevant, outside the scope of the foster parents' roles and responsibilities relative to the child, or asserts an interest, if not adopted by the child, that undermines the *child's* right to family integrity. The legislature imposed this limitation because intervention is unnecessary in this particular context, as a nonrelative foster parent's interest in the neglect proceedings, if within the scope of his or her roles and responsibilities, already is adequately represented. Permissive intervention is not only unnecessary but improper because it enables a foster parent to inject his or her personal interest into the neglect proceedings, leading to impermissible comparisons between a biological parent and a

In re Jewelyette M.

foster parent and delays, leaving the neglected children who are the subject of these petitions to languish in foster care, which is unconscionable.

B

Allowing the permissive intervention of nonrelative foster parents effectively sanctions a process that structurally invites the improper comparison of a biological parent with a foster parent during neglect proceedings. That comparison infringes on a biological parent's constitutional rights and makes it more difficult for a trial court to determine the child's best interest without the taint of impermissible considerations. This court has expressly prohibited the improper comparison of a foster parent to a biological parent in the context of termination of parental rights petitions; I can conceive of no reason why, in the context of a neglect proceeding, such comparisons are no less unconstitutional and inevitable. Because allowing the intervention of nonrelative foster parents creates an inherent risk that a court will make impermissible comparisons between foster and biological parents in the context of neglect proceedings, the legislature wisely limited the participation of a nonrelative foster parent to the right to be heard and comment on the child's best interest. This limitation strikes the proper balance between ensuring that foster parents are given an opportunity to participate meaningfully in such proceedings and protecting the integrity of those proceedings, the proper focus of which is on the best interest of the child and the respondent's right and ability to parent him or her.

This court has cautioned that "determinations [in child protection matters] are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and there-

In re Jewelyette M.

fore to reach a result based on such comparisons rather than on the statutory criteria.'' (Internal quotation marks omitted.) *In re James O.*, supra, 322 Conn. 650; see also *In re Zakai F.*, supra, 336 Conn. 301 (''[r]einstatement of guardianship proceedings employ the best interests of the child analysis . . . which leaves the reinstatement determination usually open to the subjective assessment of the trial judge'' (citation omitted)). Due to the grave risk presented by that improper comparison, our law ''do[es] not permit foster or preadoptive parents to intervene in termination proceedings because to do so would permit them to shape the case in such a way as to introduce an impermissible ingredient into the termination proceedings.'' (Internal quotation marks omitted.) *In re James O.*, supra, 651.

I cannot fathom how that risk is any less serious in neglect proceedings. The majority relies on the distinction between the adjudicative and dispositional phases, and argues that I have ''overlook[ed]'' that distinction. Footnote 29 of the majority opinion. I am acutely aware of that distinction. Indeed, because of the procedural posture of a neglect petition in relation to a petition to terminate parental rights, I find that distinction wholly irrelevant,[20] except to point out that the protections afforded by the dichotomy of an adjudication versus a disposition are eviscerated by allowing permissive intervention of nonrelative foster parents at any stage prior to the termination of a biological parent's rights. A biological parent's parental rights remain intact during the pendency of neglect proceedings, and the events that transpire during the course of neglect proceedings may be used as evidence in the adjudicatory phase of

---

[20] There is a difference, of course, with respect to relative intervention pursuant to § 46b-129 (d) (1) (C) because relatives are not state actors under the bailiwick of the department's authority and control and, as the legislature implicitly recognizes, the child's right to family integrity extends, to some extent, to extended biological family members.

In re Jewelyette M.

a termination of parental rights petition. See, e.g., *In re Joseph M.*, 158 Conn. App. 849, 862, 120 A.3d 1271 (2015) ("[i]t is well settled that courts are required to consider only facts that occurred prior to the filing of the termination petition when making a reasonable efforts assessment"); see also *In re Cameron W.*, 194 Conn. App. 633, 660, 221 A.3d 885 (2019) ("the court is required in the adjudicatory phase to make its assessment *on the basis of events preceding the date on which the termination petition was filed*" (emphasis in original; internal quotation marks omitted)), cert. denied, 334 Conn. 918, 222 A.3d 103 (2020). I can see no reason why a biological parent's rights are less worthy of protection from the risk of an improper comparison when foster parents intervene during dispositional hearings, especially because, short of termination, a biological parent's rights remain intact. In other words, the rationale and constitutional principles that hold that foster parents may not intervene in termination proceedings necessarily encompass the neglect proceedings that occur before a termination of parental rights adjudication because a biological parent has not lost that fundamental constitutional interest in family integrity.[21]

---

[21] Moreover, the salient issue during disposition is a child's best interest, which is an evidentiary question. As a result, any evidence that "tend[s] to support a relevant fact [regarding a child's best interest] even to a slight degree" should be considered, and, consequently, the suitability of a foster parent's home certainly becomes relevant in the dispositional phase. (Internal quotation marks omitted.) *State* v. *Patterson*, 344 Conn. 281, 295, 278 A.3d 1044 (2022). I nonetheless maintain that the comparison that is inevitable between an intervening foster parent and a biological parent is unconstitutional because, "despite their obvious concern about the outcome of [the child protection] proceeding, [foster parents] have no personal legal interest at stake . . . ." *In re Vincent D.*, supra, 65 Conn. App. 665. The majority's holding improperly authorizes foster parents to participate as parties and to interfere with a biological parent's fundamental right to family integrity when that biological parent's rights have not been terminated. See *Roth* v. *Weston*, 259 Conn. 202, 221, 223, 789 A.2d 431 (2002) ("the best interests of the child are secondary to the parents' rights" when they have not been terminated and "parents should not be faced with unjustified intrusions into their decision-making in the absence of specific allegations and proof of [a

In re Jewelyette M.

Indeed, I believe the risk is greater because neglect proceedings generally precede termination of parental right petitions, and, when the respondent or the petitioner seeks to revoke commitment and/or modify the disposition to protective supervision, a foster parent who has intervened necessarily has inherent advantages, material and otherwise, including the parent-like attachment that children will naturally feel for foster parents who have fulfilled their role well and ensured that the child's emotional, psychological, physical and educational needs have been met. There is nothing sinister or inappropriate in the fact that a bond occurs, and, indeed, it has long been recognized that healthy development in children depends on healthy and trusting attachments with their primary caregiver. This is why it is vitally important that a foster parent commit to support the department's permanency plan and can be trusted to do so.[22] But a biological parent who seeks to reunify—even if he or she has made significant progress in his or her rehabilitation—is necessarily in an inferior position than foster parents simply by virtue of

---

parent-like relationship between a person seeking visitation and the child]''); see also *In re Riley B.*, 342 Conn. 333, 351, 269 A.3d 776 (2022) (biological mother ''has no colorable claim to intervention as of right'' because, following termination of biological mother's parental rights, ''she lacks a direct and substantial interest'' in visitation (internal quotation marks omitted)).

[22] Notably, even relatives who have intervened and have been granted temporary custody by the court are subject to orders of the court that require them to cooperate with the department's permanency plans and services pursuant to § 46b-129. ''If the court grants such relative temporary custody during the period of such temporary custody, such relative shall be subject to orders of the court, including, but not limited to, providing for the care and supervision of such child or youth and cooperating with the [petitioner] in the implementation of treatment and permanency plans and services for such child or youth. The court may, on motion of any party or the court's own motion, after notice and a hearing, terminate such relative's intervenor status if such relative's participation in the case is no longer warranted or necessary.'' General Statutes § 46b-129 (d) (3). This provision underscores the importance of temporary caregivers, including relative caregivers whose custody occurs through the court as opposed to being licensed by the department, cooperating with the department.

351 Conn. 511 APRIL, 2025 623

In re Jewelyette M.

the fact that the child is not physically in that biological parent's care. When one adds the superior knowledge and control foster parents have over the child and his or her environment, the intervention of foster parents, who are more likely to retain private counsel, operates to create a structural disadvantage of constitutional dimension for respondent parents. In the context of termination of parental rights proceedings, we have long warned that the court must be careful not to improperly compare a biological parent to a foster parent,[23] as "[a] parent cannot be displaced because someone else could do a better job raising the child." (Internal quotation marks omitted.) *In re Corey C.*, supra, 198 Conn. App. 80. It is therefore reversible error for a trial court to base "a termination of parental rights . . . on a finding that a child's prospective foster or adoptive home will be 'better' than life with one or more biological parent[s]." *In re Paul M.*, 154 Conn. App. 488, 505, 107 A.3d 552 (2014). Allowing the permissive intervention of nonrelative foster parents in neglect proceedings necessarily gives them an elevated status that cannot be reconciled with a statutory scheme that recognizes them as state actors and requires the department to make reasonable efforts to reunify with a biological parent,[24] and a constitutional framework that

---

[23] Attempting to balance the competing interests in these cases is uniquely precarious because a judge can easily be accused of "consciously or unconsciously" engaging in the improper comparison between an intervening foster parent and a biological parent; *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 672–73; and, if appealed, reviewing courts are apt to "take the trial court's unambiguous comparison[s] at face value . . . [w]hether . . . a conscious comparison by the court or an inartful choice of words . . . ." *In re James O.*, supra, 322 Conn. 660 (*McDonald, J.*, concurring).

[24] This court, of course, does not review those cases that are resolved without the need for an appeal and in which highly motivated foster parents and biological parents, whose rehabilitative progress includes a willingness to be sensitive to a child's natural affection and bond with their primary caregiver, are able to assist with an appropriate transition to the biological parent. Cf. *In re Victor D.*, Superior Court, judicial district of Middlesex, Docket No. CP-100007160-A (November 7, 2014) (foster parents were diligent in supporting minor child to feel positively about visiting with respondent

In re Jewelyette M.

prohibits the court from making impermissible comparisons between a foster parent and a biological parent.

The majority's holding today not only creates an unacceptable risk of improper comparisons between respondent parents and foster parents in neglect proceedings but also raises systemic concerns implicating termination of parental rights petitions as well. Dispositional hearings following the adjudication of a neglect petition are part and parcel of an arc of litigation for which the paramount goal is to effectuate permanency—whether that means reunification, termination of parental rights and adoption, or transfer of guardianship—that is consistent with the child's best interest. Unless and until there is a determination by the court that they are no longer appropriate, the petitioner is obligated to make reasonable efforts at reunification, including when a child is in a preadoptive home. If reunification efforts fail and the petitioner seeks to terminate the biological parent's rights, "the court is statutorily required to address in writing 'the feelings and emotional ties of the child with respect to . . . any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties' "; id., quoting General Statutes § 17a-112 (k) (4); as well as "the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by . . . the unreasonable act of any other person . . . ." General Statutes § 17a-112 (k) (7). In my view, the very act of seeking to intervene by foster parents, who either advance the claim that they have their own right to family integrity or seek any remedy that can be viewed as an impediment to reunification, risks undermining the option of termination of parental rights and adoption of a child. Although I recognize that § 17a-112 (k) (7) is only one

father, who minimized concerns over child's ties to foster parents), aff'd, 161 Conn. App. 604, 128 A.3d 608 (2015).

351 Conn. 511 APRIL, 2025 625

In re Jewelyette M.

of seven dispositional factors and is not dispositive of a contrary best interest finding; see, e.g., *In re Nioshka A. N.*, 161 Conn. App. 627, 635, 128 A.3d 619 ("seven factors serve simply as guidelines to the court and are not statutory prerequisites" (internal quotation marks omitted)), cert. denied, 320 Conn. 912, 128 A.3d 955 (2015); it is one of the written findings that has constitutional dimensions and could be powerfully wielded as a defense to a termination if there was significant evidence to support it, which permissive intervention invites. See General Statutes § 17a-112 (k) (4) and (7).

Additionally, permissive intervention in a neglect proceeding can be used by a foster parent to effectively bypass the more difficult requirements needed for termination of parental rights and adoption, including the requirement to establish, by clear and convincing evidence, that the department has met the legal standards of reasonable efforts and that the respondent has failed to rehabilitate pursuant to § 17a-112 (j). If, instead of seeking the termination of parental rights and adoption, a foster parent intervenes in a dispositional neglect proceeding and files a motion to transfer custody and guardianship, the foster parent would have to satisfy the lower preponderance of the evidence standard of proof. See *In re Kamari C-L.*, supra, 122 Conn. App. 830. Termination petitions are subject to the stringent clear and convincing evidence standard as well as the requirement that the petitioner make reasonable efforts and meet her burden with respect to the legal standard governing the failure to rehabilitate and other grounds pursuant to § 17a-112. See *In re James O.*, supra, 322 Conn. 649. That distinction is a significant one and provides further evidence that the legislature properly limited the participation of foster parents to a statutory right to be heard in neglect proceedings. General Statutes § 46b-129 (p).[25]

_____
[25] It should also be self-evident that creative legal theories advanced by the bar, while admirable from an academic perspective and not inappropriately

In re Jewelyette M.

### C

Additionally, the majority's holding will be detrimental to judicial economy and will "undermine the state's important interest in protecting the welfare of children." *In re Na-Ki J.*, 222 Conn. App. 1, 13, 303 A.3d 1206, cert. denied, 348 Conn. 929, 304 A.3d 860 (2023). The delay this will cause in permanency for these children is unacceptable.[26] See *In re Brian P.*, 195 Conn. App. 582, 593, 226 A.3d 152 (2020) ("[i]n child protection proceedings, time is of the essence, and permitting intervention after the conclusion of the termination proceedings would unnecessarily delay permanency" and negatively affect child's best interest). Not only will the intervention of foster parents extend the litigation in the trial court, it will also increase the likelihood of more appeals that further extend the litigation and delay.

When the foster parents are allowed to intervene as parties, they likely will be given the right to advance their own interests by calling witnesses and presenting evidence, taking a tremendous toll on the time that it takes to litigate these petitions.[27] See *Khan* v. *Yale*

coming from attorneys whose clients are the children and parents who are properly before the court, can nonetheless wreak havoc on judicial economy by straining resources on a child protection system obligated to operate in a timely manner in juvenile matters.

[26] Although I am cognizant of the fact that the child was in the care of the foster parents for more than six years, it is important to note that, when Humphrey's evaluation report was received in June, 2019, the child was turning four years old.

[27] I recognize that the majority has left it to the discretion of the trial court to permit an intervening foster parent to call his or her own witnesses, cross-examine other parties' witnesses, and introduce evidence. Apart from my principal objection to such participation for the reasons stated in this dissent, I believe that determining the precise extent of a foster parent's participation on a case-by-case basis in the hands of a particular trial judge does nothing to limit the effects of delay because the best interest standard is inherently broad in its scope. Moreover, the ability to take an appeal premised on whether a court has abused its discretion on such rulings remains available, which presents yet another avenue of litigation and corresponding delay.

351 Conn. 511 APRIL, 2025 627

In re Jewelyette M.

*University*, 347 Conn. 1, 31, 295 A.3d 855 (2023) ("stress[ing] the importance of procedures such as the opportunity for parties to call witnesses"); see also *In re Juvenile Appeal (Docket No. 10718)*, supra, 188 Conn. 262 (allowing intervention of foster parents in termination of parental rights proceeding "permit[s] them to shape the case in such a way as to introduce an impermissible ingredient into the termination proceedings"). Furthermore, foster parent intervention is more likely to introduce extraneous issues into the litigation that will distract the trial court from the task at hand, which is determining the best interest of the child. That is exactly what occurred here, when the foster parents were granted permission to intervene to advance personal interests, namely, to affirm their claim of family integrity and to rebut allegations that they had interfered with reunification.[28]

In this regard, the underlying proceedings in the present case bear emphasis. In July, 2015, the respondent was issued final specific steps for purposes of facilitating reunification. See *In re Shane M.*, 318 Conn. 569, 586, 122 A.3d 1247 (2015), citing General Statutes § 46b-129 (b), (c) (6) and (j) (3). Among those specific steps were to "[t]ake part in counseling and make progress toward the identified treatment [goal]" of individual parenting, to "[a]ddress mental health needs in individual counseling to maintain emotional stability," to

---

[28] I respectfully disagree with the majority's suggestion that the interest asserted by the foster parents in this neglect proceeding was not their own personal interest. In their motion to intervene, the foster parents specifically argued that they had "a direct and immediate interest" in "family integrity" with Jewelyette on the ground that she had been in their care for years. In doing so, they recognized that, pursuant to Practice Book §35a-4 (d), "a direct and immediate interest" in the proceedings is precisely what the juvenile court is required to consider. Moreover, they further argued that their interest in family integrity increased over time, notwithstanding their acknowledgement of contrary precedent. I fail how to see how the foster parents' interest in family integrity with a foster child is anything but personal in nature.

"[c]reate and maintain [a] safe, stable and nurturing home environment," to "[s]ubmit to a substance abuse evaluation and follow the recommendations about treatment," to "[s]ubmit to random drug testing," "[n]ot [to] use illegal drugs or [engage in] alcohol abuse," and to "[c]ooperate with service provider[s'] recommen[dations] for parenting/individual/family counseling, in-home support services and/or substance abuse assessment/treatment . . . ." In April, 2017, the department "opined . . . that [the respondent] was unwilling or unable to benefit from reunification efforts because he continued to abuse alcohol, exhibit[ed] concerning mental health symptoms, and [broke] the law despite participating in services." (Internal quotation marks omitted.)

The psychological evaluations authored by Humphrey, the court-appointed clinical psychologist, however, indicated that the respondent had made notable progress as time went on. Following his March, 2019 evaluation, when Jewelyette had been in the foster parents' custody for seventeen months, Humphrey reported that the respondent's "interaction with Jewelyette was positive overall" and that "[h]e engaged Jewelyette in a warm and nurturing manner. Jewelyette called him 'Daddy' . . . [and] [h]e nicely allowed her to paint his fingernails. . . . [The respondent] frequently offered demonstrations of affection, and Jewelyette responded positively. . . . My impression of Jewelyette's interaction with her father is that she knows him, trusts him, and enjoys spending time with him. . . . [Humphrey] would describe the relationship between [the respondent] and Jewelyette as positive. However, if the [c]ourt determines [that] Jewelyette should be reunified with [the respondent], it is my opinion this will be emotionally challenging for her, and perhaps result in intense emotions associated with loss, including anger, grief, and sadness. In this case, [Jewelyette's]

relationship with [the respondent] may be tested, and they should be engaged in supportive therapy to help her with the adjustment.'' At that time, Humphrey declined to state whether, as a permanent placement option, residing with the foster parents or the respondent was in Jewelyette's best interest and, instead, ''offer[ed] only [his] opinion that [he] believe[d] [that] Jewelyette would be adequately cared for by either [the respondent] or her current caretakers [the foster parents] . . . .'' Humphrey observed that the father, ''on his own and through the assistance of his attorney, ha[d] made repeated, diligent efforts to prepare him[self] for potential reunification with Jewelyette'' and was open to ''guidance about how to 'talk to Jewelyette' if she [was] to reunify and wanted contact with her foster family.'' At the same time, Humphrey recognized a chief obstacle to successful reunification would be the psychological distress, ''perhaps in a lasting and ongoing way, [caused] by [her] removal from the people she knows as her parents.''

The petitioner withdrew the petition to terminate the respondent's parental rights on August 13, 2019, following that evaluation, but another petition was filed on December 9, 2019, after the respondent's encounter with the biological mother that ultimately resulted in his arrest and conviction for larceny in the sixth degree. The trial on that petition, however, was canceled due to the COVID-19 pandemic. The petitioner then changed course over the summer of 2020, and made the not insignificant decision to change the permanency plans from seeking the termination of the respondent's parental rights to reunification. The petitioner therefore filed a motion on September 28, 2020, to approve a permanency plan that called for reunification. It was at this point that the foster parents, contrary to their obligations under the General Statutes and applicable regulations, began to resist reunification efforts and to

In re Jewelyette M.

obstruct the court proceedings. On March 15, 2021, Judge Taylor sustained the objection to the permanency plan calling for reunification filed by Jewelyette's attorney, who argued that there was no psychological assessment to support the change in plan.

On October 29, 2021, Humphrey issued a third updated psychological evaluation and interactional study pursuant to the court order. In a stark reversal of the ambivalence he expressed in his 2019 evaluation, Humphrey now recommended reunification with the respondent as soon as possible. Humphrey recounted his past evaluations when the child responded well to the respondent and her behaviors then "suggested she knew him, trusted him, and enjoyed spending time with him." In 2021, Humphrey observed that the child "seemed prepared from the outset to engage in rejecting and resistant behavior toward [the respondent]," which the respondent "did not handle . . . well." After detailing numerous observations, Humphrey concluded that, in his opinion, "the most likely explanation for the marked shift in Jewelyette's attitude toward her father, and her behavior in his presence, is that she has been influenced to denigrate and reject him. There is little support for the notion that his behavior, in itself—given the history of the relationship—would result in Jewelyette's present posture."[29]

_____

[29] In this final evaluation, Humphrey summarized the following observations or information provided to him by outside providers. He noted that, in 2020, when in-person visits were approved, the foster parents objected on the basis of a claim that someone in the home had compromised health and that Jewelyette asked the examiner whether he was going to meet with her " 'mommy and daddy' " and said that she was only pretending to eat the snacks her father brought, adding that they were gross and that she didn't like them, even though Humphrey observed her rapidly eating the snacks her father provided and her continuing to do so while her father was putting them away. Humphrey noted that this was not only confirmed by the respondent, who claimed that Jewelyette would lie that she did not consume his food, but was similar to reports by a former service provider from the department, who Jewelyette had instructed to lie to her foster parents by saying she did not enjoy herself at visits with her father, even

In re Jewelyette M.

On November 8, 2021, the foster parents filed a motion to intervene "for the limited purpose of presenting evidence, including the cross-examination of witnesses, and argument regarding the best interest of the child in relation to the [respondent's] pending motion to revoke commitment and the motion to review the permanency plan." While that motion was pending, the department informed the foster parents on November 18, 2021, that Jewelyette would be "remove[d] . . . from their care on November 28, 2021, for the purpose of placing [her] in the home of a relative."

In response, the foster parents filed a habeas application on November 22, 2021, seeking, as relief, an order that the petitioner "refrain from removing [Jewelyette] from the care of the preadoptive foster parents" and that the petitioner "be permanently enjoined from removing [Jewelyette] from the foster parents." Judge Taylor issued a temporary injunction on November 24, 2021, "enjoin[ing] [the petitioner] from removing . . . . Jewelyette . . . from the home of [the foster parents]" until further order of the court. The court then granted the foster parents' motion to intervene on January 20, 2022, thereby enabling them to mount an opposition to the respondent's November 3, 2020 motion to revoke Jewelyette's commitment.

though the worker observed what she documented as a positive visit. Humphrey also observed that the child spontaneously told the foster parents in his presence that "she told [him] 'the truth' "—a phrase "commonly heard when children have been guided toward providing a specific set of data to an evaluator." He reiterated that the child's interview "was marked by her spontaneous and strong comments about not liking visits with the respondent, whom she would not refer to as her father." In addition, Humphrey watched the foster mother send Jewelyette to the waiting room with the reassurance that she would be " 'safe,' " leading Humphrey to express concern that "the foster parents may be casting [the respondent] as dangerous," even though Jewelyette was in the next room and only eight feet away. Humphrey concluded that it was "not unreasonable for [the respondent] to question whether there are forces actively working against him despite his efforts at rehabilitation and reunification with Jewelyette."

In re Jewelyette M.

On April 20, 2022, more than five months after the foster parents' motion to intervene was filed and an injunction in their favor was granted, the respondent called Humphrey to testify in support of his motion to revoke. The hearing was dominated by the foster parents' focus on their own interest in caring for Jewelyette and their claims that they did not interfere with reunification, notwithstanding established precedent that they have no recognized right to family integrity.[30] Indeed, they argued that their right to family integrity increased the longer the child remained in their care. The respondent, whose right to family integrity is without doubt, to this day, and now his sister, the paternal aunt in whose care Jewelyette was placed, still await final resolution of the motion for revocation that he filed on November 3, 2020. Judge Taylor denied the motion to revoke four months after the last day of trial on Mary 15, 2023, and, in response to the Appellate Court's decision in *In re Ryan C.*, the petitioner moved to remove the foster parents as parties on July 21, 2023.

The temporary injunction that the foster parents obtained in November, 2021, in response to indications that the department was seeking to reunite Jewelyette and the respondent, remained in place for almost three years, until July 16, 2024. At that time, the trial court, *Daniels, J.*, was "willing to provide temporary relief from the temporary injunction" that had prevented the department from removing Jewelyette. That injunction, which purported to be temporary, nevertheless enabled

---

[30] The foster parents were able to reshape the underlying child protection matter through their intervention so that the proceedings focused on the question of whether they had interfered with reunification efforts. Although a foster parent's interference could be relevant to a child's best interest, the question raised by this appeal is who should be the person to introduce such evidence in the proceedings. To the extent it is relevant to the child's best interest, I maintain that either the AMC, the GAL, the respondent, or the petitioner could offer evidence of alleged interference and, if appropriate, call a foster parent as a witness. See part III A of this opinion.

In re Jewelyette M.

the foster parents to utilize permissive intervention as a procedural vehicle by which they extended the litigation on the respondent's motion to revoke commitment for years while advancing their own agenda.

This pattern of delay is not novel to the case before us. As illustrated in *In re Ryan C.*, supra, 220 Conn. App. 507, and *In re Andrew C.*, 229 Conn. App. 51, 326 A.3d 575, cert. granted, 350 Conn. 931, 326 A.3d 1107 (2024), and cert. granted, 350 Conn. 932, 326 A.3d 1107 (2024), the delays precipitated by the foster parents' intervention seem almost insurmountable when viewed through the eyes of a child. See *Feinberg* v. *Feinberg*, 114 Conn. App. 589, 597 n.1, 970 A.2d 776 (2009) (three and one-half years in life of twelve year old was "a significant passage of time"), appeal dismissed, 302 Conn. 463, 28 A.3d 958 (2011) (certification improvidently granted).

In *In re Ryan C.*, supra, 220 Conn. App. 507, it took almost three years for the department to effectuate and finalize its plan to reunify the child with the respondent father after the foster parent took steps to intervene. See id., 514, 517. The department in that case had sought and obtained an order of temporary custody of Ryan C., as well as his sibling, in 2017, ultimately placing them with a foster parent. Id., 512. In 2020, after the department sought to reunify Ryan C. with the respondent father, the foster parent "filed an ex parte emergency motion to intervene for the sole purpose of seeking an emergency motion to stay, an ex parte emergency motion to stay the removal of Ryan C. from her home, a motion to intervene for purposes of seeking the transfer of guardianship of Ryan C. to her, and a motion to modify the current disposition of commitment and transfer guardianship to herself . . . ." Id., 514. The court granted the foster parent's ex parte emergency motion to intervene and emergency motion to stay on July 28, 2020. Id. In 2021, the foster parent then

In re Jewelyette M.

filed "an amended motion to intervene corrected
. . . ." (Internal quotation marks omitted.) Id. The trial
on the foster parent's motion to transfer guardianship,
together with the petitioner's motion to revoke the
child's commitment, did not start until October 29, 2021,
which was more than one year after the petitioner had
planned to reunify Ryan C. and his father. Id., 514, 516.
The trial was conducted over two additional nonconsec-
utive days[31] and, ultimately, concluded more than seven
months later in June, 2022. Id., 516–17. The trial court
rendered its decision four months after the conclusion
of trial. Id., 517. Thereafter, the respondent father
appealed, and it was not until July, 2023, that the appeal
was resolved. See id., 510, 518. All in all, it was more than
three years from when the foster mother first sought
to intervene until this court denied her petition for
certification, concluding appellate review. See id., 514;
see also *In re Ryan C.*, 348 Conn. 901, 300 A.3d 1166
(2023).

Similarly, in *In re Andrew C.*, supra, 229 Conn. App.
51, which pertained to Ryan C.'s sibling, the case was
not resolved until five years following the foster parents'
filing of their motion to intervene. See id., 53–54, 56.
The department obtained orders of temporary custody
regarding Andrew C. and filed a neglect petition in 2017.
Id., 54. In December, 2019, Andrew C.'s foster parents
sought to intervene and their intervention was granted
in January, 2020. Id., 54–55.[32] On July 20, 2020, the foster

---

[31] It is very difficult to conduct a trial in a child protection matter over
consecutive days, which are usually reserved for termination of parental
rights proceedings and contested orders of temporary custody hearings.
This brings to mind Judge Jonathan E. Silbert's "Corollary to Murphy's Law,"
which is that "[t]he greater the number of attorneys in a given case, the
harder it is to assemble them all in a single courtroom on a date certain."
(Internal quotation marks omitted.) *In re Ann J.*, Superior Court, judicial
district of New London, Juvenile Matters (November 19, 1993) (10 Conn. L.
Rptr. 405, 406).

[32] The foster parents in *In re Andrew C.*, who had cared for the child for
more than two years at that point, asserted in their motion to intervene that
they had "an interest in keeping their family intact" and "in maintaining

351 Conn. 511 APRIL, 2025 635

In re Jewelyette M.

parents objected to the permanency plan that had called for reunification on the ground that it was not in Andrew C.'s best interest, and, on July 27, 2020, the foster parents additionally filed "an emergency motion to stay the reunification of Andrew [C.] with the respondent." Id., 55–56.

On January 28, 2021, the juvenile court began a consolidated trial on the respondent's motion to revoke Andrew C.'s commitment, the foster parents' motion to transfer guardianship, and the petitioner's motion for review of the permanency plan. Id., 56. The trial, during which "the foster mother testified and the foster parents presented numerous exhibits and the testimony of several witnesses" of the court, concluded six months later in August, 2021. Id. The trial court ultimately granted the foster parents' motion to transfer guardianship of Andrew C. to them on December 2, 2021, six months after the conclusion of trial. Id. The respondent father did not appeal, but, in light of the Appellate Court's decision regarding Andrew C.'s brother in *In re Ryan C.*, supra, 220 Conn. App. 507, the respondent father filed a motion to open and vacate the trial court's judgment on October 2, 2023, which was granted three months later on January 3, 2024, from which the foster parents appealed. *In re Andrew C.*, supra, 229 Conn. App. 57–58. On November 4, 2024, the Appellate Court officially released its decision, holding that the foster parents "did not have standing to intervene . . . ." Id., 53. Although the foster parents were allowed to intervene promptly in January, 2020, it still took the trial court more than one year to hear and decide the respondent's motion to revoke and the foster parents' motion to transfer guardianship. Id., 55–56. Moreover, taking the foster parents' appeal into account, it took almost four years from the start of the consolidated trial until

their family's integrity." (Internal quotation marks omitted.) *In re Andrew C.*, supra, 229 Conn. App. 54–55.

In re Jewelyette M.

the conclusion of appellate review. See id., 56. As these two relatively recent decisions demonstrate, the intervention of foster parents frequently delays child protection proceedings for years.

Furthermore, the trial court's authority to allow for the permissive intervention of nonrelative foster parents also will have a negative impact on termination of parental rights petitions. The juvenile court is required to "make written findings regarding . . . (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by . . . the unreasonable act of any other person . . . ." General Statutes § 17a-112 (k). There can be little doubt that the delays attendant to allowing consideration of intervention motions can unduly prolong resolution of these cases.

Moreover, I am not persuaded that, once the majority's holding is entrenched as precedent, granting such motions will be rare, if not impossible. It is axiomatic that the circumstances of a child in foster care are among the most heartrending of cases in the whole of our judicial system. It is why these cases are also susceptible to the age-old maxim that bad facts make bad law. See *State* v. *McCoy*, 331 Conn. 561, 587, 206 A.3d 725 (2019). There will never be a shortage of those who will claim that the department is not doing enough or too little on behalf of the minor child. Yet such complaints should be advanced by those persons who are properly before our courts and whose fundamental rights—both the parent's and the child's—entitle them to an expeditious resolution of those complaints in our courts.

As the present case exemplifies, the practical effect of the majority's interpretation of § 46b-129 will be delay

In re Jewelyette M.

in child protection proceedings,[33] thereby "undermin[ing] the state's important interest in protecting the welfare of children." *In re Na-Ki J.*, supra, 222 Conn. App. 13. The negative "psychological effects of prolonged [child protection] proceedings on young children" means that "time is of the essence in custody cases." *In re Alexander V.*, 25 Conn. App. 741, 748, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992). Moreover, the majority's holding will increase the likelihood and frequency of appeals, both from unsuccessful foster parents and from the other parties should intervention be granted, even if those appeals are ultimately dismissed. See, e.g., *In re Santiago G.*, supra, 325 Conn. 223. A pending appeal in a child protection matter breeds uncertainty, which, of course, deprives the child of any sense of permanency until that appeal is resolved. Indeed, that was a concern in the present case during the hearing on November 4, 2024, when Jewelyette's attorney expressed concern that counsel was "attempt[ing] to set up yet another appealable issue" that would extend the underlying litigation yet again and lead to more uncertainty for Jewelyette.

In addition to extending the length of the actual litigation, allowing nonrelative foster parents to intervene in child protection proceedings will complicate the scheduling thereof. This is inimical to the child protection system, which is aimed at advancing "the strong

---

[33] In addition to extending the length of the litigation, the intervention of additional parties will cause additional scheduling issues, given that more witnesses, experts, and lawyers will need to attend "any proceeding" under § 46b-129. General Statutes § 46b-129 (p). In any given case before the juvenile court, there are typically a minimum of seven individuals required and/or given notice to participate: the petitioner, the department social worker, the respondent parents, each of whom typically has their own counsel, the AMC, and, when appropriate, the GAL. Each party has the opportunity to call his or her own witnesses and to cross-examine same. As but one example, I note that Humphrey's cross-examination in the present case spanned multiple days and was delayed in order to allow newly appearing counsel to review the transcript of Humphrey's direct testimony.

In re Jewelyette M.

public interest in [the] prompt resolution of [child protection] cases so that the children may receive loving and secure home environments as soon as reasonably possible." (Internal quotation marks omitted.) *In re Amias I.*, 343 Conn. 816, 841, 276 A.3d 955 (2022). It bears repeating that "time is of the essence" and that "unnecessarily delay[ing] permanency" runs counter to the best interests of these children.[34] *In re Brian P.*, supra, 195 Conn. App. 593.[35]

Finally, I again underscore the important role that foster parents play in the child protection system. For that reason, allegations of interference with reunification should be taken seriously.[36] The foster parents,

---

[34] I also note two additional circumstances in which allowing foster parents the right to permissively intervene would unduly delay proceedings. First, the majority's decision would manifest in an opportunity for foster parents to appeal, creating parallel tracks in litigation, as evident in the present case, because there are no automatic appellate stays in child protection matters. See Practice Book § 61-11 (b). Second, those parallel tracks of litigation will prolong these proceedings and foment the uncertainty for these children, particularly in the foreseeable circumstance when a foster parent appeals from the denial of a motion to intervene.

[35] The negative effects of these delays are compounded by the fact that our state's judicial resources are spread thin, which the Judiciary Committee repeatedly recognized during recent judicial confirmation hearings. Currently, with respect to child protection matters, which involve both delinquency and neglect proceedings, there are five judicial districts in which there is only one regular sitting judge, three judicial districts with two regular sitting judges, and two districts with three regular sitting judges. Moreover, four judicial districts do not have the support of either senior judges or judge trial referees, and the Child Protection Session in the Middlesex Judicial District has one senior judge and one judge trial referee. See footnote 31 of this opinion, quoting Judge Silbert's Corollary to Murphy's Law.

[36] The record before us, and Humphrey's 2021 report in particular, contains evidence that, if credited, suggests that the foster parents did in fact interfere with reunification in the present case. During virtual visits with the respondent, there were reports that it seemed like someone else was in the room with Jewelyette, as she would "look to the side, 'kind of . . . looking for approval.' " After positive visits with the respondent, Jewelyette would request that someone tell her foster parents that she cried during those visits. The foster parents also informed Jewelyette that she would be " 'safe,' " which Humphrey described as a concern. Most troubling are Humphrey's comments that Jewelyette would "spontaneous[ly] [launch] into complaints," which Humphrey noted is "commonly seen in custody . . . litigation, when a child has been influenced to express disdain for a parent

however, do have a forum to contest such allegations of interference. Should those allegations impact the foster parents and their ability to foster children in the future, they could "request an administrative hearing thereon in accordance with the Uniform Administrative Procedures Act [UAPA] . . . . Revocation or denial of renewal of license shall be stayed until such hearing is held except as provided in [the UAPA]." Regs., Conn. State Agencies § 17a-145-55. Moreover, after exhausting their administrative remedies, the foster parents could then pursue an appeal in the Superior Court. See General Statutes § 4-183.[37]

Because the foster parents in the present case contend that they are being incorrectly painted as interfering with reunification, I believe that claim is one that must be raised, in the first instance, in an administrative

figure." He then noted that Jewelyette would spontaneously claim that her foster parents do not direct her statements, which led Humphrey to find that "[s]uch an impromptu disclosure also typically indicates an adult or adults has either told a child what to say or has implied what should be said." Indeed, Humphrey stated in his report that "Jewelyette presents as a child who has been far too exposed to the legal issues that surround her . . . ." Finally, after noting that Jewelyette would abruptly change her behavior toward the respondent, Humphrey opined that "the most likely explanation for the marked shift in Jewelyette's attitude toward [the respondent], and her behavior in his presence, is that she [had] been influenced to denigrate and reject him."

I recognize that, in his May 15, 2023 memorandum of decision denying the respondent's motion to revoke commitment, Judge Taylor did not credit Humphrey's report in this regard. Because the neglect proceeding before Judge Taylor was, in my view, fundamentally flawed as a result of the foster parents' participation therein, that credibility determination is of no moment and, indeed, constitutionally suspect as a result.

[37] In addition to pursuing administrative remedies with respect to his or her foster license, foster parents also may seek a writ of habeas corpus "regarding the custody of a child currently or recently" in their care for a certain period of time. General Statutes § 52-466 (f); see also *Terese B.* v. *Commissioner of Children & Families*, 68 Conn. App. 223, 230 n.10, 789 A.2d 1114 (2002) (noting legislature "provid[ed] foster parents a statutory right" to pursue writ). Although the provision does not limit its application to posttermination proceedings, I view this relief as one that does not have inherent constitutional infirmities once a biological parent's rights have been terminated.

In re Jewelyette M.

proceeding pursuant to § 17a-145-55 of the Regulations of Connecticut State Agencies, rather than in the midst of a neglect proceeding. See *Cannata* v. *Dept. of Environmental Protection*, 215 Conn. 616, 622, 577 A.2d 1017 (1990) ("[i]t is a settled principle of administrative law that, if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain jurisdiction to act in the matter" (internal quotation marks omitted)). For all of these reasons, I would conclude that permissive intervention is not available to the foster parents in this case.

IV

A

In their writ of error, the foster parents claim that "[t]he trial court erred by failing to provide [them] their right to be heard at the November 4, 2024 hearing, as such right is intended under § 46b-129 (p) and other relevant law." I disagree. Section 46b-129 (p) plainly and unambiguously confers on foster parents a right to be heard and comment on the best interest of the child in neglect proceedings. In my view, that statutory right entitles foster parents to give a statement, which is either sworn or unsworn, in oral or written format, at a time that the trial court, in its discretion, deems most appropriate. See, e.g., *Griswold* v. *Camputaro*, 331 Conn. 701, 709, 207 A.3d 512 (2019) ("the trial court has broad discretion in matters of case management"); *Connecticut Associated Builders & Contractors* v. *Hartford*, 251 Conn. 169, 191, 740 A.2d 813 (1999) ("[t]he trial court has inherent authority to supervise and manage the orderly presentation of evidence").

It bears repeating that a foster parent's duties, obligations, and role in child protection proceedings are carefully circumscribed by statute. Historically, in the context of neglect petitions governed by § 46b-129, the legislature has provided foster parents with the ability

to speak to the child's current situation and best interest. I therefore would conclude that a foster parent's "right to be heard" under § 46b-129 (p) includes the right to give a statement, sworn or unsworn, through oral testimony or written statement, at a time deemed most appropriate by the trial court. Because the record indicates that the court complied with that statutory requirement and did not abuse its discretion in doing so, I would conclude that the rights of the foster parents were not violated in this case.

In construing § 46b-129 (p), "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, 338 Conn. 803, 815, 259 A.3d 1157 (2021). We also must adhere to "the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *State* v. *Cody M.*, 337 Conn. 92, 102–103, 259 A.3d 576 (2020); see also *Broadnax* v. *New Haven*, 284 Conn. 237, 245, 932 A.2d 1063 (2007) ("[t]he meaning of the relevant terms of [a statute] becomes apparent when we view them, as we must, under our established rules of statutory construction, in context with the statutory scheme of which they are a part").

As this court has observed, "the ultimate standard underlying the whole statutory scheme regulating child welfare is the best interest of the child. The public policy of this state . . . is [t]o protect children whose health and welfare may be adversely affected through injury and neglect . . . to provide a temporary or per-

In re Jewelyette M.

manent nurturing and safe environment for children when necessary . . . . Time is of the essence in child custody cases. . . . This furthers the express public policy of this state to provide all of its children a safe, stable nurturing environment. . . . When the child whose interest is to be protected is very young, delay in adjudication imposes a particularly serious cost on governmental functioning." (Citations omitted; internal quotation marks omitted.) *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 439–40, 446 A.2d 808 (1982).

Furthermore, when constitutional rights are at issue, "courts are bound to assume that the legislature intended, in enacting a particular law, to achieve its purpose in a manner which is both effective and constitutional. . . . [T]his presumption of constitutionality imposes upon the trial court, as well as this court, the duty to construe statutes, whenever possible, in a manner that comports with constitutional safeguards of liberty." (Internal quotation marks omitted.) *Fish* v. *Fish*, 285 Conn. 24, 43, 939 A.2d 1040 (2008); see also *In re Valerie D.*, supra, 223 Conn. 534–35 (this court construes statutes so as to comply, rather than conflict, with applicable constitutional requirements). Moreover, "[w]e repeatedly have recognized that when fundamental rights are implicated . . . standing serves a function beyond a mere jurisdictional prerequisite. It also ensures that the statutory scheme is narrowly tailored so that a person's personal affairs are not needlessly intruded upon and interrupted by the trauma of litigation." (Internal quotation marks omitted.) *Fish* v. *Fish*, supra, 41. The plain language of subsection (p) of § 46b-129, its surrounding statutory scheme, its legislative history, and the constitutional rights at play convince me that the right extended to nonrelative foster parents is limited in nature and is not intended to permit their permissive intervention in neglect proceedings.

By its plain language, § 46b-129 (p) limits the partici-
pation of both current and former foster parents in
dispositional hearings to "the right to be heard" and to
"comment on the best interests of such child . . . ."
It plainly and unambiguously authorizes a current or
former foster parent to be heard with respect to any
"observation or remark" that "express[es] an opinion
or attitude" about the best interest of the child. Mer-
riam-Webster Online Dictionary, available at https://
www.merriam-webster.com/dictionary/comment (last
visited March 18, 2025) (defining "comment"). Precisely
what is encompassed by the right to be heard, however,
is not specified in the statute, and, consequently, I look
to the legislative history of a foster parent's statutory
rights under § 46b-129, as well as the surrounding statu-
tory scheme. The legislative history confirms that foster
parents have no naturally given rights with respect to
foster children and that the legislature always has pro-
vided a limited set of statutory rights to foster parents.

There is no relevant legislative history from initial
passage of the provision in 1977 that provided foster
parents with standing "for the purposes of [what is now
§ 46b-129]." Public Acts 1977, No. 77-273. It is notewor-
thy, however, that the plain language of the original
subsection did not provide foster parents with unbri-
dled standing to intervene in neglect proceedings. See
General Statutes (Rev. to 1979) § 46b-129 (h). Instead,
the legislature originally limited a foster parent's "stand-
ing" to "matters concerning the placement of a foster
child living with such parent." General Statutes (Rev.
to 1979) § 46b-129 (h). Because that was evidently too
limited a role in neglect proceedings, the legislature
almost immediately amended that subsection to provide
foster parents with notice and standing to be heard
with respect to the "revocation of commitment of a
foster child" as well. Public Acts 1979, No. 79-579.
Although there is no relevant legislative history, the

In re Jewelyette M.

fact that the initial law apparently was too constrictive, such that it had to be amended and expanded shortly thereafter, reflects the legislature's view that statutes concerning neglect proceedings are to be strictly construed so as to place limitations on a foster parent's rights and to avoid infringing on the constitutional rights of biological parents. Moreover, the statutory nature of a foster parent's rights was reflected in the case law at the time such that the legislature, presumably, was aware that any rights of foster parents must be conferred by statute. See *In re Juvenile Appeal (Docket No. 10718)*, supra, 188 Conn. 261–62 ("foster parents have standing in any proceeding concerning the placement or revocation of commitment of a foster child . . . [but] this standing does not spill over into a proceeding involving termination of parental rights" (citation omitted; footnote omitted)); see also *Eason* v. *Welfare Commissioner*, 171 Conn. 630, 633, 635, 370 A.2d 1082 (1976) (concluding that foster parent "did not fall within one of those categories" of persons enumerated in General Statutes (Rev. to 1975) § 17-62 (f), "which restricts the right to file an application for revocation to a 'parent,' a 'relative' and other persons or agencies named therein"), cert. denied sub nom. *Eason* v. *Maloney*, 432 U.S. 907, 97 S. Ct. 2953, 53 L. Ed. 2d 1079 (1977).

Moreover, when it again amended the statute in 1998 to provide former foster parents with "standing to comment on the best interests of [the] child," the legislature was very specific about a foster parent's role. See Public Acts 1998, No. 98-185. During debate in the House of Representatives, Representative Mary Mushinsky, one of the bill's cosponsors, explained that the law "clarifies" that foster parents have "standing *for the limited purpose* of commenting on the child's best interest in a variety of Superior Court hearings." (Emphasis added.) 41 H.R. Proc., Pt. 7, 1998 Sess., pp. 2355–56. Mushinsky continued that, in response to complaints from the

Select Committee on Children, the legislation provided foster parents with the ability "to express an opinion on their knowledge of the child after having cared for the child for an extended period. We believe [that] it will help keep good foster parents in the system." Id., p. 2356.

Similarly, Senator Adela M. Eads, another cosponsor of the bill, explained during debate in the Senate that the amendment would provide rights to foster parents that they did not have under state law. See 41 S. Proc., Pt. 8, 1998 Sess., p. 2456. The senator detailed how "[t]his bill extends the right of foster parents by permitting them to comment on the best interests. And I want to emphasize *the best interests of the child* in any type of neglect hearings . . . even if the child is not living with [the foster parents currently] but has . . . lived with them [for] at least six months. There are an awful lot of times the children are taken [to] one foster home from [another], and the foster parents who have had these children *have not had the right or the authority* to be able to" give their opinion on a child's best interests. (Emphasis added; internal quotation marks omitted.) Id. Eads closed by essentially stating that foster parents should have a right to be heard and comment but no more, which "strikes a very good balance because it gives the [former foster parent] who has invested a great deal of love, and affection, with this child, and who knows this child better than any social worker or [department worker], to be able to have a say in the [placement] of the child. I would hope that the [Senate] would support it." Id., p. 2457.

Consequently, in 2001, the legislature was not writing on a blank slate when it further amended § 46b-129, as a long history of providing foster parents with specific and limited roles in neglect proceedings existed. When the legislature amended the statutory scheme in 2001 by replacing a foster parent's "standing" with the "right

In re Jewelyette M.

to be heard," it was not taking anything away from foster parents but, rather, was clarifying that a foster parent's role in neglect proceedings is limited to the right to be heard and comment on the best interest of the child. Public Acts 2001, No. 01-142, § 8. That statutory change reflects a continued intent on the part of the legislature to limit the role foster parents play in dispositional proceedings. Compare Black's Law Dictionary (12th Ed. 2024) p. 1700 (defining "standing" as "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right based on the party's having a sufficient interest in a judiciable controversy") with *State* v. *Hoyt*, 47 Conn. 518, 535–36 (1880) (finding that criminal defendant's right to be heard under state constitution is "subject to regulation and limitation," so long as limitations are "reasonable"); see also *State* v. *Johnson*, 227 Conn. 534, 543, 630 A.2d 1059 (1993) ("[w]hen the legislature amends the language of a statute, it is presumed that it intended to change the meaning of the statute and to accomplish some purpose"). Although I find it difficult to get past the plain and unambiguous language of the 2001 amendment of § 46b-129, I agree with the majority that the legislative history "refutes the notion that the legislature had any intention" of changing the role that foster parents play in neglect proceedings; part II of the majority opinion; because the truth is that a foster parent's role, since 1977, has been limited by statute. For that reason, I believe that the Appellate Court correctly concluded in *In re Ryan C.*, supra, 220 Conn. App. 507, that a nonrelative foster parent does not have standing to seek permissive intervention in the absence of express statutory authorization.[38] See id., 526.

---

[38] The majority contends that the decision in *Nye* v. *Marcus*, supra, 198 Conn. 138, "undercuts" my argument, but I submit that *Nye* supports it. Footnote 31 of the majority opinion. Even after the biological parents' parental rights in *Nye* had been terminated by consent, this court held that foster parents lack standing to seek habeas relief with respect to a foster child because "[foster parents] do not have a liberty interest and their emotional relationship with the child, which was acquired through the temporary foster

In re Jewelyette M.

Appellate precedent following the 2001 amendment of § 46b-129 confirms that the legislature intended to continue to limit the participation of foster parents in child protection proceedings. See, e.g., *Spiotti* v. *Wolcott*, 326 Conn. 190, 202, 163 A.3d 46 (2017) ("failure of the legislature to take corrective action . . . manifest[s] the legislature's acquiescence in our construction of a statute" (internal quotation marks omitted)). For example, in *In re Joshua S.*, supra, 127 Conn. App. 723, the child was placed in the custody of the foster parents, but, after several months, the AMC moved to modify the disposition of the neglect petition and to transfer guardianship of the child to the maternal great aunt. Id., 725–26. The foster parents in *In re Joshua S.* repeatedly moved for intervention, which the trial court had denied, in order to oppose the transfer of guardianship. Id., 726–27. The Appellate Court concluded that the foster parents "[did] not have a colorable claim to intervention as a matter of right" because "they lack[ed] a sufficient direct and substantial interest in the subject matter of the action." Id., 728–29. After noting that a foster parent's rights are "restricted by statute" and that, under General Statutes (Rev. to 2009) § 46b-129 (o), they "have a right . . . to receive notice and be heard in any proceeding concerning their foster child," the Appellate Court found that "neither this statute, nor any other statute, confers on foster parents a right to intervene in a proceeding related to their foster child. The statutory scheme provides to foster parents a limited and narrow set of rights regarding foster children," which the legislature has not disturbed. (Footnote omit-

placement, is too tenuous a basis to afford standing . . . ." *Nye* v. *Marcus*, supra, 144. In response, the legislature passed what is now General Statutes § 52-466 (f) so as to give foster parents statutory standing to file an application for a writ of habeas corpus. In my view, *Nye* illustrates the point that the majority misses—foster parents have no rights unless conferred by statute, as this court held in *Nye*, and there is no statute conferring standing on foster parents to permissively intervene in the disposition of a neglect petition, as the legislature conferred with § 52-466 (f) following *Nye*.

In re Jewelyette M.

ted; internal quotation marks omitted.) Id., 730; see also *In re Nicholas B.*, Docket Nos. CP-08-017705-A and CP-08-017706-A, 2010 WL 2383779, *3 (Conn. Super. April 27, 2010) (reviewing legislative history of § 46b-129 and concluding that, "[i]n 2001, the legislature modified the law, which had extended legal standing to foster parents, to a more limited right to be heard"). Because the legislature did not respond to decisions like *In re Joshua S.* by amending the statute to revert back to providing foster parents with standing, it tacitly confirmed the limited nature of nonrelative foster parents' participation in child protection proceedings.

Moreover, the greater statutory scheme confirms that a trial court is not authorized to allow nonrelative foster parents to permissively intervene. The legislature provided specific and detailed restrictions, including with respect to time, regarding relative intervention under § 46b-129 (d). The specificity that the legislature used concerning the intervention of relatives throughout § 46b-129 is inconsistent with the majority's conclusion that, under the common law, a trial court is authorized to grant permissive intervention to nonrelative foster parents. In § 46b-129 (d), the legislature specifically provided for relative intervention and the guidelines that must be followed in order to properly intervene.

In doing so, the legislature contemplated that relative intervention could occur early in the neglect proceedings, as "any person related to the child or youth by blood or marriage," who has not previously been identified by the department, may seek to intervene within ninety days of the preliminary hearing on the order of temporary custody "for the limited purpose of moving for temporary custody of such child or youth." General Statutes § 46b-129 (d) (1) (A). The legislature essentially deprived the trial court of discretion in this regard by directing that, "[i]f a motion to intervene is timely filed, the court shall grant such motion except for good cause

351 Conn. 511 APRIL, 2025 649

In re Jewelyette M.

shown." General Statutes § 46b-129 (d) (1) (A). The legislature provided that, more than ninety days after the preliminary hearing, "[a]ny person related to a child or youth may file a motion to intervene" for purposes of temporary custody. General Statutes § 46b-129 (d) (1) (B). At that point in time, however, relative intervention is, generally, at the trial court's discretion. See General Statutes § 46b-129 (d) (1) (B).[39]

Moreover, the legislature specifically defined an intervening relative's role in the neglect proceedings. The statute provides that "[a] relative shall appear in person, with or without counsel, and shall not be entitled to court appointed counsel or the assignment of counsel . . . ." General Statutes § 46b-129 (d) (1) (C); see also General Statutes § 46b-129 (d) (5). Furthermore, the court "shall issue an order directing the [petitioner] to conduct an assessment" of the intervening relative and file a report within forty days. General Statutes § 46b-129 (d) (2). A hearing on the relative intervenor's motion for temporary custody must be held promptly, within fifteen days of the receipt of the assessment, and, if anyone objects to custody vesting in the intervening relative—including the GAL or AMC—the objecting party has the burden of proving "by a fair preponderance of the evidence that granting temporary custody of the child or youth to such relative would not be in the best interests of such child or youth." General Statutes § 46b-129 (d) (2).

The legislature also provided that a relative can intervene for purposes of seeking guardianship of the child. See, e.g., *In re Adelina A.*, 169 Conn. App. 111, 120–21, 148 A.3d 621 (noting that "[a] respondent parent, rela-

---

[39] It is noteworthy that the intervening relative who is granted temporary custody is nonetheless expressly directed that, as a matter of court order, he or she "shall . . . cooperat[e] with the [petitioner] in the implementation of treatment and permanency plans and services for such child or youth." General Statutes § 46b-129 (d) (3).

tives, and former guardians can contest a child's placement at various stages in the [neglect] proceedings . . . [and] [s]imilarly, relatives can seek to become the child's temporary custodian or guardian by filing a motion to intervene'' (citation omitted; footnotes omitted)), cert. denied, 323 Conn. 949, 169 A.3d 792 (2016). A motion to intervene to seek guardianship must be filed ''more than ninety days after the date of the preliminary hearing'' and can be filed by ''[a]ny person related to a child or youth . . . for purposes of seeking guardianship . . . .'' General Statutes § 46b-129 (d) (4). The trial court has the discretion to grant a relative permission to intervene in order to seek guardianship, ''except that such motion shall be granted absent good cause shown whenever the child's or youth's most recent placement has been disrupted or is about to be disrupted.'' General Statutes § 46b-129 (d) (4). The Appellate Court recently described intervention under that exception as ''intervention . . . as of right . . . .'' *In re Brian P.*, supra, 195 Conn. App. 591.

The legislature's level of detail regarding the specifics of a relative's intervention refutes the majority's contention that ''subsection (d) [of § 46b-129] is concerned only with the expeditious placement of children with family members at the outset of proceedings under the statute . . . [and] does not provide a blanket revision or modification of the rules of permissive intervention in connection with neglect proceedings generally.'' Part II of the majority opinion. Subsection (d), instead, provides that a relative can file a motion to intervene for purposes of seeking guardianship at any time ninety days after the preliminary hearing, although there are provisions addressing the outset of proceedings. The majority provides no explanation as to why the legislature would include such a comprehensive and thorough scheme for the intervention of relatives but fail to provide for the intervention of nonrelative foster parents

In re Jewelyette M.

in any manner. See *BayBank Connecticut, N.A.* v. *Thumlert*, 222 Conn. 784, 790, 610 A.2d 658 (1992) ("[o]ur conclusion is further bolstered by the legislature's enactment of statutory guidelines that expressly regulate the procedure"); see also *Branford* v. *Santa Barbara*, supra, 294 Conn. 813 ("[w]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained" (internal quotation marks omitted)).

"[I]t is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly . . . ." (Internal quotation marks omitted.) *Costanzo* v. *Plainfield*, supra, 344 Conn. 108. The legislature is presumed to know the law and presumed to intend to change the meaning of a statute by changing its language. See, e.g., *Cagiva North America, Inc.* v. *Schenk*, 239 Conn. 1, 8, 680 A.2d 964 (1996) ("[t]here is a presumption that the legislature, in enacting a law, did so in view of existing relevant statutes and intended [the new enactment] to be read with them so as to make one consistent body of law" (internal quotation marks omitted)); see also *State* v. *Johnson*, supra, 227 Conn. 543. Here, in subsection (d) of § 46b-129, the legislature demonstrates that it knows how to convey its intent expressly as to who may intervene in child protection proceeding by expressly authorizing related persons to intervene in a neglect petition. Because "[t]he rights of foster parents are defined and restricted by statute"; *Hunte* v. *Blumenthal*, supra, 238 Conn. 164; it seems illogical that the legislature would confer a statutory right to intervene for relative foster parents but, then, leave it to the juvenile court's general authority to grant permissive intervention for nonrelative foster parents.

I therefore would conclude, in light of the language employed in § 46b-129, its legislative history, and the surrounding statutory scheme, that a trial court may not

In re Jewelyette M.

authorize a nonrelative foster parent to seek permissive intervention in neglect proceedings. If the legislature had intended to provide nonrelative foster parents with the right to intervene in neglect petitions, then it would have done so, as it did with relative foster parents in subsection (d) of § 46b-129. That lack of statutory authorization, in my view, is dispositive, especially within the statutory framework that implicates the fundamental rights of biological parents.[40] See, e.g., *Seramonte Associates, LLC* v. *Hamden*, supra, 345 Conn. 86 (legislature's "use of . . . different terms . . . within the same statute suggests that [it] acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings" (internal quotation marks omitted)).

B

I now detail the contours of a foster parent's statutory right to be heard under § 46b-129 (p), which involves a substantial amount of discretion for the trial court. A trial court is best positioned "to determine the effect that a particular procedure will have on [the] parties." (Internal quotation marks omitted.) *State* v. *Jones*, 314

---

[40] The majority opines that "[i]t is not evident to us that, by affording foster parents an automatic right to be heard in neglect proceedings [§ 46b-129 (p)] prohibits foster parents from seeking permissive intervenor status to participate as parties in those proceedings." Part II of the majority opinion. I respectfully disagree. As this court has often observed, "[w]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained." (Internal quotation marks omitted.) *Branford* v. *Santa Barbara*, supra, 294 Conn. 813. The legislature, in enacting and amending § 46b-129, specifically provided for the participation of nonrelative foster parents in child protection proceedings. If it had intended to permit permissive intervention by nonrelative foster parents, "it easily could have said so." *State* v. *Ortiz*, 217 Conn. 648, 654, 588 A.2d 127 (1991). Because "[t]he rights of foster parents are defined and restricted by statute" and foster parents "do not enjoy a liberty interest in the 'integrity of their family unit' "; *Hunte* v. *Blumenthal*, supra, 238 Conn. 164; I submit that there was no need for the legislature to "clearly and plainly" prohibit parents from seeking permissive intervenor status in neglect proceedings. *Vitanza* v. *Upjohn Co.*, 257 Conn. 365, 381, 778 A.2d 829 (2001).

Conn. 410, 420, 102 A.3d 694 (2014); see also *Griswold* v. *Camputaro*, supra, 331 Conn. 709 ("the trial court has broad discretion in matters of case management"). Accordingly, it is best left to a trial court's discretion to decide how a foster parent should optimally exercise his or her right to be heard under subsection (p). The trial court's discretion in this regard is supported by our case law. See, e.g., *In re Vincent D.*, supra, 65 Conn. App. 668 ("[w]e are persuaded that the court did not abuse its discretion in permitting foster parents to participate, to a limited degree, in the dispositional phase of proceedings to terminate the parental rights of the mother"); *In re Nicholas B.*, supra, 2010 WL 2383779, *4 ("A qualified foster parent and counsel, if applicable, may be present during the child protection proceeding. Sequestration orders may be entered at the court's discretion . . . ."). I therefore would conclude that, under § 46b-129 (p), foster parents are entitled to give a statement, which is either sworn or unsworn, in oral or written format, at a time that the trial court, in its discretion, deems most appropriate.

The right to be heard memorialized in § 46b-129 (p) does not, however, authorize foster parents to present or to cross-examine witnesses, or to present their own evidence. See *In re Nicholas B.*, supra, 2010 WL 2383779, *4 ("At the close of evidence, the foster parent has the right to be heard and comment by making an unsworn statement to the court expressing her or his opinion regarding the best interest of the child, without being subject to [cross-examination]. . . . Section [46b-129 (p)] does not extend to the foster parent or counsel the right to offer evidence or [cross-examine] any witness or otherwise participate in the proceeding."). In sum, the right to be heard for foster parents under § 46b-129 (p) includes the right to make a statement with respect to the child's best interest at a time left to the discretion of the trial court.

In re Jewelyette M.

The decision of the Appellate Court in *In re Vincent D.*, supra, 65 Conn. App. 658, illustrates the proper parameters of a foster parent's right to be heard so as to avoid comparisons with a biological parent. In that case, the trial court sequestered the foster parents but allowed them "to observe and to comment through counsel" on the proposed disposition of the termination of parental rights petition. Id., 664. As the Appellate Court recounted, foster parents "have no right to intervene in the *adjudicatory* stage of a termination proceeding"; (emphasis in original) id., 665; but are allowed to intervene in the dispositional phase, as "the suitability and circumstances of [the prospective] adoptive parents . . . [may] be considered." (Internal quotation marks omitted.) Id., 666. A foster parent's input is welcomed during the dispositional phase because "persons with significant knowledge of and experience with the child" should be encouraged to "[assist with] the court's determination of the placement that best protects the best interest of the child." Id. The foster parent in *In re Vincent D.* was therefore properly allowed "to participate, to a limited degree, in the dispositional phase of proceedings"; id., 668; though the foster parent's counsel was "precluded" from calling or questioning witnesses. Id., 664. This limited, but useful, participation ensures that a foster parent's "significant knowledge of and experience with the child" can aid the court in determining the child's best interest without overly delaying the child protection proceedings. Id., 666.

Given my interpretation of the "right to be heard" under § 46b-129 (p), I would conclude that Judge Daniels did not abuse his discretion when he allowed the foster parents to give an unsworn statement at the beginning of the November 4, 2024 hearing on the petitioner's motion to open and modify the disposition. The foster parents, speaking through their attorney, Rachel Levine, sought to have the foster parents present for

In re Jewelyette M.

the entire hearing and, then, give a "sworn statement, through the testimony of [the foster father] . . . ." Levine argued that the foster parents needed to be present during the hearing because they had "extremely limited information," but Judge Daniels disagreed. The court found that Levine's representation was "not entirely accurate," as the court had given the foster parents notice of the motion and, furthermore, they had been provided with the revocation study. Judge Daniels reasoned that the foster parents would "[c]ertainly" be able to comment on the best interest of Jewelyette on the basis of the foregoing.[41]

The trial court provided the parties with an opportunity to respond. The respondent's counsel argued that the foster parents' request "is just further indication [of] the bad faith of which the [foster parents] have conducted themselves" and asserted that it was "an attempt for further delay" and "to further manipulate this child . . . . I am shocked that we are literally dealing with this." The GAL agreed that the foster parents involvement is "prolonging everything" and objected to them being present throughout the hearing. Deetta Roncone-Gondek, Jewelyette's attorney, characterized both the respondent's and the foster parents' counsel as "attempt[ing] to set up yet another appealable issue" and, as the majority appropriately highlights, added that this case "has become less about Jewelyette and more about the adults in the room getting to decide. . . . It's not about Jewelyette anymore . . . ." The trial court, agreeing with Roncone-Gondek's sentiments, allowed the foster parents to make a statement through Levine before the hearing began.

Judge Daniels' decision to do so was well within his discretion under § 46b-129 (p), as he allowed the foster

_____

[41] Judge Daniels repeatedly noted how the foster parents' pending appeal injected uncertainty into the proceedings but that his decision would be "based upon the law as it exist[ed] [that day]."

parents an opportunity to be heard and to comment on the best interest of the child, albeit briefly. Although the court did not allow the foster parents to attend those proceedings, to call their own witnesses, or to present their own evidence, the trial court was not obligated to do so under the statutory scheme carefully crafted by the legislature. Rather, given the foster parents' involvement in the previous proceedings, the court was well-informed of their concerns, such that allowing them to provide a brief statement at the beginning of the hearing both advanced judicial economy and adequately protected the foster parents' statutory "right to be heard and comment . . . ." General Statutes § 46b-129 (p). In light of the foregoing, I would conclude that the trial court did not abuse its discretion when it allowed the foster parents to give a brief statement at the start of the November 4, 2024 hearing. I therefore would deny the foster parents' writ of error.

For the foregoing reasons, I respectfully dissent.

————————————————